*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO FEBRUARY 7, 2019

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                 *
UNITED STATES OF AMERICA         *
                                 *  1:17-cr-157-PB
            v.                   *  June 7, 2018
                                 *  Afternoon Session
KURT CARPENTINO                  *  1:22 p.m.
                                 *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL DAY 2
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:


For the Government:        Georgiana L. Konesky, AUSA
                           Seth R. Aframe, AUSA
                           United States Attorney's Office




For the Defendant:         Dorothy E. Graham, Esq.
                           Jonathan R. Saxe, Esq.
                           Federal Defender's Office




Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

1                          I N D E X

2
     WITNESS                                          PAGE
3
     ERIC ALBRIGHT
4
5        Direct Examination (Continued)         3
         Cross-Examination                     11
6        Redirect Examination                  26

7

8    MACKENZIE HARVEY

9        Direct Examination                    31
         Cross-Examination                     54
10       Redirect Examination                  75

11
                      ADMITTED EXHIBITS
12

13   Government's Exhibit 23                     4

14   Government's Exhibit 15b                   41

15   Government's Exhibit 16                    42

16   Government's Exhibit 14a                   47

17

18

19

20

21

22

23

24

25

```
 1                     P R O C E E D I N G S
 2              THE COURT:  Come on up, Detective.
 3              You can go ahead, Counsel, when you're ready.
 4                    DIRECT EXAMINATION CONTINUED
 5   BY MS. KONESKY:
 6        Q.   Detective, before we get into the recordings
 7   we were discussing, I would just like to discuss one
 8   other issue with you.
 9              There's been some discussion in this case --
10   the jury's heard a discussion about whether or not
11   Mr. Carpentino was provided water, so I'm going to show
12   you what's marked for identification as Government's
13   Exhibit 23.
14              Do you recognize this?
15        A.   Yes.
16        Q.   And what is this an image of?
17        A.   That's the holding cell that Mr. Carpentino
18   was in while he was in custody at the barracks.
19        Q.   And is this an accurate representation of
20   Mr. Carpentino in the holding cell that day?
21        A.   It is.
22              MS. KONESKY:  I'd like to move to strike the
23   ID and admit Government's Exhibit 23.
24              THE COURT:  Any objection?
25              MR. SAXE:  No objection.
```

1            THE COURT:  Without objection, it'll be

2    admitted.

3            (Government's Exhibit 23 admitted.)

4        Q.   Detective Albright, I would ask you if you

5    could point out -- is there a sink in this room?

6        A.   Yes.

7        Q.   And could you point out where that is?

8        A.   It is directly behind Mr. Carpentino, above

9    the toilet in that stainless steel vestibule under the

10   light.

11       Q.   And are you aware if that sink works?

12       A.   Yes.

13       Q.   And I'll ask you to look -- you have to look a

14   little closely at the front of it.  Is there something

15   on top of the sink there?

16       A.   It would appear that to the right-hand side of

17   the sink, on the countertop there is a clear plastic

18   cup.

19       Q.   Okay.  And could you just circle that since

20   it's a little hard to see.  You can touch the screen.

21       A.   (Witness complied.)

22       Q.   Did -- oh, there we go.  It just didn't show

23   up here.  Great.

24            One other issue.  We've discussed that there

25   were audio and video recordings of the interview of

1   Mr. Carpentino.  What are we only going to listen to the

2   audio recordings today?

3      A.   I'm sorry?

4      Q.   Why will we only listen to the audio

5   recordings today?

6      A.   The way that the video and audio recording

7   system in the interview room and any of the other rooms

8   at the barracks that are equipped the same way work is

9   there are two switches on the outside of the entryway to

10   those interview rooms.  One is for the audio recording

11   and one is for the video.

12        After checking with my administrative staff

13   that handles making copies of those media-related items

14   or interviews, she had indicated that the recording for

15   the video had not been activated and was, therefore, in

16   a motion-activated setting so that anytime anybody moved

17   in there and it sensed the movement, it would capture

18   the video or a short clip and during the entire

19   recording, it did capture the audio.

20      Q.   Okay.  But it only captured short clips of the

21   video?

22      A.   That's correct.

23      Q.   Okay.  Let's go ahead and begin listening to

24   these recordings.  I'd like to pass out the transcripts

25   to the jury.

1          THE COURT:  All right.  Let me -- let me ask.

2   Have counsel reviewed the transcripts and you have no

3   objection to them being used as an assistive device with

4   respect to the audio?

5          MR. SAXE:  Correct.

6          THE COURT:  All right.

7          So let me just tell you about transcripts,

8   though.  So the actual evidence here is not the

9   transcript.  The actual evidence is the audio that

10  you'll be listening to.  The parties have agreed that

11  these transcripts can be distributed to you, but it's

12  what you hear ultimately that is the evidence.  The

13  transcript you're free to use to the extent you find it

14  helpful to you in following along.  All right?

15         You can go ahead and distribute the

16  transcripts and if you have one up for me, too, please.

17  Thank you.

18     Q.   Now, before we begin the transcript, whose

19  voices will be heard on -- on these recordings?

20     A.   It will be Mr. Carpentino, myself, and

21  Sergeant McCoy.

22         MS. KONESKY:  Okay.  You can go ahead and play

23  the first clip.

24         THE COURT:  Can we just have a little more

25  scene-setting here?

1               It's an excerpt from a larger interview.  Can

2    you elicit some information about exactly where we are

3    in this process?

4               MS. KONESKY:  Yes, your Honor.  Thank you.

5         Q.   Detective Albright, the first clip is the

6    beginning of the interview.  Could you tell me a little

7    bit about how you began the interview?

8         A.   It's shortly after we covered the Miranda

9    warnings again during the second interview.

10        Q.   Okay.  And, actually, I'm going to play all

11   the way from the start of the interview.

12        A.   Okay.

13        Q.   And as you testified, this is the second

14   interview that day?

15        A.   That's correct.

16              THE COURT:  Just so that I'm clear, you're

17   going to play a clip from the time he comes into the

18   interview room and it's going to end at some point --

19   it's going to be a continuous audio of what occurred

20   until the point at which it stops.  That's what the

21   first clip is?

22              MS. KONESKY:  That's correct.

23              THE COURT:  Okay.  Thank you.

24                   (Audio recording played.)

25        Q.   So at the end of that recording, somebody

1    commented on the defendant's penmanship.  Why was that?

2         A.   It was just -- that was Sergeant McCoy.  I

3    don't know why he commented on it.

4         Q.   But it had --

5              THE COURT:  What was he commenting on?

6         Q.   What was he commenting on?

7         A.   He was commenting on Mr. Carpentino's

8    penmanship being very nice.

9         Q.   But why did he have a chance to view

10   Mr. Carpentino's penmanship?

11        A.   Oh, I'm sorry.  Because he signed the waiver,

12   the Miranda waiver.

13        Q.   Okay.  We have three additional clips to play,

14   and I'm going to play them back to back.  Was there a

15   significant amount of time in between these clips in the

16   recording?

17        A.   Not -- not a real significant amount of time,

18   no.

19             MS. KONESKY:  Okay.  This is audio statement

20   clip 1.

21                  (Audio recording played.)

22             MS. KONESKY:  Could you play the next one?

23                  (Audio recording played.)

24             MS. KONESKY:  Dena, will you please play the

25   last clip.

1                     (Audio recording played.)

2        Q.    Trooper Albright --

3              THE COURT:  Before you do that, you played

4    three discrete clips.  Are they marked as separate

5    exhibit numbers?

6              MS. KONESKY:  They are, your Honor.

7              THE COURT:  Could you identify them in the

8    order in which they were played for the record, please.

9              MS. KONESKY:  Yes, your Honor.  They are

10   actually four clips.  The first one is Government's 11h;

11   the second, 11a; the third, 11c; and the fourth, 11e.

12             THE COURT:  Okay.  Now, we have transcripts of

13   them all, so to mark the breaking point between them,

14   it'll be reflected in the transcripts?  Because I -- I

15   mean, all you did was pause and then just played clips

16   consecutively, so if somebody's listening to the tapes,

17   I'm just trying to figure out how we -- it's clear in

18   the record when one exhibit ends and the next one

19   starts.

20             MS. KONESKY:  Thank you.  I think I asked

21   Ms. Blanco to play the next clip between each one.  I

22   should have --

23             THE COURT:  Okay.

24             MS. KONESKY:  -- introduced the exhibit

25   number.  But, yes, those four that I just read in the

1  order --

2          THE COURT:  Okay.  That's fine.  Thank you.

3      Q.   Trooper Albright, approximately how long was

4  the entire second interview with Mr. Carpentino?

5      A.   It was somewhere between 45 minutes and an

6  hour, roughly.

7      Q.   Did we just listen to the majority of that

8  interview?

9      A.   We did.

10          MS. KONESKY:  No further questions.  Thank

11  you.

12          THE COURT:  Thank you.  Wait a second.

13          Go ahead.

14          MR. AFRAME:  Can we approach just for one

15  second?

16          THE COURT:  Yes.

17                      AT SIDEBAR

18          MR. AFRAME:  Is it the Court's intention to

19  instruct on the law of statutory rape in Vermont?

20  Because otherwise this would be the witness who could

21  say what that law is because we have to prove it's a

22  criminal act.

23          THE COURT:  I haven't -- I haven't thought

24  about it.

25          MR. AFRAME:  We're prepared to ask him those

1    questions.

2              THE COURT:  All right.  Do you -- what is your

3    position?

4              MR. SAXE:  We don't object.

5              THE COURT:  To asking him the questions?  You

6    can ask the questions and I'll give an instruction as

7    well.  Okay?

8              MR. AFRAME:  Okay.

9                    CONCLUSION OF SIDEBAR

10       Q.   Trooper Albright, just one more question for

11   you.

12             Are you familiar with the laws of statutory

13   rape in Vermont, in the state of Vermont?

14       A.   Yes.

15       Q.   And could you briefly describe what those laws

16   prohibit?

17       A.   Basically, it says that anybody -- they can't

18   have consensual or nonconsensual sex with a minor, would

19   be under the age of 16 in our state.

20             MS. KONESKY:  Thank you.

21             THE COURT:  All right.  Cross-examination?

22             MR. SAXE:  Thank you, your Honor.

23                    CROSS-EXAMINATION

24   BY MR. SAXE:

25       Q.   Okay.  So you said in your -- early on in your

1    direct that your initial assignment in this case was go

2    to the hospital, correct?

3        A.    That's correct.

4        Q.    And that's because that's -- somebody normally

5    gets assigned to go to the hospital with the alleged

6    victim and part of that is to collect evidence, right?

7        A.    Yes.

8        Q.    Be present if there's any statement or

9    interview, right?

10       A.    Yes.

11       Q.    Okay.  So -- and you were -- your role was

12   changed; you were then instructed to get involved in

13   questioning the defendant, right?

14       A.    That's correct.

15       Q.    So but typically, even though you weren't the

16   one that went to the hospital, somebody would go to the

17   hospital, right?

18       A.    Yes.

19       Q.    Okay.  And is your understanding that

20   initially she was going to be brought to Springfield,

21   but then she eventually went to Dartmouth-Hitchcock?

22       A.    Yes.

23       Q.    And is that because it's a bigger hospital and

24   they're more able to treat people and gather evidence?

25       A.    My understanding was that there was not a

```
 1   sexual assault certified nurse at Springfield Hospital,

 2   but there was one at Dartmouth, so they rerouted and

 3   never went to Springfield.

 4       Q.   Okay.  And that's important for gathering

 5   evidence and treating the alleged victim, right?

 6       A.   That's correct.

 7       Q.   All right.  So -- so then you were -- I assume

 8   it was a superior that assigned you to -- and Trooper

 9   McCoy to do the interview?

10       A.   Yes.

11       Q.   And were you monitoring the dispatch as the

12   information was coming in?

13       A.   At what point?

14       Q.   Okay.  So between the time that you initially

15   were charged with going to the hospital and the time

16   that you interviewed the defendant, were you able to

17   listen to the dispatchers?

18       A.   Are you referring to the radio?

19       Q.   Yeah, that's what I mean.  Yeah, probably --

20       A.   No, I wasn't.

21       Q.   Okay.  But before you interviewed the

22   defendant, did you receive a briefing as to what the --

23   law enforcement's understanding of the case at that

24   time?

25       A.   Not really a briefing, but I did have some
```

14

1    information.

2         Q.   Okay.   So it is important that if you're going

3    to interview a suspect, you have at least some

4    information concerning what's going on in the case,

5    right?

6         A.   Yes.

7         Q.   And so that will assist you in -- in the

8    interrogation, right?

9         A.   If it's available, yes.

10        Q.   Okay.   And there were two of you, you said,

11   Trooper McCoy and yourself, involved in the interview?

12        A.   Yes.

13        Q.   And why are there two troopers?

14        A.   That's the way that we always try to do our

15   interviews.

16        Q.   So is it -- is it your recollection that the

17   first interview started at roughly 12:59?

18        A.   It was late morning, early afternoon.

19        Q.   Okay.

20        A.   I don't remember the exact time.

21        Q.   And as you indicated, he was kept in that cell

22   before the interrogation began, correct?

23        A.   Yes.

24        Q.   And he -- you went over his Miranda rights

25   with him, correct?

1      A.    Yes.

2      Q.    And that included that he had the right to

3  speak to an attorney before the questioning, right?

4      A.    Yes.

5      Q.    And if he wanted to have an attorney present

6  during questioning, he could do that, right?

7      A.    Yes.

8      Q.    And anything that he could -- that could --

9  that he said could be used against him, right?

10      A.    Yes.

11      Q.    And he didn't have any trouble waiving his

12  Miranda rights and talking to you that first time,

13  right?

14      A.    No.

15      Q.    All right.  So -- so it sounds like you

16  testified that when the interview began, you sort of

17  got some background information from him?

18      A.    Yes.

19      Q.    Okay.  So -- and then it -- it sounds like you

20  just let him tell a story, right?

21      A.    That's fairly accurate, yeah.

22      Q.    And -- and at some point you -- you knew what

23  these other allegations were, right?  You had some idea

24  of some of the other allegations, right?

25      A.    I had a -- a little bit of an idea.  I

1    wouldn't say I had a real clear picture.

2        Q.    Did you interview Patrick Elmore?

3        A.    I did.

4        Q.    Did you interview Patrick Elmore before you

5    interviewed the defendant?

6        A.    I did.

7        Q.    All right.  So without getting into what he

8    told you, you had all the information from Patrick

9    Elmore, right?

10       A.    I did.

11       Q.    All right.  Did you interview anyone else

12   before you interviewed the defendant?

13       A.    No.

14       Q.    And did the rest of your -- where did the rest

15   of your information regarding the case come from, a

16   fellow trooper?

17       A.    I had received some basic information from

18   some earlier radio transmissions.  I had also received a

19   very brief statement from the lead detective at the

20   time, Rick Holden, about the reported allegations in

21   this case.

22       Q.    Okay.  So you had all that information, right?

23       A.    Yes.

24       Q.    And so what Mr. Carpentino told you did not

25   line up with that information, right?

17

1          A.   Not entirely, no.

2          Q.   Well, before -- okay.

3               So that caused you to become a slight bit more

4    aggressive in the questioning, correct?

5          A.   I don't think I was aggressive.

6          Q.   Okay.

7          A.   I was pointed.

8          Q.   You were what?

9          A.   I was pointed.  I was more direct.

10         Q.   Okay.  So -- all right.

11              So could you play -- pull up Exhibit N-1,

12    please.

13              Okay.  So at that point he had told you that

14    he had just been driving around, correct?

15         A.   Just so I'm clear, are we -- we're talking

16    about the first interview?

17         Q.   Good question.  Okay.  These questions are all

18    about the first interview.

19         A.   Okay.

20         Q.   Okay.  And then just to clarify, at some point

21    in time during that first interview he said, okay, wait

22    a minute, I want a lawyer.  Right?

23         A.   Yes, he did.

24         Q.   And you stopped at that point, just like

25    you're supposed to?

1      A.    Yes.

2      Q.    Okay.  But prior to that point you began to

3  ask questions that, as you indicated, were a little bit

4  more pointed.

5            Okay.  Could you play that?

6                 (Audio recording played.)

7      Q.    Okay.  So at that point in time, you knew that

8  no one had identified Kurt as being in the woods with

9  anybody, right?  You spoke with Mr. Elmore.

10     A.    No, Mr. Elmore had indicated that he had seen

11 Mackenzie in the woods with someone else.

12     Q.    Okay.  But he didn't say it was

13 Mr. Carpentino, right?

14     A.    No, he didn't.

15     Q.    Okay.  But you told Mr. Carpentino that people

16 had seen him in the woods with Mackenzie, right?

17     A.    I did.

18     Q.    Okay.  And that wasn't true, right?

19     A.    No.

20           MR. SAXE:  Okay.  Okay.  Continue with N-1.

21                 (Audio recording played.)

22     Q.    Okay.  So, again, you're telling him that we

23 have independent witnesses who have no reason to lie

24 saying they saw you there with Mackenzie this morning on

25 that property.  Right?

1    A.    Yes.

2    Q.    And, again, that was not true, right?

3    A.    It wasn't completely true, no.

4         MR. SAXE:  Okay.  Play Exhibit N-2.

5              (Audio recording played.)

6    Q.    Okay.  So you would agree with me at that

7    point what you're doing is you're giving him the

8    information and the story that you had -- at least that

9    you had concerning what had happened, right?

10   A.    Yeah, that's accurate.

11        MR. SAXE:  All right.  And then play Exhibit

12   N-3.

13             (Audio recording played.)

14   Q.    Okay.  So you're telling him straight up there

15   that you have information -- that you want to get his

16   information lined up with the information that you had,

17   right?

18   A.    That wasn't me.

19   Q.    Well, okay.  Was -- was there another trooper

20   there during the interview?

21   A.    That was Trooper McCoy --

22   Q.    Okay.

23   A.    -- who said that.

24   Q.    So, in any event, that information was

25   conveyed to the defendant, right?

1    A.    That's right.

2    Q.    That you're trying to get his information to

3    line up with everybody else's, correct?

4    A.    Yes.

5    Q.    And at that point, your sole role in this

6    investigation was questioning him, right?

7    A.    At that point.

8    Q.    You hadn't done any other investigation to

9    evaluate the accuracy of any of this other information,

10   correct?

11   A.    No, only the -- interviewing Mr. Elmore and I

12   knew that there was some other investigative matters

13   that were taking place.

14   Q.    All right.  And you were talking about videos

15   from Jiffy Mart and Walmart.  Did anybody go to check to

16   see if there was any videos of him in the car with

17   Mackenzie?

18   A.    Eventually we did request that New Hampshire

19   authorities do that and they were unable to obtain any

20   footage.

21   Q.    Okay.  And then at the very end of the

22   interview, that's when you brought up the subject of

23   DNA, right?

24   A.    I believe that -- I know that was in the

25   interview.  I don't know --

1       Q.   Okay.

2       A.   -- if that was at the end.

3       Q.   And right after that is when he said, wait,

4  got to talk to a lawyer about this, right?

5       A.   There's definitely a point where he says that

6  he wants to speak to an attorney.

7       Q.   And he asked that a lawyer be present during

8  the interview, right?

9       A.   Later he asked if that was possible.

10      Q.   All right.  And when you read the Miranda

11  waiver form to him, the Miranda waiver form says, you

12  have a right to talk to a lawyer before we question you

13  and you have a right to have a lawyer present when

14  you're questioned.  That's what the Miranda form says,

15  right?

16      A.   Yes.

17      Q.   And you read that to him?

18      A.   Several times.

19      Q.   And then when he said, I'd like to have a

20  lawyer present when I'm questioned, you said, that's not

21  the way it works.  Right?

22      A.   Well, I explained to him that in my

23  experience, those two things did not typically happen.

24      Q.   Okay.  So -- so, in any event, I got ahead of

25  myself a little bit.

1          THE COURT:  Can I see counsel at sidebar?

2                    AT SIDEBAR

3          THE COURT:  Do you have a good faith basis to

4  believe that the communications are something other what

5  they're depicted on the tape?

6          MR. SAXE:  No.

7          THE COURT:  Well, you just misrepresented what

8  was said.  I spent a day studying that -- you didn't

9  say --

10          MR. SAXE:  What did I represent?

11          THE COURT:  That he asked to have a lawyer

12  present during questioning.  And he didn't.

13          MR. SAXE:  On the second tape.  I got ahead --

14  that's when I said I got ahead of myself.

15          THE COURT:  Well, stop it.  Okay?  You're

16  misrepresenting things, so you need to be more careful.

17          MR. SAXE:  Okay.  If I did, I apologize.

18                CONCLUSION OF SIDEBAR

19     Q.   So, in any event, you ended the first

20  interview when he said he wanted a lawyer, right?

21     A.   Yes.

22     Q.   And then the jury just heard the beginning of

23  the second interview, right?

24     A.   It sounds like they heard the majority of the

25  second interview.

1       Q.   Okay.  But do you -- the government played an

2  exhibit which depicted the exact conversation which took

3  place during the second interview, right?

4       A.   Yes.

5       Q.   You brought him back to the interview room,

6  right?

7       A.   Yes.

8       Q.   And he brought up the subject of a lawyer a

9  couple times, right?

10       A.   Yes, he did.

11       Q.   So -- so you had that conversation and he

12  eventually agreed to waive his right to have a lawyer

13  present during that second questioning, correct?

14       A.   Yes, he did.

15       Q.   All right.  And then he began to tell you

16  essentially the same story that he told you the first

17  time, right?

18       A.   He did.

19       Q.   All right.  And then -- you then had the

20  following conversation, Exhibit N-4.

21                (Audio recording played.)

22       Q.   So that's pretty accurate, right?  You had

23  been very clear about the information that you had

24  according to the story from -- that you were -- believed

25  happened, correct?

24

1      A.    I gave him some of the specifics, yes.

2      Q.    Okay.  So then there was a clip where he began

3  talking about having sex in the attic with Mackenzie,

4  correct?

5      A.    Yes.

6      Q.    All right.  So do you -- did you ever follow

7  up on that to see what the details were of the living

8  situation at that residence?

9      A.    Hinsdale PD obtained a search warrant and

10  searched the home.

11      Q.    Do you know whether any of the other people

12  that lived there were questioned?

13      A.    I believe that several of them were.

14      Q.    Do you know whether Carol Pino was questioned?

15      A.    I believe she was.

16      Q.    So did you take part -- did you take any part

17  in the investigation with Hinsdale Police of that

18  residence where this allegedly happened?

19      A.    If you're asking me if I went to the residence

20  and took part in the execution of the warrant, no, I did

21  not.

22      Q.    Okay.

23      A.    I haven't been to the residence.

24      Q.    All right.  And then after that particular

25  discussion, you then started asking him questions

1   concerning the specific events of April 27th, right?

2       A.   Yes.

3       Q.   Okay.  And then I believe in the clip there

4   was a section where you said, I'm just -- Kurt, just so

5   you're clear, so that you understand, we got Hinsdale PD

6   pulling the videos from the house.  Okay?

7            Do you remember that?

8       A.   Yes.

9       Q.   And then you said:  We've got her cell phone;

10  we're doing a warrant on your car.  We're doing a

11  warrant on the abandoned hotel that your sister owns.

12  That's where Mackenzie says that you had sex with her

13  either late last night or early this morning.  We're

14  doing a warrant there.  Is there -- I mean, I just --

15  she says that you took her from her house in Hinsdale,

16  not forcibly, but drove her up to Vermont and stayed

17  there at that hotel where you had sex with her again.

18  Okay?

19           I don't know why anybody would tell us that.

20  And the Jiffy Mart video, the Sunoco video, I mean, all

21  that stuff, I hope it's there for your sake.  I hope

22  you're alone, for your sake, but I got a pretty good

23  feeling that you're not alone.  And that's -- I mean,

24  that's all I can tell you?

25           And then you also added:  And I guess -- and

1    they're doing a sex assault kit on Mackenzie.  I would

2    guess they're going to find your DNA.

3              Right?  You told him that?

4         A.   That's exactly what I said, yes.

5         Q.   All right.  And then that's when he just said,

6    okay, I drove her up to Vermont and had sex with her,

7    right?

8         A.   Shortly thereafter, yes.

9              MR. SAXE:  All right.  Could I have a second,

10   your Honor?

11             THE COURT:  Yes.

12             MR. SAXE:  Nothing further.

13             THE COURT:  Any redirect?

14                     REDIRECT EXAMINATION

15   BY MS. KONESKY:

16        Q.   After the first interview, did you have any

17   intention of speaking to Mr. Carpentino again?

18        A.   No.

19        Q.   And why did you speak to him again?

20        A.   Because he requested to speak to me again.

21             MR. KONESKY:  Okay.  Thank you.  Nothing

22   further.

23             THE COURT:  Thank you, sir.  You're all set.

24   You're excused.  You don't have to stay around.

25             THE WITNESS:  Thank you.

1              (Witness excused.)

2          THE COURT:  We'll take our break now and come

3     back in about 15 minutes.

4              I'll stay and talk to you afterwards.

5                    (Jury excused.)

6          THE COURT:  You wanted to raise something?

7          MR. AFRAME:  So we're going to call the victim

8     next and I just want to go over just a couple things so

9     it goes smoothly.

10             In the beginning of the examination, for the

11    very first part, I'd ask to be allowed to lead a little

12    bit so that she does not blurt out something that would

13    send our trial off the rails about --

14         THE COURT:  Yeah, have you instructed her

15    about not referring to the defendant's prior conviction?

16         MR. AFRAME:  I have, Judge, but you'll see

17    she's a limited person.  And so --

18         THE COURT:  Uh-huh.

19         MR. AFRAME:  -- it's a challenge.

20         THE COURT:  I -- I -- I would rather that you

21    lead on noncrucial matters to avoid the witness

22    inadvertently saying something that's problematic.  So

23    I'm going to give you permission to do that.

24             If you get to the key portions of the case,

25    though, you can ask focused questions, but not put words

1    in her mouth.

2            MR. AFRAME:  Right.  No, exactly.

3            So in the beginning -- it's really the

4    beginning when we're talking about where he lives and

5    how he came on the scene.  If left to her own devices,

6    she would say the truth about that.  I have instructed

7    her --

8            THE COURT:  Yeah.

9            MR. AFRAME:  -- but this'll be a high-stress

10   situation for a limited person.

11           THE COURT:  No, I understand.  She has -- she

12   has limited intellectual capacity and --

13           MR. AFRAME:  Yes.

14           THE COURT:  -- and her ability to follow

15   instructions on that may be somewhat limited.  And I

16   think it is far safer to allow leading.

17           I just -- when you get to the -- the central

18   issues, did she have some kind of sexual contact with

19   him in Vermont, did she come to Vermont with him, you

20   need to ask those questions in ways that aren't just

21   putting words in her mouth.

22           MR. AFRAME:  Yes.

23           THE COURT:  Because that's -- but the rest of

24   it I agree you should be careful in leading and you

25   should be careful on cross-examination, whichever person

1  is going to do it.

2          We can only do so much to instruct a witness.

3  So if you ask questions that could call for a

4  problematic answer, there's a risk that you could get

5  that problematic answer.  So you have to be very careful

6  and precise with the way that you question her.  All

7  right?

8          Anything else?  How long do you think your

9  direct will take?

10         MR. AFRAME:  My direct is not very long.  It

11 is maybe 25 to 30 minutes.

12         THE COURT:  Okay.  So you think there's a

13 possibility we could finish with her today?

14         MR. AFRAME:  It would be great if we could.

15         THE COURT:  Okay.  Yeah.  I mean, I -- I'm not

16 likely to keep the jury much after 4:00 today.  This is

17 a full day of hearing.  We'll see how things go, if I

18 think I can get to the end comfortably within a certain

19 period of time.  But I don't want in any way to restrict

20 the defendant's cross-examination.  She's a central

21 witness.  You could -- you should be able to take as

22 much time with her as you need.  All right?

23         MS. GRAHAM:  And, your Honor, I will ask to

24 approach after direct regarding some issues I want to

25 get into on cross-examination per your order.

1           THE COURT:  Oh, okay.  All right.  Well, let's

2    see where we are.  If it's going to be any kind of

3    extended discussion, I would prefer to send the jury out

4    because we play the music and we whisper, but there's

5    still a risk that the jury hears something that they

6    shouldn't hear.

7           So what we'll possibly do is then after your

8    direct, we'll take a short break.  I'll send the jury

9    out, tell them it'll just be a couple minutes.  You can

10   then present what you want to present, I'll rule on it,

11   and we can go.  All right?

12          MR. AFRAME:  Yes.

13          THE COURT:  All right.  So let's -- whenever

14   the --

15          MS. GRAHAM:  Your Honor, my client needs to

16   use the bathroom.  May we just --

17          THE COURT:  Yeah.  We're taking a break now.

18   So I'm just saying to the court reporter, as soon as the

19   court reporter is ready, I'm ready to come back in.

20          MR. AFRAME:  Okay.

21       (Recess taken from 2:33 p.m. until 2:53 p.m.)

22          THE COURT:  Want to swear the witness in?

23          THE CLERK:  Would you please stand and raise

24   your right hand?

25          **MACKENZIE HARVEY,** having been first duly

1  sworn, testified as follows:

2          THE CLERK:  Thank you.  Would you please state

3  your name and spell your last name for the record.

4          THE WITNESS:  Mackenzie Harvey, H-a-r-v-e-y.

5          THE CLERK:  Thank you.  Please be seated.

6          THE COURT:  You can be seated.

7          And I'd just ask you to sort of -- yeah, pull

8  up close and then try to speak as loudly as you can so

9  everybody can hear you.  Okay?

10          THE WITNESS:  Uh-huh.

11          THE COURT:  Go ahead.

12                   DIRECT EXAMINATION

13  BY MR. AFRAME:

14      Q.   Mackenzie, how old are you now?

15      A.   I am 16.

16      Q.   And what is your birthday?

17      A.   May 8th, 2002.

18      Q.   And, currently, what state do you live in?

19      A.   Alabama.

20      Q.   And who do you live with in Alabama?

21      A.   My dad, his girlfriend Robin, two boys, Jacob

22  and Seth, and a granddaughter Brooklyn.

23      Q.   And do you go to school in Alabama?

24      A.   Yes.

25      Q.   And what grade did you just finish?

1       A.   Ninth.

2       Q.   Let me just ask you a couple questions about

3  your medical history.

4            Do you have any difficulty hearing?

5       A.   Yes.

6       Q.   And what do you do to help you with that?

7       A.   I wear hearing aids and I just look at the

8  people's mouths so I can see what they're trying to say.

9       Q.   And how long have you had that condition?

10      A.   Ever since I was a baby.

11      Q.   Okay.  And are you wearing your hearing aids

12  today?

13      A.   Yes.

14      Q.   And are you able to hear me well?

15      A.   Yes.

16      Q.   Okay.  Do you have certain learning issues

17  that make school difficult for you?

18      A.   Yes.

19      Q.   And do you know what those are called?

20      A.   No.

21      Q.   Do you know what ADD is?

22      A.   No.

23      Q.   Okay.  And has anyone ever told you that you

24  have depression?

25      A.   Yes.

1      Q.    Okay.  Was it a doctor that told you that?

2      A.    Yes.

3      Q.    Now, before you moved to Alabama, what state

4   did you live in before that?

5      A.    New Hampshire.

6      Q.    And what town in New Hampshire did you live

7   in?

8      A.    Hinsdale.

9      Q.    Okay.  And let's focus now on the summer of

10  2016.  How old were you in the summer of 2016?

11     A.    14.

12     Q.    And what city and town did you live in then?

13     A.    Hinsdale, New Hampshire.

14     Q.    And what address did you live at in Hinsdale,

15  New Hampshire?

16     A.    76 Glen Street.

17     Q.    And who were the people in the summer of 2016

18  who were living with you at 76 Glen Street?

19     A.    My sister Kaitlynne, my brother Mikey, my two

20  nephews, Landon and Bryce, my baby brother David, and I

21  think that was it.

22     Q.    Did you say -- was your mother there?

23     A.    Oh, and my mom.

24     Q.    Okay.  Was Kurt Carpentino the landlord of

25  that house?

1      A.   Yes.

2      Q.   And do you see Kurt Carpentino in the

3 courtroom?

4      A.   Yes.

5      Q.   And can you just identify for the Court where

6 he's sitting?

7      A.   He's wearing a blue shirt --

8      Q.   Okay.

9      A.   -- over there.

10      Q.   Okay.  Thank you.

11           Do you know, was Mr. Carpentino friendly with

12 your mother?

13      A.   Yes.

14      Q.   And in the early part of the summer of 2016,

15 was he living in Manchester?

16      A.   Yes.

17      Q.   And what street was he living on?

18      A.   Walnut.

19      Q.   Okay.  Sometime at the end of the summer of

20 2016, did Mr. Carpentino start to spend more time around

21 your house?

22      A.   Yes.

23      Q.   Did he ever start to spend the night at your

24 house?

25      A.   Yes.

1    Q.    And where in the house would he stay when he

2  stayed at your house?

3    A.    The attic.

4    Q.    Okay.  And let me -- just so we can see your

5  house, I'm going to show you a couple pictures.  Okay?

6    A.    Uh-huh.

7    Q.    I'm going to show you first what's been marked

8  as Government -- Defense Exhibit M.

9          Do you see that house?

10   A.    Yes.

11   Q.    Do you know that house?

12   A.    Yes.

13   Q.    What is that house?

14   A.    76 Glen Street.

15   Q.    Okay.  And do you see -- just looking at that

16  picture, do you see that -- where the attic that you

17  just talked about is in that picture?

18   A.    Yes.

19   Q.    Can you just touch it on the screen for me?

20   A.    (Witness complied.)

21   Q.    Okay.  Thanks.  That's good.  Great.

22          Okay.  And could I show the other one, which

23  is M-2?

24          Is this the same house?

25   A.    Yes.

1      Q.    We don't see the attic in that one, do we?

2      A.    You actually do.  It would be this little

3  window vent right there.

4      Q.    You're right.  I'm wrong.

5            Okay.  And where were -- which room -- which

6  of -- do you know which of these windows was your

7  bedroom?

8      A.    (Indicating.)

9      Q.    Great.  Okay.  Thank you.

10           So you just told us, I think, that in the late

11  summer or early fall of 2016, Mr. Carpentino started to

12  spend some nights at least at 76 Glen Street; is that

13  right?

14     A.    Yes.

15     Q.    Did he spend every night there?

16     A.    Yes.

17     Q.    Was he -- was he nice to you?

18     A.    Yes.

19     Q.    Was he nice to your family?

20     A.    Yes.

21     Q.    What kind of nice things would he do?

22     A.    He would buy stuff for the house that we

23  needed.  He would buy me coffees, jackets, shoes,

24  whatever the family needed.

25     Q.    Okay.  So let's put Mr. Carpentino aside for a

1  minute and let me just ask you about your life aside

2  from Mr. Carpentino in Hinsdale at that time.

3          Would you describe your life as easy or

4  difficult?

5      A.    Difficult.

6      Q.    Why would you say that, Mackenzie?

7      A.    Because I was failing school and I had a lot

8  of family issues going on.  My grandfather had just

9  passed away.

10     Q.    Okay.  So I want to turn now to the -- the

11 fall of October 2016.  Did your relationship with

12 Mr. Carpentino change sometime in the fall of 2016?

13     A.    Yes.

14     Q.    And are you able to identify a day or an event

15 that you think -- when the relationship started to

16 change?

17     A.    It was on -- it was in October when we went to

18 the haunted hayride.

19     Q.    Okay.  And can you just tell me who went on

20 this hayride?

21     A.    My sister Kaitlynne, my brother Mikey, some of

22 my brother's friends, me, and Mr. Carpentino.

23     Q.    And did your mother go on that hayride, too?

24     A.    Yes.

25     Q.    Okay.  And tell us again where it was, what

```
 1   city?
 2        A.    It was -- I think it was in New Hampshire.
 3        Q.    Okay.  And what happened between you and
 4   Mr. Carpentino on that ride?
 5              Did you ever touch each other, I guess is my
 6   question.
 7        A.    Yeah, it -- the hayride started going back and
 8   forth like this and there was chainsaws all around and I
 9   got down by his feet.
10        Q.    Okay.  And did you grab on to him?
11        A.    Yes.
12        Q.    Okay.  And on the ride home that night on the
13   hayride, did you notice anything different about
14   Mr. Carpentino as it related to you?
15        A.    Yes.
16        Q.    What was different?
17        A.    Just the way that he kept on looking at me in
18   the mirror, in the visor mirror.
19        Q.    Okay.  And what happened later that night or
20   the next -- early the next morning?
21        A.    I went up to the attic with him.
22        Q.    And is that where he was staying?
23        A.    Yes.
24        Q.    And what happened in the attic that night?
25        A.    We had sex.
```

1          Q.   And, Mackenzie, I know this is a very, very

2     difficult question.  What does that mean to you, that

3     you had sex?

4          A.   That he went inside me.

5          Q.   And what part of him went inside of you?

6          A.   His penis.

7          Q.   And which part into you did it go?

8          A.   The vagina.

9          Q.   How old were you on that night in the attic?

10         A.   14.

11         Q.   After that night in the attic, did you

12    continue to have a sexual relationship with

13    Mr. Carpentino?

14         A.   Yes.

15         Q.   Did you have sex in other places at the Glen

16    Street house?

17         A.   Yes.

18         Q.   Besides the attic, what were some of those

19    places?

20         A.   The living room, the kitchen, and the hallway.

21         Q.   Did you, at that point, consider

22    Mr. Carpentino to be your boyfriend?

23         A.   Yes.

24         Q.   Were you able -- how were you able to

25    communicate with him other than talking face to face?

```
 1    Like were you able to communicate with him by telephone

 2    or text?

 3         A.   Yes.

 4         Q.   How did you get telephones by which to

 5    communicate with him?

 6         A.   He would buy them for me.

 7         Q.   And how about borrowing other people's phones?

 8    Did you ever do that?

 9         A.   Yes.

10         Q.   Did you ever send a picture of yourself to

11    Mr. Carpentino that was a sexual picture?

12         A.   Yes.

13         Q.   And did you send that picture to his phone?

14         A.   Yes.

15         Q.   I'm going to show you now what's been marked

16    for identification as Government's Exhibit 15b.  Can you

17    just look inside that folder and then after you've

18    looked at it, close it.

19         A.   (Witness complied.)

20         Q.   Do you know this picture?

21         A.   Yes.

22         Q.   And what did -- is this a picture of you?

23         A.   Yes.

24         Q.   And who took this picture?

25         A.   Me.
```

1    Q.    And what did you do with it?

2    A.    Sent it to Carpentino.

3          MR. AFRAME:  I would move to strike the ID at

4    this point, but not publish the picture.

5          THE COURT:  Is there objection?

6          MS. GRAHAM:  No, your Honor.

7          THE COURT:  Without objection, it will be

8    admitted as an exhibit.

9          (Government's Exhibit 15b admitted.)

10   Q.    So would you sometimes text with each other?

11   A.    Yes.

12   Q.    And how about letter writing?  Did you write

13   letters to one another?

14   A.    Yes.

15   Q.    Did Mr. Carpentino sometimes write letters to

16   you?

17   A.    Yes.

18   Q.    I'm going to show you now what's been marked

19   as Government's Exhibit 16.

20         I want you to look carefully at that letter.

21   Do you recognize that letter?

22   A.    Yes.

23   Q.    Is that a letter that you received?

24   A.    Yes.

25   Q.    And who did you receive that letter from?

1      A.   Mr. Carpentino.

2      Q.   And did you receive it at a point in time when

3 you were boyfriend and girlfriend?

4      A.   Yes.

5      Q.   Okay.  And I'm going to read a few parts of it

6 and maybe ask you one or two questions.

7           So I'd ask to strike the ID on Government's

8 Exhibit 16.

9           THE COURT:  Any objection?

10          MS. GRAHAM:  No, your Honor.

11          THE COURT:  Without objection.

12          (Government's Exhibit 16 admitted.)

13          MR. AFRAME:  I'd ask to publish Government's

14 Exhibit 16.

15          THE COURT:  All right.  Go ahead.

16          MR. AFRAME:  And I'd ask you to blow up the

17 first several lines, down to --

18          THE COURT:  Have you got some water there?  Do

19 you want any water?

20          THE WITNESS:  It's right there.

21          THE COURT:  Are you okay?  All right.  Good.

22      Q.   So I'm going to read this and first I'm just

23 going to ask you if I read it correctly.

24          I don't know if you know how much I really

25 love you.  I just you to be happy (sic).  I want to make

1    you happy.  If we leave, it will not be until you're 18.

2    You'll be in hiding, can't leave the house even to go

3    outside in the yard.  You'll have no friends to call.

4    It will be just you and me.  I'll have to work and go to

5    the store without you.  I don't want you to feel stuck

6    or that the house is your prison, but that's what it

7    will be like.

8            Did I read that correctly, Mackenzie?

9       A.   Yes.

10      Q.   What is that about?

11      A.   About him wanting me to run away with him.

12      Q.   Okay.

13           And now:  Look, if you got to tell me

14   something, write it quickly and throw it in my room.

15   Any letter I give you, go to the bathroom, read it, rip

16   it, flush it, or throw it in my room and I'll take care

17   of it again -- and I'll take care of it.

18           Did I read that right?

19      A.   Yes.

20      Q.   Where was Mr. Carpentino's room?

21      A.   The attic.

22      Q.   And did you sometimes give him letters there?

23      A.   Yes.

24      Q.   So -- so the little bit that's out, that's

25   just -- and let me show you the letter.

1          So the actual letter, right, Mackenzie, has a

2    hole in it; is that right?

3        A.   Yes.

4        Q.   And I'm just going to show that to the jury so

5    they can see that's the condition of the letter.  So

6    that's why there's a little bit there that we can't see.

7          But it says:  You -- and a letter is

8    missing -- enter --

9        A.   It says better.

10       Q.   Okay.  You better say it didn't happen and she

11   is trying to send me away because me and her aren't

12   working out.  If we are in court, it never happened and

13   mom is making you say it.  If you love me, you'll say we

14   never had sex and mom is making you say we did.  Then

15   after all the bullshit we'll find each other and run

16   away unless we can run away before that ever happens.  I

17   need you on my side to make this work.  Before we run,

18   you need your social security card and a current photo

19   ID so when you're 18 you can get driver's license and

20   live as an adult.  I'm trying to make this work.  I love

21   you.

22          Did I read that right?

23       A.   Yes.

24       Q.   And, again, was that about the idea of you

25   running away?

1   A. Yes.

2   Q. And how about the part where it says if you

3 love me, you'll say we never had sex; if you did say

4 that, would that be true or a lie?  What was he asking

5 you to do there, Mackenzie?

6   A. He was telling me to lie in court.

7   Q. Did you and he talk a lot about the idea of

8 running away?

9   A. Yes.

10   Q. Did he have any special nicknames for you,

11 Mackenzie?

12   A. Yes.

13   Q. What was the nickname that Mr. Carpentino

14 would call you?

15   A. Hell Kitty.

16   Q. Hello Kitty?

17   A. Hell Kitty, without the O at the end.

18   Q. Okay.  And who was your closest female friend

19 in Hinsdale around this time?

20   A. Jasmine Baker.

21   Q. Did Mr. Carpentino know Jasmine Baker?

22   A. Yes.

23   Q. Okay.  So, Mackenzie, I want to turn now

24 from -- I'm going to turn now to April 27th, 2017.

25 Okay?

1              And before I do that, I want to show you

2     what's been marked as Government's Exhibit 14a, which

3     I'll represent is a text message exchange.

4              And I'd ask you to take a minute to review the

5     text message exchange and once you've done that, I'll

6     ask you a couple questions.

7         A.   Okay.

8         Q.   Do you recognize this phone number under the

9     "from"?

10        A.   Yes.

11        Q.   Whose -- whose phone number is that?

12        A.   Carpentino.

13        Q.   Okay.  And the way that -- who is this text

14    message exchange between?

15        A.   Me and Carpentino.

16        Q.   And we've added some color to this and some of

17    the text exchanges are white and some are -- I'll call

18    it a salmon color.  Let's look at the white ones.

19             Who wrote the white ones?

20        A.   Me.

21        Q.   And who wrote the salmon ones?

22        A.   Carpentino.

23        Q.   And what's the date of the -- of this text

24    conversation you guys were having?  This is the date

25    column over here.

47

```
1          A.   4/26/17.

2          Q.   4/26/2017?

3               Okay.  I move to strike the ID on Government's

4    Exhibit 14a.

5               THE COURT:  Any objection?

6               MS. GRAHAM:  Yes, your Honor, as to hearsay,

7    the portions that are not from -- from the defendant.

8               THE COURT:  All right.  Can I see the

9    document?

10              Can you point me to any specific information

11   in the exhibit that you say is inadmissible hearsay?

12              MS. GRAHAM:  May I have one moment, your

13   Honor?

14              THE COURT:  Yes.

15              MS. GRAHAM:  Sorry, your Honor.  What exhibit

16   are we looking at?

17              THE COURT:  14a.

18              MS. GRAHAM:  Thank you.

19              Your Honor, I withdraw my objection.

20              THE COURT:  It'll be admitted as a full

21   exhibit without objection.

22              (Government's Exhibit 14a admitted.)

23         Q.   Now, I'm not going to publish this now, but

24   is there discussion in that -- in there about that

25   Mr. Carpentino loves you?
```

1      A.   Yes.

2      Q.   And is there discussion of sex in there?

3      A.   Yes.

4      Q.   And this is 4/26/2017?

5      A.   Yes.

6      Q.   So let's turn to either very late the same

7   night as that text message of 4/26 or maybe very early

8   the next morning on 4/27, April 27th, 2017.

9           Did Mr. Carpentino come to your bedroom window

10  that night?

11     A.   Yes.

12     Q.   And if we could bring up M again, M-2.

13          You already pointed out your bedroom for us.

14  Can you do that again for us?

15     A.   He was standing right here, right underneath

16  the window.  He told me to climb out from here, down to

17  him, and he caught me.

18     Q.   Okay.  And how did he get your attention?

19     A.   He threw rocks from right around this area up

20  to here.

21     Q.   And were you expecting him that either night

22  or early morning?

23     A.   Yes.

24     Q.   Okay.  And did you have any items packed?

25     A.   Yes.

1      Q.    And what were they packed in?

2      A.    A backpack.

3      Q.    And what items did you have?

4      A.    Extra clothes.

5      Q.    You had extra clothes.  Did you have anything

6  else to keep warm?

7      A.    A camo jacket.

8      Q.    Okay.  Did you have a blanket?

9      A.    Yes.

10      Q.    What color was that blanket?

11      A.    Black and white.

12      Q.    Okay.  And I'm just going to show you now

13  Government's Exhibit 12.

14          Do you recognize this?

15      A.    Yes.

16      Q.    What is that?

17      A.    It's the black and white blanket I had.

18      Q.    Okay.  Had on that night?

19      A.    Yes.

20      Q.    So from what I understood, you were expecting

21  him to come.  Did you know where you were going?

22      A.    No.

23      Q.    Did you think you were running away?

24      A.    Yes.

25      Q.    You said you climbed down, and tell me again

1    what happened once you came out the window.

2         A.    I scraped my knee, my leg, up against the

3    wall.

4         Q.    And what -- did Mr. Carpentino help you down?

5         A.    I jumped down to him and he caught me.

6         Q.    Okay.  And where did you go next?

7         A.    Went up into the woods and down the old train

8    tracks down to his Dodge Neon.

9         Q.    Okay.  And which part of the car did you get

10   in?  Did you get in the front seat or the back seat?

11        A.    The front.

12        Q.    And who drove?

13        A.    Carpentino.

14        Q.    Okay.  Did any sexual activity take place in

15   the car as you were driving?

16        A.    Yes.

17        Q.    What happened?

18        A.    He was fingering me and ...

19        Q.    And did you put your mouth on any part of him?

20        A.    Yes.

21        Q.    What part?

22        A.    Penis.

23        Q.    And what did you end up driving to, like what

24   kind of building?

25        A.    An abandoned motel building.

1       Q.   And let me show you Government's Exhibit 2 --

2  2.  Do you recognize that picture?

3       A.   Yes.

4       Q.   What is that?

5       A.   The abandoned motel building.

6       Q.   And I'll show you Government's Exhibit 5.  Do

7  you recognize that?

8       A.   Yes.

9       Q.   And what's that?

10      A.   That's the inside of the room we were in.

11      Q.   When you got inside, did you have anything to

12 drink?

13      A.   Yes.

14      Q.   What did you have to drink?

15      A.   Corona.

16      Q.   And who gave you the Corona?

17      A.   Mr. Carpentino.

18      Q.   Did he put anything out on the floor?

19      A.   Yes.

20      Q.   What did he put on the floor?

21      A.   A dark green tarp.

22      Q.   And, Mackenzie, what happened on that tarp?

23      A.   We had sex.

24      Q.   And was it the same kind of sex that you

25 described earlier as having taken place in the attic?

1      A.   Yes.

2      Q.   And how old were you when you were in that

3 attic -- I'm sorry.  How old were you when you were in

4 the abandoned motel in Vermont?

5      A.   14.

6      Q.   Did you spend the rest of that night in the --

7 in the motel?

8      A.   Yes.

9      Q.   And the next morning, did you go outside?

10      A.   Yes.

11      Q.   And after some time the next morning, did you

12 realize people were looking for you?

13      A.   Yes.

14      Q.   And did they eventually find you?

15      A.   Yes.

16      Q.   At the time you were found, was Mr. Carpentino

17 there?

18      A.   No.

19      Q.   What had happened to him?

20      A.   He had ran to Keene to get me another phone to

21 keep in contact.

22      Q.   Okay.  And once you were found, have you

23 ever -- have you had any other contact with

24 Mr. Carpentino since April 27th, 2017?

25      A.   No.

1          MR. AFRAME:  No other questions, Judge.

2          THE COURT:  All right.  Thank you.

3          We need to take a short break, members of the

4    jury.  It's just a couple minutes.  I need to talk to

5    the lawyers.

6          So you can go back to the jury deliberation

7    room.  I'll bring you back in just a minute.

8                    (Jury excused.)

9          THE COURT:  All right.  Be seated.

10          What did you want to take up with me?

11          MS. GRAHAM:  Your Honor, I don't know if you

12    want to clear the courtroom or you want me to approach,

13    but it's items that are in the order and I don't believe

14    I'm allowed to disclose them.

15          THE COURT:  Okay.  So anybody who's not

16    connected -- not employed by the court should also leave

17    momentarily.  We'll notify you as -- it'll be open again

18    in just a minute.  I need to speak to the lawyers about

19    something.

20        (Sealed portion filed under separate cover.)

21          THE COURT:  Can I just ask for planning

22    purposes, how long do you think this examination will

23    be?

24          MS. GRAHAM:  I don't think it will be more

25    than 30 minutes --

1          THE COURT:  Okay.

2          MS. GRAHAM:  -- or even 20 minutes.

3          THE COURT:  Okay.  All right.

4          So, Mackenzie, come back up and have a seat

5  and we'll bring the jury in and get going again.

6          THE CLERK:  All rise for the jury.

7          (Jury entered the courtroom.)

8          THE COURT:  All right.  Cross-examination.

9                  CROSS-EXAMINATION

10  BY MS. GRAHAM:

11     Q.   Mackenzie, I have some questions for you.

12  Okay?

13          From November 2016 to April of 2017, okay, you

14  had mentioned who was living in the house, right?

15     A.   Yes, ma'am.

16     Q.   Okay.  Now, your mom's boyfriend, Frank, was

17  also living there, right?

18     A.   Yes, ma'am.

19     Q.   And Frank had been your mom's partner for

20  about ten years; is that right?

21     A.   Yes.

22     Q.   And so that was a pretty full house; is that

23  right?

24     A.   Yes.

25     Q.   And just to -- so your mom was there and Frank

1    was there?

2         A.   Yes.

3         Q.   And did they share a bedroom?

4         A.   Yes.

5         Q.   And your sister was there with her children,

6    right?

7         A.   No.  Sorry.  Frank was actually in a separate

8    room.

9         Q.   Okay.

10        A.   He had just moved into a different room.

11        Q.   Okay.  So we have Frank, your mom, your sister

12   with her children, right?

13        A.   Uh-huh.

14        Q.   Your brother Michael?

15        A.   (Nods head.)

16        Q.   And his wife?

17        A.   Yes, ma'am.

18        Q.   Okay.  And they have children?

19        A.   Yes, ma'am.

20        Q.   And then you have a younger brother, right?

21        A.   Uh-huh.

22        Q.   And was there anyone else there?

23        A.   Mr. Kurt -- Mr. Carpentino.

24        Q.   Okay.  And so where were you -- you had your

25   own bedroom at that point?

1        A.    Yes, ma'am.

2        Q.    Okay.  And as you've already said, Kurt,

3   Mr. Carpentino, was your landlord, right?

4        A.    Yes, ma'am.

5        Q.    And he came over to do repairs often on the

6   house?

7        A.    Yes, ma'am.

8        Q.    For instance, painting the house?

9        A.    There was like -- I think it was something to

10  do with the paint and like the sinks leaking.

11       Q.    Okay.  And he worked in Keene; is that right?

12       A.    Yes, ma'am.

13       Q.    And he would sometimes come from his job from

14  Keene and stop in and see you all; is that right?

15       A.    Yes, ma'am.

16       Q.    And he had an apartment in Manchester, right?

17       A.    Yes, ma'am.

18       Q.    Now, the prosecutor asked you about your mom

19  and Mr. Carpentino.  They were friendly?

20       A.    Yes, ma'am.

21       Q.    And were there times that you were present

22  when they argued?

23       A.    Yes, ma'am.

24       Q.    And did you ever hear them argue about her not

25  paying rent?

57

1          A.    Yes, ma'am.

2          Q.    Because your mom had been late in paying rent

3     or she wasn't paying rent?

4          A.    No, ma'am.   That is a lie.   She was always on

5     time paying the rent.

6          Q.    Okay.   Did you ever hear your mom threaten

7     Kurt that she'd have him arrested if he evicted her?

8          A.    Yes.

9          Q.    Now, you did not -- you weren't allowed to

10    have your own phones, right?

11         A.    Uh-huh.   Yes.

12         Q.    You couldn't have them?

13         A.    No.

14         Q.    But you borrowed other children's phones or

15    other kids' and students' at school, right?

16         A.    Yes.

17         Q.    And would you borrow Jazzy's phone?

18         A.    Yes.

19         Q.    Now, did you ever steal or sneak and take

20    Mr. Carpentino's phone?

21         A.    No, ma'am.

22         Q.    You never went into his car and took his

23    phone?

24         A.    No.

25         Q.    Did your family ever find you with his phone

1   and you got in trouble for it?

2        A.   No.

3        Q.   Now, I want to talk about April 26th.  That's

4   the day that you went to Vermont, right?

5        A.   Yes, ma'am.

6        Q.   Okay.  You came home from school and you had a

7   phone on you; is that right?

8        A.   Yes, ma'am.

9        Q.   And your mom took that phone away from you?

10       A.   Yes, ma'am.

11       Q.   So you weren't able to call anyone or text

12   anyone?

13       A.   No, ma'am.

14       Q.   And your mom left the house around 6:00; is

15   that right?

16       A.   Yes.

17       Q.   You weren't home alone, right?

18       A.   No.

19       Q.   There were people in the house?

20       A.   Yes.

21       Q.   Who was in the house?

22       A.   Frank, my baby brother, Mikey, and I think

23   Kaitlynne was home.

24       Q.   And how old's Mikey?

25       A.   I think he's 22 or 23 now.

1    Q.   Okay.  And Kaitlynne's older than you?

2    A.   Uh-huh.

3    Q.   How old is she?

4    A.   I want to say she's 22 or 21.

5    Q.   Okay.  And you -- you went to bed that night,

6  right?

7    A.   Yes, ma'am.

8    Q.   And were you in your brother's room or your

9  own room?

10   A.   It was in my own room.  It was -- it was my

11  brother's room and then my brother had moved in a

12  different room, his father's room.

13   Q.   So are you saying that that was originally

14  your brother's room and then --

15   A.   Yes.

16   Q.   -- you moved into -- okay.

17        And you were taking some medication; is that

18  right?

19   A.   Yes.

20   Q.   And so you sleep pretty soundly when you take

21  your medication?

22   A.   Yes.

23   Q.   And when you went to bed, did you have your

24  hearing aids on?

25   A.   No.

1      Q.   So you're sleeping soundly and you're woken up

2   by hearing rocks on the window?

3      A.   Yes.  I could only hear them because it was so

4   quiet and nobody else was there.

5      Q.   Okay.  Well, there were other people in the

6   house, right?

7      A.   Yes, but they were being so quiet.  My door

8   was shut.

9      Q.   Okay.  And where's your brother sleeping at

10   that point?

11      A.   In his father's room.

12      Q.   Was that on the second floor?

13      A.   Yes.

14      Q.   So is that the window right next door to

15   yours?

16      A.   No.  It's the one straight ahead.

17           MS. GRAHAM:  Can we pull up M-1?  M-1.

18      Q.   So I'm going to show you a picture of the

19   house again.  Okay?

20           Okay.  So is that the right side of the house

21   that -- can you look at the picture?

22      A.   No, it's on the other side.

23           MS. GRAHAM:  Okay.  So can we have M, please.

24           Thank you.

25      Q.   Okay.  Is it that one?

1      A.   Yes.

2      Q.   Okay.  And so, again, if you wouldn't mind,

3  circle the window that you were sleeping in or the

4  bedroom you were sleeping in.

5      A.   Oh, the room I was staying in?

6      Q.   That you were sleeping in.

7      A.   That's on the other side.

8      Q.   Okay.  Other side.  If I could have -- there

9  we go.  Is that the shot?

10      A.   (Indicating.)

11      Q.   Okay.  And the window right next door to that,

12  what window is that to?

13      A.   This one?

14           THE COURT:  There are -- yeah, which one do

15  you mean, the one she's now marked?

16           MS. GRAHAM:  The one she's circled, yes.

17           THE COURT:  Okay.

18      A.   That was my mom's room.

19      Q.   Okay.  Thank you.

20           Okay.  So, Mackenzie, you hear rocks at your

21  window, you've packed your bag, and you jump out of the

22  second floor window.  Is that what you're saying today?

23      A.   Yes, ma'am.

24      Q.   Okay.  And no one in the house hears anything

25  or wakes up?

1      A.   No, ma'am.

2      Q.   And it's raining that night, right?

3      A.   Not that I can remember.

4      Q.   Okay.  Was it -- the ground muddy outside?

5      A.   No.

6      Q.   What kind -- what was the weather like?

7      A.   It was like cold, damp, a little bit chilly.

8      Q.   Okay.  And then from there, you say you head

9  up to Vermont; is that right?

10      A.   Yes, ma'am.

11      Q.   Now, the prosecutor asked you a few questions

12  about your close friend.  Her name was Jazzy?

13      A.   Yes, ma'am.

14      Q.   Okay.  And was Jazzy planning on renting an

15  apartment from the defendant?

16      A.   No, ma'am.

17      Q.   Okay.  You were not -- you didn't have any

18  knowledge about that?

19      A.   No, ma'am.

20      Q.   But Jazzy helped you with this plan, right, to

21  go to Vermont?  She was in on the plan.

22      A.   She did not know about us going pretend

23  camping.

24      Q.   Okay.

25      A.   He -- Mr. Carpentino told me to tell her that

```
 1    we were going camping in Vermont and that's when my --
 2    when Ms. Patrick told my mom -- that my friend came and
 3    told my mom that and then that's what striked her.
 4         Q.   Okay.  So, Jazzy -- I'm sorry.  You're --
 5    Mackenzie, on that day spoke with a policeman, right,
 6    Mr. Turner?
 7         A.   Yes, ma'am.
 8         Q.   Okay.  When you came out of the woods, you got
 9    into his cruiser; is that right?
10         A.   Yes, ma'am.
11         Q.   And did you know that his -- when you spoke
12    with him that it was being video recorded and audio
13    recorded?
14         A.   No, ma'am.
15         Q.   Okay.  Do you recall that you said to him that
16    Jazzy was -- Jazzy got you a phone and Jazzy was helping
17    out with these plans?
18         A.   No, ma'am, I do not.
19         Q.   Okay.  I'm going to ask you to listen to a
20    clip and you tell me if that is your voice.  Okay?
21                   (Audio recording played.)
22         Q.   Okay.  So is that what you told the trooper,
23    that Jazzy was helping you out with everything?
24         A.   I did not sound like that, ma'am.  That was
25    not me.  I had a full straight voice.
```

1    Q.   Okay.  What I can do is see if we have the

2  video clip, if you can hold on.

3         Okay.  So, Jazzy -- I'm sorry.  I keep calling

4  you Jazzy.

5         Mackenzie, what I'm going to do is I'm going

6  to show you a second clip, okay, that shows you in the

7  cruiser, just so you understand where I'm getting this

8  from.  Okay?

9              (Video recording played.)

10   Q.   That's you in the cruiser, correct?

11   A.   Yup.

12   Q.   Okay.  So you understand now that that was

13 your voice --

14   A.   Yeah.

15   Q.   -- in the cruiser?

16        Okay.  So that's what you told Trooper Turner

17 about Jazzy --

18   A.   Yes.

19   Q.   -- correct?  Okay.

20   A.   After I just saw that, now I remember that.

21   Q.   Okay.  Now, you talked about being in the car

22 with Mr. Carpentino, going up to Vermont, right?

23   A.   (Nods head.)

24   Q.   Did he have any phones with him?

25   A.   Yes.

1        Q.   Okay.  How many phones did he have with him?

2        A.   He had everything with him because that was

3  when my mom had kicked him out of the house.

4        Q.   Okay.  And he smashed all those phones, right?

5        A.   Yes, ma'am.

6        Q.   And that's what you told the police, that he

7  smashed them?

8        A.   Yes, ma'am.

9        Q.   And that he smashed them at the hotel, right?

10       A.   Yes, ma'am.

11       Q.   Okay.  So -- and, again, did you tell them

12  where those smashed phones were?

13       A.   Yes, ma'am.

14       Q.   Now, Mackenzie, you talked about you had sex

15  with Mr. Carpentino when you were at Caboose Corners,

16  which is the motel, right?  You talked about that,

17  right?

18       A.   Yes, ma'am.

19       Q.   Okay.  And he had sexual intercourse; he put

20  his penis in you.  Is that what you --

21       A.   Yes.

22       Q.   -- implied?

23       A.   Yes.

24       Q.   And he ejaculated?

25       A.   No.

```
 1        Q.    He didn't ejaculate?

 2        A.    (Shakes head.)

 3        Q.    Do you know what that word means, that he --

 4   well, that's what you -- you told the nurse, correct, at

 5   the hospital, that he ejaculated all over you?

 6        A.    Yes.  Yes.

 7        Q.    Okay.  And you told the nurse that you tried

 8   to clean it up, right?

 9        A.    Yes.

10        Q.    And you tried to clean it up with a sponge and

11   some water?

12        A.    Yes.

13        Q.    Okay.  Now, when Mr. Carpentino -- you said he

14   left to get a phone for you; is that right?

15        A.    Yes.

16        Q.    And we're talking about the morning of

17   April 27th.  So he leaves to go get a phone, right?

18        A.    Yes.

19        Q.    And you -- you stay at the hotel, right?

20        A.    Yes.

21        Q.    And did you see Mr. Elmore?

22        A.    Yes.

23        Q.    Okay.  And you were alone?

24        A.    Yes.

25        Q.    And you didn't -- you ran and hid, right?
```

1      A.   Yes, just because -- only because I didn't

2    recognize him at first.

3      Q.   So you ran and you hid?

4      A.   Yes.

5      Q.   And you did not walk -- you knew where the

6    police station was, right?

7      A.   No.

8      Q.   Well, remember that clip we just saw, that I

9    just showed you with Officer Turner?  Do you remember

10   telling him that you were hitchhiking to the police

11   station?

12     A.   No, I was telling him that Mr. Carpentino had

13   told me that if he had not shown up that I could

14   hitchhike to the police station to tell them that I was

15   lost and I wanted to go home.

16     Q.   Okay.  But did you tell Officer Turner that

17   you were hitchhiking to the police station, that you

18   personally were?

19     A.   I believe I did.  I don't remember.

20     Q.   Okay.  Now, Mackenzie, you heard your family

21   and you -- you saw them when you came out of the woods,

22   right?

23     A.   Yes, ma'am.

24     Q.   Okay.  And your mom asked you if you had been

25   raped; is that right?

1      A.   Yes, ma'am.

2      Q.   And you told her you didn't know what that

3 meant?

4      A.   Yes, ma'am.

5      Q.   And you told Officer Turner that you were

6 technically sexually assaulted, right?  Those were your

7 words.

8      A.   Yes, ma'am.

9      Q.   Now, Mackenzie, you talked a little bit when

10 the prosecutor was talking to you about how you have

11 some depression, right?

12      A.   Yes, ma'am.

13      Q.   Okay.  And you also see a doctor, right?

14      A.   Yes, ma'am.

15      Q.   And that doctor gives you medication; is that

16 right?

17      A.   Yes, ma'am.

18      Q.   And I should say I'm talking about also in

19 April of 2017, you had a doctor, right?

20      A.   Yes, ma'am.

21      Q.   And you were on -- you were diagnosed not only

22 with anxiety -- or depression, rather, also oppositional

23 defiance disorder?

24      A.   Yes, ma'am.

25      Q.   Now, you've testified that the first time that

```
 1    you had this sexual encounter with Mr. Carpentino was in

 2    October or November of 2016, right?

 3         A.   Yes, ma'am.

 4         Q.   Okay.  And at that time in your life, right,

 5    you were going to school at Hinsdale Middle School?

 6         A.   Yes, ma'am.

 7         Q.   All right.  And you had a school resource

 8    officer there, right?

 9         A.   Yes, ma'am.

10         Q.   And do you remember what his name was?

11         A.   No, ma'am, I do not.

12         Q.   Does it sound like D'Alessandro?

13         A.   Yes.

14         Q.   Okay.  And he's there to help out kids like

15    yourself?

16         A.   Yes, ma'am.

17         Q.   And some kids can go to him if they're having

18    problems, right?

19         A.   Yes, ma'am.

20         Q.   And you know how to reach him or where to find

21    him at the school?

22         A.   Yes, ma'am.

23         Q.   Okay.  And, in fact, you went and you talked

24    with him in March of 2017, right?

25         A.   I believe so.
```

1      Q.   I'm sorry, I didn't hear that.

2      A.   I believe so.

3      Q.   Okay.  You went to him and you told him

4 specifically that everything was okay at the house,

5 right?

6      A.   Yes, ma'am.

7      Q.   And you were talking specifically about in

8 reference to Mr. Carpentino, right?

9      A.   Yes, ma'am.

10      Q.   So you told this school resource officer that

11 everything was okay.  You never told him in March that

12 Mr. Carpentino was having sex with you at the house, did

13 you?

14      A.   No, ma'am, I have not.

15      Q.   And you never told him at this school meeting

16 in March of 2017 that your mom knew that you were having

17 sex with Mr. Carpentino, right?

18      A.   No, ma'am, I have not.

19      Q.   And you never told him that Kurt had done

20 anything to threaten to hurt your family, right?

21      A.   Yes, ma'am, he has.

22      Q.   No, you never told the officer in March of

23 2017 --

24      A.   No, ma'am, I have not.

25      Q.   Now, as you just talked about, around this

1  time period you had a case manager, right, at Monadnock

2  Family Services?

3        A.   Yes, ma'am.

4        Q.   Okay.  And you also had a counselor there as

5  well, right?

6        A.   Yes, ma'am.

7        Q.   And you had a doctor there who would prescribe

8  you your medications, right?

9        A.   Yes, ma'am.

10       Q.   And before -- before the date that

11 Mr. Carpentino got arrested, so before April 27th, you

12 never told any of those people that Kurt Carpentino was

13 having sex with you, right?

14       A.   No, ma'am, I have not.

15       Q.   Okay.  And those are people that are there to

16 help you, right?

17       A.   Yes, ma'am.

18       Q.   And I -- and you probably meet with them

19 fairly regularly?

20       A.   Yes, ma'am.

21       Q.   And during that time in your life, you also

22 had Kim and Patrick Elmore, right?

23       A.   Yes, ma'am.

24       Q.   And you were involved in their youth ministry?

25       A.   Yes, ma'am.

1     Q.   And you were very close to them, right?

2     A.   Yes, ma'am.

3     Q.   And to the point where you would call Kim

4 every day?

5     A.   Yes, ma'am.

6     Q.   And you trusted them?

7     A.   Yes, ma'am.

8     Q.   And you never told them before April 27, 2017,

9 that Kurt was having sex with you or doing anything like

10 that?  You never told them that?

11     A.   No, ma'am, I have not.

12     Q.   Now, in March of 2017, a woman came to your

13 house to talk to you.  Do you remember that?

14     A.   Yes, ma'am.

15     Q.   Her name was Maureen?

16     A.   Yes, ma'am.

17     Q.   Okay.  And she came to speak to you about

18 Kurt.  Do you remember that?

19     A.   Yes, ma'am.

20     Q.   Okay.  And she asked you if you ever -- if he

21 ever stayed at the home, and you said no.  Right?

22     A.   Yes, ma'am.

23     Q.   And she asked you if she -- if you were ever

24 alone with Mr. Carpentino, right?

25     A.   Yes, ma'am.

1     Q.   And you said no?

2     A.   Yes, ma'am.

3     Q.   Okay.  So during that meeting, you never told

4  that woman that Kurt was having sex with you, right?

5     A.   Yes, ma'am.

6     Q.   You never said that he's having sex with me

7  and my mom knows?

8     A.   Yes, ma'am.

9     Q.   Mackenzie, I want to ask you a question about

10  a report you made in 2015.  I know that's a long time

11  ago, but I have a question for you.

12          So I want to talk to you about a time that you

13  were with I think a friend and you were walking down the

14  street of -- Glen Street and you told the police that

15  your neighbor threatened you with a shotgun.

16     A.   Yes, ma'am.

17     Q.   Okay.  That wasn't true, right?

18     A.   That was true.

19     Q.   Okay.  He never got arrested, right?

20     A.   Yes, ma'am.

21     Q.   He never had to go to court for that?

22     A.   Yes, ma'am.

23     Q.   Okay.  Nothing ever happened.  He didn't get

24  any trouble, right?

25     A.   Yes, ma'am.

1        MS. GRAHAM:  Can I just have one moment, your

2   Honor?

3        THE COURT:  Yes.

4    Q.   Mackenzie, I just have a few more questions.

5        On direct examination the prosecutor asked you

6   about a tarp, right?

7    A.   Yes, ma'am.

8    Q.   Did you -- okay.  And you had sex on that

9   tarp, right?

10   A.   Yes, ma'am.

11   Q.   Okay.  And that tarp was at the motel?

12   A.   Yes, ma'am.

13   Q.   And you told the police about that tarp?

14   A.   Yes, ma'am.

15   Q.   And we just talked about how you said you used

16  a sponge and water to clean off the ejaculation, right?

17   A.   Yes, ma'am.

18   Q.   And that was left at the hotel?

19   A.   Yes, ma'am.

20   Q.   And you clearly told the police about that,

21  right?

22   A.   Yes, ma'am.

23   Q.   Now, you've written -- we talked about

24  letters, right, going back and forth?

25   A.   Yes, ma'am.

1      Q.    Okay.  You wrote some letters that were about
2  dreams that you had, right?
3      A.    Yes, ma'am.
4      Q.    And some of those letters were about some
5  fantasies that you were having, right?
6      A.    Yes, ma'am.
7      Q.    And that's what you told your mom, that the
8  letters were about dreams, right?
9      A.    Yes, ma'am.
10          MS. GRAHAM:  Okay.  Thank you.  I have nothing
11  further.
12          THE COURT:  Redirect?
13                   REDIRECT EXAMINATION
14  BY MR. AFRAME:
15      Q.    You were asked, Mackenzie, about phones that
16  Mr. Carpentino had when you were in Vermont and you said
17  he had all -- all of his stuff in the car?
18      A.    Yes.
19      Q.    Did -- and you said he smashed some phones?
20      A.    Yes.
21      Q.    Did he have lots of phones?
22      A.    He only had two, his original phone and then
23  his state phone.
24      Q.    Do you know if there were other phones in the
25  car that he smashed?  Do you know -- that he didn't

1    smash?  Do you know that?

2         A.    No, sir, I do not.

3         Q.    Okay.  Now, you were -- it was brought to your

4    attention a whole bunch of times in March of 2017 when

5    people asked you or talked to you about Kurt and -- or

6    you talked to people and you didn't tell them about your

7    sexual relationship with him; is that right?

8         A.    Yes, sir.

9         Q.    Did you like Kurt Carpentino at that time?

10        A.    No, sir.

11        Q.    Did you -- were you in a situation where you

12   were acting as boyfriend and girlfriend at that time?

13        A.    No, sir.

14        Q.    Did you know it was wrong for you to be having

15   sex with him?

16        A.    Yes, sir.

17        Q.    Did you want to -- were you talking about

18   running away at that point with him?

19        A.    No, sir.

20        Q.    So let me just clarify when I'm talking about.

21             March of 2017, so when is it -- you run away

22   with Kurt Carpentino in April of 2017, right?  So this

23   is a month before I'm talking about now.  Okay?  Do you

24   know when I'm talking about?

25        A.    No, sir.

1    MR. AFRAME:  Okay.  Judge, I have no other

2 questions.

3    THE COURT:  All right.  Thank you, Mackenzie.

4 You're all set.  So you -- you can be excused and you

5 don't have to come back.  You're all done.  Okay?

6    THE WITNESS:  Thanks.

7    THE COURT:  If you can -- I think we'll -- why

8 don't you just wait there for a second.

9    I think we're at a good stopping point for the

10 day, members of the jury, so we'll break.  We're on

11 schedule.  We're ahead of schedule.  Please come back at

12 nine o'clock morning and we will take more evidence

13 during the day.

14    Keep my general instructions in mind.  Have a

15 good evening, everybody.  We'll see you tomorrow

16 morning.

17    Just wait there for a second, Mackenzie.

18    (Jury excused.)

19    THE COURT:  Okay.  Now you're all done,

20 Mackenzie.  Head on back out.  You're all set.

21 Everybody else be seated, please.

22    THE WITNESS:  Thank you, sir.

23    (Witness excused.)

24    THE COURT:  What's your schedule?

25    MR. AFRAME:  We have a couple of phone sort of

1    related witnesses, then we have a witness who will do

2    the jail letter logs and then we have the lawyer who's

3    going to present the letters.

4              THE COURT:  So finish --

5              MR. AFRAME:  And the crime scene person will

6    introduce some pictures.  So short stuff.

7              THE COURT:  By lunchtime, you think?

8              MR. AFRAME:  At the -- at the worst.

9              THE COURT:  All right.  And do you anticipate

10   calling any witnesses?

11             MR. SAXE:  We -- we just had a discussion,

12   your Honor, because things were going pretty fast, that

13   we're trying to get our witnesses here for tomorrow.  It

14   might be 12:30.

15             THE COURT:  Already.

16             MR. SAXE:  We can try to get it earlier,

17   but --

18             THE COURT:  Is there a good possibility that

19   we can complete the evidence in the case tomorrow?

20             MR. SAXE:  I think so.

21             THE COURT:  Okay.  So we'll plan on Monday for

22   closing arguments then?

23             MR. SAXE:  I -- obviously I can't --

24             THE COURT:  No guarantees, but that's --

25             MR. SAXE:  I'd say that's a pretty fair guess.

1           THE COURT:  Reasonable expectation.  Okay.

2           So I've got -- any jury instructions you

3    either have proposed, I have.

4           MR. SAXE:  Yes, your Honor.

5           THE COURT:  All right.  So I will try to

6    put -- I'm not sure I'll be able to put something

7    together tomorrow.  I was planning to do it over the

8    weekend.  So I will definitely have something for you

9    before you give closing arguments, but I may not be able

10   to give it to you until Monday.

11          The -- you both know my basic charge, so that

12   won't be a surprise to either side.  And I've charged on

13   these kinds of cases in the past, so you can look at the

14   charge that I've given in the past.  I don't anticipate

15   there's anything that will be unusual about this -- this

16   instruction.  So if you have any particular question you

17   want to review with me on Friday to get my general view,

18   you can raise it with me, but otherwise, I think it's a

19   straight vanilla instruction for taking a minor across

20   state lines.

21          So if you have something specific you want to

22   review with me or you want -- one of your charges is at

23   all unusual or there's a difference between what you're

24   saying and what the government's saying, raise it --

25   plan to raise it with me on Friday.  Okay?

1          MR. AFRAME:  Yes.

2          MR. SAXE:  Yes.

3          THE COURT:  Anything else?

4          MR. AFRAME:  Nope.

5          THE COURT:  All right.  See you in the

6   morning.

7       (Proceedings adjourned for the day at 4:05 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 11/9/18            _Lizau Dubois_

                              Liza Dubois, RMR, CRR
                              Licensed Court Reporter No. 104
                              State of New Hampshire