*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO FEBRUARY 7, 2019

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   1:17-cr-157-PB
              v.                *   June 11, 2018
                                *   8:56 a.m.
KURT CARPENTINO                 *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL DAY 4
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:


For the Government:        Georgiana L. Konesky, AUSA
                           Seth R. Aframe, AUSA
                           United States Attorney's Office



For the Defendant:         Dorothy E. Graham, Esq.
                           Jonathan R. Saxe, Esq.
                           Federal Defender's Office



Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

2

```
1                    I  N  D  E  X

2


3
   CLOSING ARGUMENTS:                        PAGE
4
5  By Ms. Konesky                             13

6  By Ms. Graham                              28

7  By Mr. Aframe (Rebuttal)                   35

8
9  JURY INSTRUCTIONS                          39

10
   VERDICT                                    61
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Court is in session and has for
 3   consideration a jury trial in United States of America
 4   vs. Kurt Carpentino, criminal case number
 5   17-cr-157-1-PB.
 6              THE COURT:  The defendant isn't present.  He's
 7   being brought in.  It's five minutes to 9:00, four
 8   minutes to 9:00.  I don't want to delay the jury.  I'm
 9   going to talk to you about a jury instruction question
10   you submitted to me.  I don't believe the defendant has
11   the right to be present for that, but I will rehearse
12   exactly what happened as soon as we get him in here.
13   Okay?
14              MR. SAXE:  That's fine, your Honor.
15              THE COURT:  Okay.  So help me understand the
16   problem that you are seeking to address with your first
17   of your two proposed changes.  I agree to give the
18   second, I'm including that in the draft.
19              MR. SAXE:  Okay.  I just think that ours is a
20   little less likely to confuse the jury.  That's all.
21   Because --
22              THE COURT:  I know, but I want you to tell
23   me, I'm confused that the jury might do X if you give
24   your instruction and my instruction will help address X
25   problem.
```

```
1                 MR. SAXE:  Okay.  I think if you say that --
2                 THE COURT:  I don't know.  Am I being clear?
3                 MR. SAXE:  Yes.
4                 THE COURT:  When there's something wrong with
5      my instruction, in your view, and your view is it's more
6      confusing than yours and I'm simply asking you,
7      confusing about what.
8                 MR. SAXE:  I understand.
9                 THE COURT:  Okay.
10                MR. SAXE:  Okay.  And I don't think that the
11     proposed instruction is illegal or it isn't to the point
12     that it's legally wrong, I just think ours is clearer.
13     So --
14                THE COURT:  I understand.  I'm trying to get
15     at -- let me try one last time.  Okay?
16                I am trying to accommodate whatever your
17     concern is.  I have a problem with your proposed
18     instruction that I will explain to you, but I don't
19     understand the problem that your proposed instruction is
20     trying to address.  I have a guess about it.  If you
21     want, I'll speak to you about it and you can tell me
22     whether it's right.
23                I think you're picking up on something that
24     the prosecutor said as we were going out the door on
25     Friday after having had our charge conference where the
```

1   prosecutor said, speculate about this, suppose -- should

2   the jury be instructed that all that is necessary is

3   that the person be charged with an offense, not that he,

4   in fact, committed the offense.  And your fear is that

5   the jury might construe my instruction as permitting

6   them to find the defendant guilty under, say, the

7   following extreme fact pattern.

8           Suppose the defendant and Ms. Harvey decided,

9   let's fool your mom and the police into thinking that

10  you and I have a sexual relationship when we don't; I'm

11  going to take you across state lines, you're going to

12  then go to the Vermont police and say that Mr. -- what's

13  your client's name --

14          MR. SAXE:  Carpentino.

15          THE COURT:  -- Carpentino had -- just had sex

16  with me; we'll then recant that after the charge is

17  brought.

18          Under the prosecutor's crazy theory of the

19  case, that would be a crime that would be prosecutable

20  under the statute.  I think that's a crazy theory of the

21  case and if that's the concern you're getting at, I

22  think I have a way of addressing it.

23          Is that the concern?

24          MR. SAXE:  Yeah.  And I did look at the --

25  when I looked at the jury instructions in the

1    First Circuit, there wasn't one.  So I looked at a bunch

2    of other circuits.

3              THE COURT:  Yeah.

4              MR. SAXE:  Some of them use your proposal.

5              THE COURT:  Yeah, is that what you're

6    concerned about?

7              MR. SAXE:  Yes.

8              THE COURT:  Okay.  All right.

9              So let me suggest -- the problem I have with

10   your proposed instruction, okay, is it a crime for

11   Ms. Harvey to have sex with someone over the age of 19.

12   Is she a criminal for doing that?

13             MR. SAXE:  No.

14             THE COURT:  Okay.  So she couldn't be charged

15   with a crime for doing what she allegedly did here,

16   right?

17             MR. SAXE:  I understand, yes.

18             THE COURT:  All right.  So we agree on that,

19   right?

20             So if I read your instruction, it is -- what

21   you're proposing is --

22             MR. SAXE:  Fourth line down --

23             THE COURT:  Wait a second.  Wait a second.

24             Third, the defendant intended that Harvey

25   engage in sexual activity which, if it had occurred, is

1    a crime in Vermont.

2              That read literally could be understood by a

3    jury to mean that if Ms. Harvey didn't commit a crime in

4    Vermont, it wasn't -- if the act that they were

5    intending to engage in would not be a crime by

6    Ms. Harvey, then you couldn't find the defendant guilty.

7              The statute is phrased in awkward language

8    because it's trying to address a particular -- a

9    combination of problems, as I see it.  One is a

10   prostitution problem, but the other is what if you take

11   a minor across state lines to have sex with them.  Okay?

12   And that's why they used the phraseology they used, the

13   "any person" language.

14             And both the government's original instruction

15   and your proposed instruction suffer from a fatal

16   deficiency and I don't think the jury would do it, but

17   once they get my instructions, we will never know how

18   they interpret them.  So it's important that I try to

19   craft them in a way that is legally correct.

20             And the "any person" language -- yeah, bring

21   him in.

22             The "any person" language, it's vital to the

23   statute because it requires that Ms. Harvey engage in

24   conduct which could be prosecuted as an offense against

25   any person.  And so it captures the pimp who brings a

1    child across state lines, it captures a person who

2    brings a child across state lines to have sex with

3    someone else, and it captures a person who brings

4    someone across state lines to have sex with them

5    themselves.  And it is not a defense to the crime that

6    the child who engages in the sexual act could not be

7    prosecuted.  Are we all in agreement about that --

8              MR. AFRAME:  Yes.

9              THE COURT:  -- basic proposition?

10             MR. SAXE:  Yeah, I agree.

11             THE COURT:  Okay.  So here's what I propose to

12   address your problem -- your instruction as proposed is

13   deficient.  I played around with ways to address the

14   concern that I thought you had and all of them

15   involve -- that I could think of involve multiple

16   sentences that make very confusing a problem which isn't

17   really a problem here.

18             So what I would say is this.  I can add one

19   word that I think could address the problem.  Here's

20   what I propose.

21             Third, at the time of the transportation, the

22   defendant intended that Harvey would engage in sexual

23   activity for which any person could be successfully

24   prosecuted under Vermont law.

25             That eliminates the prosecutor's crazy problem

1    of there's probable cause to believe you committed the

2    crime under Vermont law even though you didn't commit

3    the crime -- you didn't intend to commit the crime under

4    Vermont law, you intended to create circumstances that

5    gave rise to probable cause to believe that a crime had

6    been committed and thereby you committed the crime.

7              I'm not buying that.  Okay?  The prosecutor's

8    going to show me some --

9              MR. AFRAME:  I'm not arguing that, just to be

10   clear.

11             THE COURT:  Okay.  That's what you were

12   saying.

13             MR. AFRAME:  I was just talking about it.

14             THE COURT:  Okay.  But I think that's what

15   prompted this discussion.

16             So do you think that successfully prosecuted

17   precludes the argument that you were speculating about?

18             MR. AFRAME:  Yes.

19             THE COURT:  Yeah.  So if I put that in, okay?

20             MR. SAXE:  That's fine.

21             THE COURT:  All right.  That's good.

22             Any other issues?

23             MR. SAXE:  Just the second one, which you said

24   you agreed you would put in --

25             THE COURT:  We agreed.

1          MR. SAXE:  -- regarding the testimony.

2          THE COURT:  Yeah.  All right.

3          So could you bring this upstairs to my -- to

4    my assistant and have her -- just this line -- see

5    third? -- make this change, which really involves just

6    putting in the word successfully before prosecute.

7          MR. AFRAME:  Can I ask one question before you

8    send that away?

9          THE COURT:  Yes.

10          MR. AFRAME:  Did you add the part about

11    consent that we talked about?

12          THE COURT:  Yes.  So let me just -- engaging

13    in a sexual act with a child who is under the age of 16

14    is a crime in Vermont regardless of whether the child

15    consents to the sexual act.

16          MR. AFRAME:  Right.

17          THE COURT:  All right.  Can you bring that up?

18    Do you understand what I'm asking her to do?  Put the

19    word successfully in front of prosecute there, print out

20    five copies of the instructions, and she needs to do a

21    verdict form for me also.

22          THE LAW CLERK:  Okay.

23          THE COURT:  Okay.  Everybody good?

24          MR. SAXE:  If I could just have one second.

25          THE COURT:  Yes.  Let me -- let me just --

1            Mr. Carpentino, over the weekend, your lawyers

2    sent an email to the clerk in which they proposed a

3    last-minute change to the jury instructions.  It was

4    of two parts.

5            The second part addressed a standard

6    instruction that a court gives when a defendant

7    testifies, as you did, and I agreed to give that

8    instruction in full that they are proposing.

9            The first part of it was addressed to the

10   element of what your intention had to be in order for

11   you to be guilty of a crime and the -- your lawyers

12   agreed that I used the phraseology in the statute in my

13   proposed instruction, but they wanted to address a

14   particular concern because the way the statute is

15   worded, they were concerned that a jury might

16   misunderstand the way I instructed the jury to -- and

17   convict you based on the mistaken premise that if you

18   intended to engage in activity for which you could be

19   charged with a crime, even if you didn't intend to

20   engage in activity for which you could be convicted of a

21   crime, they might find you guilty.

22            I don't think that is a plausible theory under

23   which you could be found guilty and so they proposed an

24   instruction to try to cure that problem.  I have -- the

25   instruction as they proposed it, in my view, creates

1    another problem, confusing problem, and I tried to

2    address their concern through an alternative method,

3    which was to put the word successfully in front of

4    prosecuted so that it's clear to the jury unless you

5    intended to engage in conduct which would, in fact,

6    justify a conviction of you for a crime, you cannot be

7    found guilty.

8            And I think we have reached agreement that the

9    proposal that I have made addresses the defense's

10   concern without raising the concern that I had with the

11   instruction as proposed by your lawyer.

12           And we started that discussion four minutes

13   before 9:00 because now we're ten minutes after 9:00 and

14   I don't like to have the jury waiting.  You were brought

15   in in the middle of the discussion and I think I have

16   fairly summarized what we had talked about.

17           Does anybody want to add anything else to what

18   we've just said?

19           MR. SAXE:  No, your Honor.

20           THE COURT:  Did you want to take a minute and

21   further -- see if your client has any questions or

22   anything?

23           MR. SAXE:  I think he understands it, but --

24   no, that's fine.

25           THE DEFENDANT:  Thank you, your Honor.

1          THE COURT:  All right.  You're welcome.

2          Okay.  Are we ready to bring the jury in?

3          MS. GRAHAM:  Yes.

4          THE COURT:  As soon as my clerk comes back,

5    we'll bring the jury in.  There he is.  Good.

6              (Jury entered the courtroom.)

7          THE COURT:  Good morning, members of the jury.

8    I hope you had a nice weekend, a beautiful New Hampshire

9    weekend, and hopefully we'll have a few more in the

10   weeks ahead.

11         We're ready to go ahead with closing

12   arguments.  And the way it's going to work is that the

13   government will go first, then the defendant will have

14   an opportunity to make a closing, and the government has

15   an opportunity for a brief rebuttal.

16         If you're ready to proceed, please go ahead.

17         MS. KONESKY:  At the beginning of this trial,

18   my colleague told you that this was a case about

19   manipulation, the defendant's manipulation of

20   14-year-old Mackenzie Harvey for sex.

21         The Court will instruct you on the three

22   elements of the offense, three things the government has

23   to prove for you to find the defendant guilty.

24         First, that the defendant knowingly

25   transported Mackenzie Harvey in interstate commerce;

1   second, that at the time of the transportation,

2   Mackenzie was under the age of 18; and, third, that at

3   the time of the transportation, the defendant intended

4   that Mackenzie would engage in sexual activity for which

5   any person could be successfully prosecuted under

6   Vermont law.

7           Now, the Court will instruct you that taking

8   someone from New Hampshire to Vermont is transportation

9   in interstate commerce.

10          And you've heard evidence about McKenzie's

11  age.  She testified that her birthday was in May of

12  2002, making her 14 on April 27th, 2017.  And the

13  defendant also knew that Mackenzie was 14.  If you

14  recall, in his confession, he stated, what am I going to

15  do with a 14-year-old.

16          Now let's move on to the most significant

17  issue here.  Did the defendant transport Mackenzie and

18  did he do so with a purpose of engaging in criminal

19  sexual activity?

20          The judge will instruct you that the sexual

21  activity doesn't have to be the only reason that the

22  defendant took Mackenzie to Vermont.  It just has to be

23  one of the main reasons.  And to that point, you've

24  heard a lot of evidence about things that happened

25  before April 27th, 2017, things that explain how the

1    sexual relationship between Mackenzie and the defendant

2    came to be and evidence which explains how Mackenzie

3    ended up in Vermont that day.

4          During this trial, you've heard evidence about

5    who Mackenzie Harvey is.  Patrick Elmore testified that

6    he met Mackenzie through his church youth group.  He

7    described her as a girl with a big heart, but low

8    self-esteem.  She has a hearing disability; she had a

9    difficult home life.

10         And Mackenzie told you about her life as well.

11   She also said that her life at that time was difficult.

12   She was having trouble in school, her grandfather had

13   passed away, there were issues at home.  Mackenzie had

14   been diagnosed with depression.

15         And you watched Mackenzie as she sat up here

16   and you heard what she said.  You saw her cover her face

17   as she used anatomical terms to describe the sex acts

18   that she engaged in with the defendant.

19         You've also heard evidence about McKenzie's

20   mom, Carol Pino, and Frank Brown, another man who lived

21   in their house, and from those you can get some sense of

22   what McKenzie's life was like in Hinsdale.

23         Mackenzie was vulnerable.  She was prey to a

24   predator.  She was easily manipulated.  And in the fall

25   of 2016, the defendant began his manipulation.

1          Mackenzie told you that the defendant was

2    friends with her mom and that he began to spend more and

3    more time at their house in Hinsdale.  And she told you

4    that he was nice to her and he bought her things.  He

5    bought her coffees and shoes and clothes and he did

6    things for the family.

7          And that kindness paid off when on a hayride

8    Mackenzie got scared and she clung onto the defendant's

9    leg.  And he saw that as his invitation.  And you heard

10   testimony that shortly after that hayride, the sexual

11   relationship between Mackenzie and the defendant began.

12          How do we know this?  Well, because Mackenzie

13   told you in her testimony and the defendant's confession

14   tell the same story.  Both Mackenzie and the defendant

15   describe their relationship beginning on the hayride.

16   They both describe their first sexual encounter in the

17   attic at the Hinsdale home.  They both described plans

18   to run away together and hiding their relationship.  The

19   defendant's confession talked about Carol Pino's

20   knowledge of that relationship and how she held that

21   over his head.

22          Now, take a look at Exhibit 16; this is the

23   letter that Mackenzie said she received from the

24   defendant during their relationship before April of

25   2017.  If you love me, you'll say we never had sex and

1  mom is making you say we did.  Then after the bullshit,

2  we'll find each other and run away unless we can run

3  away before that ever happens.

4          This letter corroborates both Mackenzie's

5  story and the defendant's confession.

6          Also take a look at the text messages that

7  Mackenzie said she sent to the defendant the day before

8  they left on April 26th.  If you have any doubt about

9  the nature of their relationship, look at those texts.

10  It was a sexual relationship.

11          And to be clear, Mackenzie, at this point, to

12  the extent that a 14-year-old is able, was a willing

13  participant.  She thought she loved the defendant.  But

14  as the judge will instruct you, her consent doesn't

15  matter.  It doesn't make the defendant less guilty.

16          And so it's with this background of their

17  relationship that we come to April 27th, 2017.

18  Mackenzie testified and she told you the story.  She

19  told you that she expected the defendant to get her that

20  night.  She had packed some clothes, she packed her

21  black and white blanket.  She went to sleep and she was

22  awoken by rocks being thrown at her window.  She opened

23  the window, she climbed down to the defendant, he took

24  her over the train tracks and to his car.

25          The defendant described this exact same story.

1    This is from Exhibit 11e.

2                    (Audio recording played.)

3            MS. KONESKY:  Mackenzie told you that in the

4    car ride on the way to Vermont, the defendant touched

5    her.  She performed oral sex on him.

6            When they got to Vermont, to the filthy

7    run-down motel in disrepair pictured in Exhibit 5, the

8    defendant gave Mackenzie a Corona to drink, he laid out

9    a tarp, and they had sex.  As Mackenzie said, he put

10   her -- his penis in her vagina.  His sexual activity was

11   at least one of the reasons, if not probably the -- the

12   only reason the defendant took Mackenzie from her home

13   to Vermont that night.

14           Now, other than Mackenzie's testimony, what

15   other evidence do you have to show that this happened?

16   Well, just hours later, that same morning, Patrick

17   Elmore arrived at the property, a property owned by the

18   defendant's sister, and he saw a girl in a pink jacket

19   and a man in the woods.  He didn't initially -- he

20   wasn't a hundred percent sure that it was Mackenzie at

21   first, but shortly thereafter he saw that girl again

22   with the same pink jacket and he was sure that it was

23   Mackenzie.  And then shortly thereafter the defendant

24   just happens to come driving by those same woods.

25   Coincidence?

1        When Mackenzie's family members waved at the

2    defendant and yelled at him, he didn't stop.  He told

3    you he drove right by.  If that was really as the

4    defendant claims, because he didn't want to talk to them

5    about a rental issue, does that make any sense?  Or does

6    it make more sense that he drove right by because he

7    knew what he had done?

8        The defendant was arrested just a few miles

9    away, taken into custody, and he gave a detailed

10   confession.  You should consider the defendant's

11   confession.  And here's some -- some -- now, the

12   defendant will tell you, actually, that his confession

13   was false and he says this is because the officers

14   pressured him and he said he just wanted to get back to

15   his cell.  And he testified he also wanted to get Carol

16   Pino in trouble.

17       When you listen to that confession, I ask that

18   you do so using your common sense.  You heard the part

19   of the confession where the defendant says that the

20   officers pressured him.  In his opening statement, the

21   defense attorney called Detective Albright aggressive.

22   Listen to it.  Ask yourselves whether Detective Albright

23   sounds aggressive.  Think about the long pauses in that

24   conversation.  Think about the quiet voices.  Ask

25   yourself whether there's anything about that

1  conversation that would make somebody fabricate a

2  confession to appease the officers.

3            And most importantly, consider the detailed

4  confession that the defendant gave.  The officers asked

5  him about the night before.  And yet it was the

6  defendant's decision to start from the very, very

7  beginning.  His own words.  Think about the details that

8  he gave that lined up exactly with Mackenzie's details,

9  the first night in the attic, the hayride, the train

10 tracks.  He specifically described which room in the

11 hotel they had sex in.

12           Think about the conversations with Carol Pino

13 that he recounted for the officers and the detailed

14 information he gave about how she held her knowledge of

15 this relationship over his head.  Listen to this clip

16 where the defendant describes part of the sexual

17 activity.

18                 (Audio recording played.)

19           MS. KONESKY:  And that clip is also from

20 Exhibit 11e and in that, the defendant gave very

21 specific details.  Why did he tell this to the police?

22 Because it was true.

23           And if this isn't enough, think about the

24 physical evidence.  Mackenzie testified that the

25 defendant gave her a Corona and, sure enough, the crime

1   scene search team found a Corona in the motel.  And it

2   stood out to them because it was one of the only things

3   there that wasn't dusty.  It appeared that it had

4   recently been brought there.

5           In the defendant's glove box of his car,

6   officers recovered a cell phone.  On that cell phone was

7   a picture of Mackenzie touching herself.  Mackenzie

8   looked at the picture and she told you that she took it

9   and she sent it to the defendant.  And it was found in a

10  phone in the glove box of the defendant's car.

11          Also in that car officers recovered a used

12  condom.  And that leads me to what might be the most

13  damning piece of evidence in this case, which is the

14  letters the defendant sent.

15          Attorney Olmstead testified that he received

16  this letter in 17a from the defendant:  Jazzy, please

17  give to Kenzie.

18          Attorney Olmstead testified that he didn't

19  read the letters all the way through, but he saw parts

20  of them.  He saw love, I love you; he said that he saw

21  the hearts.  He said that he saw Jazzy, please give to

22  Kenzie.  He looked at these letters and he identified

23  these letters as the ones that he received.

24          And if you don't believe that, look at Exhibit

25  17, which is the letter that he sent at that time.

1    Enclosed are two handwritten letters that Kurt

2    Carpentino sent to me and asked that I get to you for

3    forwarding to Kenzie.

4           Now, the defendant said that there were no

5    instructions to forward the letters to Kenzie.  If

6    that's true, where did Attorney Olmstead get this?  And

7    why was the defendant sending letters to Mackenzie's

8    best friend, Jasmine Baker?  He did so because he wanted

9    them sent to Mackenzie.

10          Now, let's take a look at those letters in a

11   little more depth.  In 17b, in a letter that the

12   defendant -- in which the defendant asks Mackenzie to

13   lie for him, and letters, by the way, that the defendant

14   says were written by somebody else, he includes intimate

15   details.  He talks about the hayride, our first kiss,

16   our first love letter, our first night together.

17          In one of the letters which he sends -- which

18   he sent on Mackenzie's birthday, he said, happy

19   birthday.  This is somebody who knew when her birthday

20   was.

21          He also, in this letter, discusses the used

22   condom in the car.  Who else would have known about the

23   used condom in the car?

24          Read these letters when you deliberate.  Use

25   your common sense.

1          And let's also talk about the handwriting.

2    Attorney Olmstead testified that he recognized the

3    handwriting on these letters as belonging to Kurt

4    Carpentino.  And he knew that because he has years of

5    experience receiving handwritten letters from Kurt

6    Carpentino.

7          And you'll have these letters when you

8    deliberate.  Look at them for yourselves.  Compare them

9    to the eviction notice which the defendant admitted he

10   wrote.  Compare the spelling, compare the handwriting,

11   the word choice.  These letters were written by the

12   defendant.

13         Now, the defendant, when he testified, asked

14   you to believe that Carol Pino somehow concocted this

15   complex scheme because she was upset with him for trying

16   to evict her and that Mackenzie traveled here from her

17   dad's house in Alabama to lie to you to help her

18   mother's scheme.

19         In support, he provided an eviction notice.

20   The eviction notice was only filed with the court in

21   July of 2017, months after the defendant had been in

22   jail.  He says it was served on April 20th, but as he

23   admitted, the only thing that you have to go by on that

24   is his word.  The only thing that tells you it was

25   served on April 20th is his word.

1          And I'd ask you to consider that in light of

2   the letter on May 8th, 2017, which the defendant also

3   admits to writing to his attorney, Frank Olmstead.

4          In that letter he says for 12 Oak Hill Road

5   and 76 Glen Street, that's the address where Carol Pino

6   and Mackenzie lived, please send a letter requesting

7   rent to be sent to you and ask if they both plan on

8   continuing to rent.

9          If he had evicted Carol on April 20th, why

10  would he send this letter to his attorney on May 8 and

11  why wouldn't he mention the eviction?  It makes no

12  sense.

13         Now, Mackenzie testified that at one point she

14  did hear her mother threaten to send the defendant to

15  jail if he tried to evict them.  I want you to think

16  about two things.  First, if Mackenzie is part of this

17  big conspiracy, scheme, with her mother to set up the

18  defendant, why would she admit to that?

19         And, second, think about what you know about

20  what Carol Pino knew.  She did have something over his

21  head.  She knew that he had a sexual relationship with

22  her daughter.

23         MS. GRAHAM:  Objection, your Honor.  Facts not

24  in evidence.

25         MS. KONESKY:  There is significant evidence --

```
1              THE COURT:  Wait.
2              I'm -- come up to sidebar.
3                         AT SIDEBAR
4              THE COURT:  What are you trying to say?
5  Because I'm not understanding it.
6              MS. KONESKY:  That the -- the reason that
7  Carol Pino may have said that is because she was aware
8  of the sexual relationship.  So she did have something
9  to threaten to send him to jail with.
10             THE COURT:  What's the evidence of that?
11             MS. KONESKY:  The defendant's confession that
12 Carol Pino knew what was going on and that she had
13 threatened --
14             THE COURT:  See, the -- the problem I'm having
15 with this is there's no evidence -- the defendant -- the
16 defendant is saying he's -- his confession is false.
17 Mackenzie never testified that her mother knew about the
18 relationship.  You don't need to be doing this.  So I
19 mean --
20             MS. KONESKY:  You can --
21             THE COURT:  I have to say, I have no idea
22 whether she knew about the relationship or not.  The
23 only thing I know is that the defendant was -- as I see
24 the evidence, was trying to plant a story and be
25 prepared with a story.  I thought that was your case.
```

1    But your case is actually that Carol Pino knew that they

2    were having a sexual relationship?

3                MS. KONESKY:  Well, I don't think it's

4    necessary to find that, but I do think there is

5    evidence.  There's the letter, Exhibit 16, where they

6    talk about Carol knowing.  But I mean, I don't need

7    to --

8                MR. AFRAME:  It doesn't matter.

9                MS. KONESKY:  -- push this.  Yeah, I can just

10   move on.

11               MS. GRAHAM:  I would ask the Court to strike

12   it and instruct the jury --

13               THE COURT:  Yeah, I think it's better to do

14   it.  I'm just not a -- you're right in that there is one

15   piece of evidence, which is he made a statement in which

16   he said she knew.  And that is in evidence.  So you're

17   not -- you're not making any --

18               It is true; your client did say that she knew

19   he was having a sexual relationship, right?

20               MS. GRAHAM:  Right, but this is the same

21   statement that I think the government's --

22               THE COURT:  But is it not in evidence?

23               MS. GRAHAM:  His letter is in evidence.

24               THE COURT:  Yeah.  His -- his confession is in

25   evidence, right?

 1              MS. GRAHAM:  Correct.

 2              THE COURT:  And his confession is that she

 3       knew about them having a sexual relationship.

 4              MS. GRAHAM:  Right.

 5              THE COURT:  All right.  So your objection's

 6       overruled.

 7                        CONCLUSION OF SIDEBAR

 8              THE COURT:  Objection overruled.

 9              You can continue.

10              MS. KONESKY:  Ladies and gentlemen, when you

11       evaluate the evidence in this case, I ask that you use

12       your common sense.  When you do, you'll find that it

13       shows that the 33-year-old defendant, Kurt Carpentino,

14       manipulated 14-year-old Mackenzie Harvey into

15       believing -- somehow believing in her 14-year-old mind

16       that she was his girlfriend.

17              Look at the letter he gave her during their

18       relationship.  He promised love, he promised happiness.

19       At some point they planned to run away together.  On

20       April 27th, 2017, Mackenzie waited, she packed her

21       things, she woke up to rocks being thrown at her window,

22       and she climbed out with the defendant.  They walked

23       over the train tracks and to his car and he took her

24       from Hinsdale, New Hampshire, to Rockingham, Vermont, to

25       the abandoned motel.

1          When they got there, he gave her a Corona, he

2     laid out a tarp, and they had sex.  At some point the

3     defendant realized what he was doing, in his own words,

4     was way beyond sane.  And he was right.

5          Within a few weeks -- actually, that morning,

6     that next morning, the defendant was apprehended and he

7     confessed and he gave a full and a detailed confession.

8     But within a few weeks, he sent letters to Mackenzie

9     asking her to lie.  In those letters, he promised her

10    love, he promised he would listen to her, he promised he

11    would talk to her, not at her.  Look at those letters.

12    He replaced the Os in love with hearts to relate to a

13    14-year-old girl.  This was the defendant's final

14    attempt to manipulate Mackenzie Harvey.

15         When you review the evidence, I urge you to do

16    so using your common sense.  And when you do, I suggest

17    that you will find that the defendant is guilty beyond a

18    reasonable doubt.

19              THE COURT:  Thank you.

20              Counsel.

21              MS. GRAHAM:  Good morning, ladies and

22    gentlemen.

23              Kurt Carpentino did not sexually assault

24    Mackenzie.  He didn't transport her from New Hampshire

25    to Vermont.  This case has been about the delivery of a

1  promise, Carol Pino's promise and threat to get Kurt

2  arrested if he evicted them.

3          This case falls on the testimony of a girl who

4  writes letters and journals about dreams and fantasies

5  about boys, who showed signs of some infatuation with

6  Kurt, but who didn't respond.

7          It falls on the testimony of a girl who,

8  despite having so many people in her life, told no one

9  that this was happening.  She told no one because it

10  didn't happen.

11          You heard that Mackenzie had a number of

12  resources in her life.  She had a counselor; she had a

13  caseworker; she had a doctor who prescribed her

14  medication; people who were there in her life to help

15  her who she saw fairly regularly.

16          She had the Elmores.  She called Kim Elmore

17  daily.  Do you think that she would not tell her,

18  someone who was so close to her?

19          You also heard that Mackenzie spoke with a

20  woman named Maureen who came to her house.  And Maureen

21  asked her, Mackenzie, are you alone with Kurt?  No, she

22  said.  Mackenzie, does Kurt ever stay here in the house?

23  No, she said.

24          And you heard that Mackenzie went to school

25  and sought out her resource officer there and told him

1    everything is okay at home.  Why didn't she tell these

2    people in March of 2017 that Kurt was abusing her?

3    Because the simple explanation is that it didn't happen.

4    So what happened after all of those opportunities and

5    all of those people that she could talk to?

6              Carol Pino got the demand notice.  You saw the

7    document, the eviction notice.  Pay attention to -- I

8    think it was page 3 or 4.  That was the demand notice

9    that was served on April 20th by Kurt.  How do you know

10   that?  Kurt told you.  He testified about it.  And, most

11   importantly, you heard Mackenzie testify, yes, I heard

12   my mom threaten Kurt that she would arrest him if he

13   evicted them.

14             So let's talk about the evidence you heard in

15   this case.  You heard from Frank Brown.  Did he seem

16   like he had any dog in this fight?  Did Frank Brown seem

17   like a straight shooter to you?  He isn't with Carol

18   Pino anymore.  He's moved on with his life.  So what did

19   he say that's so important?  That he was living there

20   but for a few weeks.  He was there and he told you that

21   Kurt never lived at that house and he certainly didn't

22   have a room up in the attic.  And he never saw anything

23   unusual between the two of them.

24             Now, Mackenzie testified that during the

25   period of October of 2016 and April of 2017, she had sex

1  with Kurt many places in the house -- in the attic, in

2  the living room, kitchen -- during that period of time,

3  in a house that was full.  You heard who was living

4  there at the time.  There was Carol, there was Frank,

5  there was the son Michael and his wife and children, the

6  sister and her child, and another guest, Jason.  Your

7  common sense tells you that a house that full would have

8  seen something.

9          And what was the quality of Mackenzie's

10  testimony?  She wasn't able to provide you with in-depth

11  details.  And the details that she did give weren't

12  supported by the evidence.

13          Now, the government told you to reflect on how

14  she reacted when she was on the stand talk about these

15  acts.  You'll get a chance to look at the emails.  Is

16  that the same person that you see in those emails and

17  the person who testified?

18          Now, you also heard her testify that when she

19  came home from school on April 26th, her mom took her

20  phone away from her and she didn't have a phone when she

21  left.  But remember what Detective Solari said; that he

22  looked at that phone, that there were phone calls made

23  at 11:30, up until about 3:00 a.m.

24          And what did Mackenzie say when I asked her if

25  Jazzy was part of this plan, that Jazzy gave her a

1    phone.  She denied it.  Even when I played her audio,

2    she said, no, that's not me.  And then she said, yes,

3    that is me, when I actually showed her video of herself

4    saying that.

5              Now, Detective Solari brought forth some

6    information.  He told you that -- about an LG phone and

7    that the phone calls that were made from Mackenzie's

8    phone on April 26th, there were no phone logs, no phone

9    calls, no text messages found on that LG phone that was

10   found in the car.

11             You heard that the government associates that

12   LG phone with Kurt and that number with Kurt, but you

13   also heard Detective Solari tell you that that LG phone

14   was also associated with another email address.  What

15   was that email address?  Jazzythebomb.  What does that

16   suggest to you?  That others had access to the phone;

17   that Kurt did not exclusively use that phone.

18             And what about the picture that Mackenzie

19   testified about that was found on the LG phone?  You

20   heard Detective Solari explain where that picture was.

21   When you opened up the phone, it wasn't there in the

22   photo gallery.  It had been deleted.  And so what does

23   that mean?  You take a phone and you can take a picture

24   of yourself and then you delete it.  That image goes

25   into some memory in that phone.  So if I give you that

1    phone, you wouldn't necessarily know that that image was

2    ever there.

3            Why is that important for you?  Because you

4    heard testimony that Mackenzie took items from Kurt.

5    And you know that phone was associated with another

6    email address.  Kurt testified that he never saw that

7    image and there's no other evidence that Kurt received

8    it.

9            Now, you've heard about statements that Kurt

10   gave to the police.  He took the stand and he told you

11   why he said what he said, that the police provided him

12   with a lot of details and that's how he was able to

13   provide details about the case.  That's how he knew it.

14   And that he felt compelled to give him -- give the

15   police what they wanted.  But he told you on the stand

16   on Friday that he never sexually assaulted Mackenzie or

17   took her across state lines.

18           Now, you also heard about letters from

19   Attorney Olmstead.  You never heard who touched those

20   letters before they got to the police.  You have no

21   idea, no evidence presented to you, how those got from

22   the attorney to the police.

23           So let's now talk about what you didn't hear.

24   What you don't hear sometimes is more powerful than what

25   is said.

1      You heard Mackenzie tell you that Kurt

2   ejaculated on her.  The police made sure to take her to

3   a hospital where there was a sexual assault nurse on

4   staff.  The troopers had an evidence collection team.

5   They searched and collected evidence in this case.  They

6   collected it from the motel, from Kurt's car, from the

7   hospital.  They took cuttings from the car, they took

8   the Corona bottle, a blanket, a used condom, and they

9   took a DNA swab from Kurt.  They labeled these items,

10   they tagged them, they placed them in bags ready for the

11   crime lab.  Why go through this process?  You heard from

12   the evidence collector DNA and fingerprint tests can

13   help determine who committed a crime and who was at the

14   crime scene.  You heard and saw no scientific or

15   forensic evidence that Kurt had sex with Mackenzie or

16   that he was in that hotel.

17      The trooper talked a lot about how he saw

18   fingerprints on the passenger side of Kurt's car.  Did

19   you hear any testimony, any evidence, that those

20   fingerprints were Mackenzie's?  No.

21      Did you see any pictures of tire marks or

22   footprints at the home or at the motel?  No.

23      Did the troopers collect a sperm-laden sponge

24   from the motel?  No.

25      Did they collect a tarp?  No.

1          Remember, Mackenzie agreed that she told that

2    sexual assault nurse that Kurt ejaculated on her, that

3    she took a sponge and she tried to wipe it off, but not

4    all of it came off.  And that she had sex on a tarp.

5    There was no sponge, no tarp in evidence.

6          Did the troopers collect any of these smashed

7    phones at the motel?  No.

8          DNA tests and forensic science don't take

9    sides, they don't choose positions, they assist in

10   identifying and helping you determine if a crime was

11   committed, who committed the crime.

12         What did you hear about that kind of evidence

13   in this case?  What has the government, who has the

14   burden in this case, given you?  Silence.  And that

15   should speak volumes for you.

16         And lastly I will say about silence, why

17   didn't the government call Carol Pino?  Ask yourselves

18   that question.

19         We ask that you return a verdict of not

20   guilty.

21         THE COURT:  Thank you.

22         Government's rebuttal?

23         MR. AFRAME:  Ladies and gentlemen, I got the

24   first word and I get the last word and I promise the

25   last word will be a lot shorter than the first.  So let

1    me just touch on a couple of things that you just heard.

2           The first statement that was made was this

3    case falls on the testimony of a girl.  No, it does not.

4    It falls on the statements made by Kurt Carpentino.

5    You've heard his confession.  He told you what he did

6    and then he wrote what he did.  He wrote it after and it

7    comports with what he wrote before.  That's the critical

8    evidence in this case.

9           Now, it was just made -- a point to you was

10   made that the -- that Mackenzie did not tell these

11   people that it was happening in March of 2017.

12          Can I see Exhibit 16 for one second?  Would

13   she tell someone in March of 2017 that this was

14   happening?  She believed this was her boyfriend.  She

15   believed in Kurt Carpentino.  She was manipulated by

16   him.  And you see in that letter that he says, don't

17   tell them we're having sex -- I'm paraphrasing slightly,

18   but go read Exhibit 16:  Do it for me.

19          She would be loyal to him in March 2017.  This

20   was her boyfriend.  He was instructing her what to do

21   and she was doing it.  And I suggest to you she knew it

22   was wrong and it's what she was doing.  She was in

23   pretty deep.

24          So it should come as no surprise to you that

25   she didn't tell this list of people in March of 2017.

1            So the idea here, I guess, is that it was

2   somehow related to this eviction, this April 20th

3   eviction, and you're supposed to believe that this was

4   all some kind of big setup, a frame-up.  And all the

5   facts or the information that would lead to the

6   frame-up, that was known to Kurt Carpentino when he

7   confessed.  They had had the fights about the eviction.

8   That had already all gone on.

9            So there's Kurt Carpentino with the Vermont

10  State Police and instead of saying, this was a frame-up

11  by this girl's mother because we're in some eviction

12  dispute -- that might be the logical thing you'd think

13  he'd do.  No, he decides that he's going to implicate

14  somehow the mother in a crime he didn't commit to get

15  her in trouble instead of saying it was a frame-up.  He

16  never said that.

17           Frank Brown.  That's the testimony you're

18  supposed to rely on?  He didn't even know the last name

19  of the guy living in the attic where Kurt Carpentino

20  admits he's living.  Really.

21           Phone calls made on the phone that Carol Pino

22  took late at night on April 26th into 27th.  What did

23  the defendant say in his confession about Carol Pino?

24  She wanted a relationship with him, but he said, you

25  really want a relationship with me after you know my

1    (sic) daughter's been on me?  I'm paraphrasing a little,

2    but that's essentially what he said.  Carol Pino very

3    well could have been calling, at all hours of the night,

4    Kurt Carpentino.

5            So this confession, it got whisked away in the

6    statement you just heard and about a sentence, he was

7    pressured by the police.  Let's just think about that

8    for a second.  He was pressured by the police.

9            What did Albright say?  We're going to do a

10   search warrant at the motel, we're going to do a search

11   warrant at the Hinsdale house, we're going to get the

12   videotape from the Jiffy Lube and the Sunoco, we're

13   going to do a DNA kit.  I hope that helps -- that works

14   out for you, Mr. Carpentino.  Those are things they're

15   going to do.

16           Does that put pressure on a person?  I suppose

17   it does if they did it.  If the police say, we're going

18   to go do all those different things and those things are

19   going to show that you did it and you really did do it,

20   it might be time to give it up.

21           But flip that over.  If you didn't do it and

22   the police said we're going to go do things one, two,

23   three, four, five, wouldn't you say, that's going to

24   exonerate me, go ahead, go do those things.  I didn't do

25   it.  That's not what he said.

1          And then you have the letters.  Those letters,

2    they just tell the whole story.  And you're supposed to

3    believe that they somehow are fakes.  You're supposed to

4    believe the whole thing was a fake, was a frame-up.  If

5    this was a frame-up, it's the greatest frame-up in

6    history.  The letters are so good that Attorney

7    Olmstead, someone with -- to use the defense's words --

8    no dog in this fight, said, that's his handwriting,

9    identified the letters.  Those letters are from Kurt

10   Carpentino.  They're not part of some frame-up.

11          And it just so happened there's a girl in the

12   woods with a guy and the defendant happens to be driving

13   by at the moment and his phone is in the car and the

14   condom's in the back.  It's all just -- it's a frame-up?

15   Come on, ladies and gentlemen.  It's more manipulation.

16          We come back to where I began.  The defendant

17   manipulated this girl and when he got caught, he tried

18   to manipulate her again and that manipulation continued

19   in this courtroom.  It's time for the manipulation to

20   stop.  The defendant is guilty.  Find him so.

21          Thank you.

22          THE COURT:  Thank you.

23          All right, members of the jury, I'm going to

24   instruct you now on the law that you will apply in

25   deciding this case.

1          I apologize in advance.  I'm going to be

2     reading the instructions.  But the good news for you is

3     that you don't need to take notes on the instructions if

4     you don't want to.  You can see the mass exodus of

5     people as I tell you I'm going to read jury

6     instructions.  They don't want to be here to listen to

7     this.  But it's important that you know about it and

8     it's important that you -- I convey the information

9     accurately to you.

10          And so I'm going to read the instructions and

11     you're going to have a copy of them with you in the room

12     when you begin your deliberations.  And you'll see I put

13     little headings on each different section, so if you

14     want to say, oh, what did the judge tell us about the

15     burden of proof?  There'll be a section on that.  Or the

16     elements of the offense and you can just turn to the

17     instructions and read them and discuss them in the jury

18     room to the extent you find it helpful to you.

19          So let me begin.

20          At this stage of the trial, it's my duty to

21     instruct you on the principles of law that you will

22     apply in deciding this case.  It is your duty to follow

23     these instructions during your deliberations.  You

24     should not single out any one instruction, but instead

25     apply these instructions as a whole to the evidence in

1    this case.

2            You are the sole and exclusive judges of the

3    facts.  You must weigh the evidence that has been

4    presented impartially, without bias, without prejudice,

5    without sympathy.  You must make a determination as to

6    what the facts are, what the truth is, based on the

7    evidence presented in this case.  You will decide the

8    case by applying the law as I give it to you in these

9    instructions and the facts as you find them to be from

10   the evidence.

11           In determining what the facts are, what the

12   truth is, you must necessarily assess the credibility of

13   each witness and determine what weight you will give to

14   each witness's testimony.  By credibility I mean the

15   believability or truthfulness of a witness.

16           You should carefully scrutinize the testimony

17   given, the circumstances under which each witness has

18   testified, and every matter in evidence which tends to

19   show whether a witness is worthy of belief or not worthy

20   of belief.  Consider each witness's intelligence,

21   motive, state of mind, demeanor and manner while

22   testifying.

23           Consider the witness's ability to see, hear,

24   or know the matters about which that witness has

25   testified.  Consider whether the witness had a good

1    memory of what the witness has testified about.

2           Consider whether the witness had any reason

3    for telling the truth or not telling the truth, whether

4    the witness had an interest in the outcome of the case,

5    whether the witness had anything to gain or lose as a

6    result of his or her testimony, whether the witness had

7    any friendship, relationship, or animosity towards other

8    individuals involved in the case, whether the witness's

9    testimony was consistent or inconsistent with the

10   witness's answer own testimony and the testimony of

11   other witnesses.  Consider the extent to which, if any,

12   the testimony of each witness is either supported or

13   contradicted by other evidence in the case.

14          After assessing the credibility of each

15   witness, you will assign to the testimony of each

16   witness, both under direct and cross-examination, such

17   weight as you deem proper.  You are not required to

18   believe the testimony of any witness simply because that

19   witness was under oath.  You may believe or disbelieve

20   all or part of the testimony of any witness.  It is

21   within your province to determine what testimony is

22   worthy of belief and what testimony may not be worthy of

23   belief.

24          During the course of the trial, you have heard

25   several government agents testify.  You should consider

the testimony of a government agent in the same manner
as you consider the testimony of any other witness in
the case.  In no event should you give the testimony of
a government agent any more credibility or any less
credibility simply because that witness is a government
agent.

The testimony of a witness may be discredited
or, as we sometimes say, impeached by showing that the
witness previously made statements which are
inconsistent than or -- which are different than or
inconsistent with his testimony here in court.
Inconsistent or contradictory statements which are made
by a witness outside of court may be considered only to
discredit or impeach the credibility of the witness and
not to establish the truth of these earlier out-of-court
statements.

You must decide what weight, if any, should be
given to the testimony of a witness who has made prior
inconsistent or contradictory statements.  In making
this determination, you may consider whether the witness
purposely made a false statement or whether it was an
innocent mistake; whether the inconsistency concerns an
important fact, or whether it had to do with a small
detail; whether the witness had an explanation for the
inconsistency, and whether that explanation appealed to

1    your common sense.

2            If a person is shown to have knowingly

3    testified falsely concerning any important or material

4    matter, you obviously have a right to distrust the

5    testimony of such an individual concerning other

6    matters.  You may reject all of the testimony of that

7    witness or give it such weight or credibility as you may

8    think it deserves.

9            It is exclusively your duty, based upon all of

10   the evidence and your own good judgment, to determine

11   whether the prior statement was inconsistent, and, if

12   so, how much, if any, weight is to be given to the

13   inconsistent statement in determining whether to believe

14   all or part of that witness's testimony.

15           The fact that the prosecution is brought in

16   the name of the United States of America entitles the

17   government to no greater consideration than that

18   accorded to any other party in litigation.  By the same

19   token, the government is entitled to no less

20   consideration.  All parties, whether the government or

21   individuals, stand as equals at the bar of justice.

22           The weight of the evidence is not necessarily

23   determined by the number of witnesses testifying on

24   either side.  You will consider all the facts and

25   circumstances in evidence to determine which of the

1    witnesses are worthy of belief.  You may find that the

2    testimony of a small number of witnesses on a particular

3    issue is more credible than the testimony of a greater

4    number of witnesses on the other side of that issue.

5          In reviewing the evidence, you will consider

6    the quality of the evidence and not the quantity.  It is

7    not the number of witnesses or the quantity of testimony

8    that is important, but the quality of the evidence that

9    has been produced that is important.  You will consider

10   all of the evidence no matter which side produced or

11   elicited it, because there are no property rights in

12   witnesses or in the evidence that is presented.

13         During the course of the trial you have heard

14   certain statements, arguments, and remarks from counsel.

15   These are intended to help you in understanding the

16   evidence and in applying the law to this case.  However,

17   in the event that counsel have made any statements

18   concerning the evidence that are contrary to your

19   recollection of the evidence, then you must take your

20   own recollection as to the evidence.

21         If counsel have made any statements concerning

22   the law that are contrary to my instructions, you must

23   take the law from me.  You're not to be concerned with

24   the wisdom of any rule of law.  Regardless of any

25   opinion you may have as to what the law ought to be, it

1  would be a violation of your sworn duty to base a

2  verdict on any other view of the law than the law as I

3  give it to you in my instructions.

4          From time to time during the course of the

5  trial counsel have made objections.  This is a proper

6  function to be performed by counsel on behalf of their

7  respective clients.  You should not concern yourself

8  with the fact that objections have been made, nor with

9  my rulings on those objections.  I must rule on

10  objections and have not intended to indicate in any way

11  by my rulings or by what I have said what the verdict

12  should be in this case.

13          In this case, as in all cases, I'm completely

14  neutral and impartial.  It's up to you to determine

15  whether the defendant is guilty or not guilty based on

16  the facts as you find them to be and the evidence as I

17  give it to you.

18          The direct evidence in this case consists of,

19  one, the sworn testimony of witnesses, both on direct

20  and cross-examination, regardless of who may have called

21  the witness; two, the exhibits which have been received

22  into evidence; and, three, any facts to which all

23  lawyers have agreed or stipulated.

24          Certain things are not evidence and cannot be

25  considered by you as evidence.  Arguments and statements

by lawyers are not evidence.  What they have said in

their opening statements, closing arguments, and at

other times is intended to help you interpret the

evidence, but it is not evidence.  If the facts as you

remember them differ from the way the lawyers have

stated them, your memory controls.

Questions and objections by lawyers are not

evidence.  Attorneys have a duty to their clients to

object when they believe a question is improper under

the rules of evidence.  You should not be influenced by

objections or by my rulings on objections.

Testimony that has been excluded or stricken,

or that you have been instructed to disregard, is not

evidence and may -- must not be considered.

Anything you may have seen or heard when court

was not in session is not evidence.  You are to decide

the case solely on the evidence received at trial.

There are two types of evidence which you may

properly use in deciding whether a defendant is guilty

or not guilty.

Direct evidence is the testimony given by a

witness about what that witness has seen, has heard, or

has observed or what the witness knows based on personal

knowledge.  Direct evidence also includes any exhibits

that have been marked and any stipulations which have

1   been agreed to by the lawyers for both sides.

2           Evidence may also be used to prove a fact by

3   inference, and this is referred to as circumstantial

4   evidence.  In other words, from examining direct

5   evidence, you may be able to draw certain inferences

6   which are reasonable and justified in light of your

7   daily experience and common sense.  Such reasonable

8   inferences constitute circumstantial evidence.

9           The law makes no distinction between the

10  weight to be given to either direct or circumstantial

11  evidence.  It's up to you to decide how to weigh the

12  evidence in this case.  However, the defendant cannot be

13  found guilty of any crime based upon a hunch or even a

14  suspicion or suspicion, even a strong one, or on what is

15  probably the case.  He can -- he can only be found

16  guilty if, on the direct evidence and the reasonable

17  inferences you draw from the direct evidence, you are

18  satisfied that he is guilty of the crime beyond a

19  reasonable doubt.

20          During the course of the trial, I may have

21  instructed you that certain evidence was being admitted

22  for a limited purpose.  It's your duty to follow these

23  instructions during your deliberation.

24          The fact that a -- the fact that an indictment

25  has been returned against the defendant is not evidence

1   of the defendant's guilt.  An indictment is merely a

2   formal method of accusing an individual of a crime in

3   order to bring that person to trial.  It is you who will

4   determine whether the defendant is guilty or not guilty

5   of the offenses charged based upon a consideration of

6   all of the evidence presented and the law applicable to

7   the case.  Therefore, you must not consider the

8   indictment in this case as any evidence of the guilt of

9   the defendant, nor should you draw any inference from

10  the fact that an indictment has been returned against

11  him.

12          A defendant, although accused, begins a trial

13  with a clean slate -- with no evidence against him.  The

14  law permits nothing but the admissible evidence

15  presented before you to be considered in support of any

16  charge against the defendant.

17          The presumption of innocence alone is

18  sufficient to acquit the defendant unless you are

19  satisfied beyond a reasonable doubt that the defendant

20  is guilty after a careful and impartial consideration of

21  all of the evidence in the case.

22          You have heard that Mr. Carpentino made a

23  statement in which the government claims he admitted

24  certain facts.  It is for you to decide, one, if

25  Mr. Carpentino made the statement; and, two, if so, how

1    much weight to give it.  In making that -- those

2    decisions, you should consider all of the evidence about

3    the statement, including the circumstances under which

4    the statement may have been made and any facts or

5    circumstances tending to corroborate or contradict the

6    version of events described in the statement.

7           The burden is always on the government to

8    prove guilt beyond a reasonable doubt.  This burden

9    never shifts to a defendant.  The law does not impose

10   upon a defendant in a criminal case the burden or duty

11   of calling any witnesses or producing any evidence.

12          The law does not compel a defendant in a

13   criminal case to take the witness stand and to testify.

14   No presumption of guilt may be raised and no inference

15   of any kind may be drawn from the fact that a defendant

16   does not testify, because the law does not impose upon a

17   defendant in a criminal case the burden or duty of

18   calling any witnesses or producing any evidence.

19          If, after a careful and impartial

20   consideration of the evidence in this case, you have a

21   reasonable doubt as to whether the defendant is guilty

22   of any charge, you must find the defendant not guilty on

23   that charge.  If you view the evidence in this case as

24   reasonably permitting two conclusions -- one consistent

25   with innocence, the other consistent with guilt -- you

1   must adopt the conclusion that is consistent with
2   innocence.
3           You must never find a defendant guilty based
4   on a mere suspicion, conjecture, or guess.  Rather, you
5   must decide the case on the evidence that is before you
6   and the reasonable inferences that can be drawn
7   therefrom.
8           The indictment charges that the offenses --
9   the offense at issue was committed on or about a certain
10  date.  The proof need not establish with certainty the
11  exact date of the alleged offense when the term "on or
12  about" is used, for, in such instance, it is sufficient
13  if the evidence establishes beyond a reasonable doubt
14  that the offense charged was committed on a date
15  reasonably near the date alleged; that is, a date
16  reasonably close in time to the date upon which the
17  offense is alleged to have occurred.
18          The defendant has been charged with a
19  violation of 18 U.S.C. Section 2423(a), which makes it a
20  crime for a person to knowingly transport an individual
21  who has not attained the age of 18 years in interstate
22  commerce with the intention that the individual engage
23  in any sexual activity for which any person can be
24  charged with a criminal offense.
25          In order for the defendant to be found guilty

on this charge, the United States must prove each of the

following elements beyond a reasonable doubt:

First, that the defendant knowingly

transported Mackenzie Harvey in interstate commerce;

Second, at the time of the transportation,

Harvey was under the age of 18 years; and

Third, at the time of the transportation, the

defendant intended that Harvey would engage in sexual

activity for which any person could be successfully

prosecuted under Vermont law.

I instruct you that a person is transported in

interstate commerce if the person is transported between

New Hampshire and Vermont.

Sexual activity for purposes of this case is

contact between the penis and vulva that involves

penetration, however slight, contact between the mouth

and the penis, and contact between the mouth and the

vulva.

Engaging in a sexual act with a child who is

under the age of 16 is a crime in Vermont regardless of

whether the child consents to the sexual act.  A sexual

act, under Vermont law, means conduct between persons

consisting of contact between the penis and vulva, the

mouth and the penis, and the mouth and the vulva.

Because it would not be a crime under Vermont

1    law for the defendant to engage in sexual activity with

2    Harvey unless at the time she was under 16, you may not

3    find the defendant guilty unless the government proves

4    beyond a reasonable doubt that Mackenzie Harvey was

5    under 16 when the defendant transported her from

6    New Hampshire to Vermont.

7            A defendant acts with an intention that a

8    person will engage in sexual activity for which any

9    person could be prosecuted if he acts voluntarily and

10   with the specific intention that the person transported

11   will engage in sexual activity for which any person

12   could be prosecuted.

13           The United States does not need to prove that

14   the defendant's sole reason for transporting Mackenzie

15   Harvey from New Hampshire to Vermont was for the purpose

16   that she would engage in sexual activity.  A person may

17   have several different purposes or motives for such

18   transportation.  The government must prove beyond a

19   reasonable doubt, however, that at least one of the

20   defendant's substantial motivations was for Mackenzie to

21   engage in illegal sexual activity.

22           The principles of law set forth in these

23   instructions are intended to guide you in reaching a

24   fair and just result in this case which is important to

25   all of the parties.  You are to exercise your judgment

1   and common sense without prejudice, without sympathy,

2   but with honesty and understanding.

3        You should be conscientious in your

4   determination of a just result in this case because that

5   is your highest duty as officers of the court.  Remember

6   also that the question before you can never be: will the

7   government win or lose this case?  The government always

8   wins when justice is done, regardless of whether the

9   verdict be guilty or not guilty.

10        When you've considered and weighed all the

11   evidence, you must make one of the following findings:

12        If you have a reasonable doubt as to whether

13   the government has proved any one or more of the

14   essential elements of the crime charged, it is your duty

15   to find the defendant not guilty.

16        If you find that the defendant has proved all

17   of the essential elements of the crime charged beyond a

18   reasonable doubt, then you may find the defendant

19   guilty.

20        The punishment provided by law for the

21   offense charged in the indictment is exclusively my

22   responsibility and you should -- and should never be

23   considered by you in any way at arriving at your --

24   arriving at an impartial verdict.

25        When you retire, you should elect one member

1    of your jury as the foreperson.  That individual will

2    act very much like a chairman of a committee, seeing to

3    it that the deliberations are conducted in an orderly

4    fashion and that each juror has a full and fair

5    opportunity to express his or her views, positions, and

6    arguments on the evidence and on the law.

7          The verdict must represent the considered

8    judgment of each juror.  Your verdict must be unanimous

9    as to each count.  In this case, there's only one count.

10         It is your duty as jurors to consult with one

11   another and to deliberate with a view to reaching an

12   agreement, if you can do so without violence to

13   individual judgment.  Each of you must decide the case

14   for yourself, but do so only after an impartial

15   consideration of the evidence in the case with your

16   fellow jurors.

17         In the course of your deliberations, do not

18   hesitate to reexamine your own views and to change your

19   position if convinced it is erroneous.  But do not

20   surrender your honest conviction as to the weight or

21   effect of the evidence solely because of the opinion of

22   your fellow jurors or merely for the purpose of

23   returning a verdict.

24         Remember at all times you're not partisans,

25   you're judges, judges of the facts.  Your sole interest

1    is to seek the truth from the evidence in the case.

2            If during your deliberations it becomes

3    necessary to communicate with me, you may do so only in

4    writing, signed by a -- the foreperson or one or more

5    members of the jury.  Give that note to the marshal and

6    he or she will bring it to my attention.  No member of

7    the jury should ever attempt to communicate with me

8    except by a signed writing, and I will communicate with

9    you on anything concerning the case either in writing or

10   orally in the courtroom.

11           Remember you're not to tell anyone, including

12   me, how the jury stands, numerically or otherwise, on

13   the matters you are deciding until you have reached a

14   unanimous verdict or have been discharged.

15           Nothing said in these instructions is intended

16   to suggest or convey in any way or manner what your

17   verdict should be.  The verdict is your sole and

18   exclusive duty and responsibility.

19           When you've reached -- arrived at a verdict,

20   notify the marshal and you will be returned to the

21   courtroom where the foreperson will render the verdict

22   orally.

23           Does counsel need to see me with respect to

24   any additional instructions?

25           MS. GRAHAM:  No, your Honor.

1              MR. SAXE:  No, your Honor.

2              MR. AFRAME:  No, your Honor.

3              THE COURT:  All right.  So we will recess and

4    be -- those exhibits that have been introduced into

5    evidence will be brought in to you, along with a copy of

6    my written charge and the verdict form and you're free

7    to select your foreperson and begin your deliberations.

8              I'm going to direct the clerk to administer

9    the oath to the court security officer.

10             THE CLERK:  Please raise your right hand.

11                 (Court security officer sworn.)

12             THE COURT SECURITY OFFICER:  Yes, I do.

13             THE COURT:  All right.  Anything else before

14   we recess?

15             THE JUROR:  I have a question.

16             THE COURT:  Let me -- let me ask, is it a

17   question about the law or what you're doing as a --

18             THE JUROR:  What we're doing as jurors.

19             THE COURT:  All right.  What I suggest you do

20   is when you recess, write it down and sign it and submit

21   it.  And I will evaluate what -- what to do after

22   getting your instruction because I -- I'm a little

23   concerned about us having a -- a dialogue about that.

24   I'd rather see the -- your question written out in

25   writing.  All right?  Is that okay with you?

1          THE JUROR:  That's fine.  Thank you.

2          THE COURT:  All right.  So let's -- we'll

3   recess and when the juror has the written question, I'll

4   review it with the parties.  Okay?

5          THE CLERK:  All rise.

6          Oh, your Honor, excuse the alternates?

7          THE COURT:  Thank you.  The clerk will advise

8   me I -- you two folks stay right here.  Just have a seat

9   there.  The rest of you can go in.

10                    (Jury excused.)

11          THE COURT:  These are -- the last two are the

12  alternates, right?

13          THE CLERK:  Yes.

14          THE COURT:  All right.

15          So you may know that juries traditionally

16  consist of 12 people.  You may have counted and seen

17  that there were 14 people.  You were the last two

18  people.  You were the alternates.  Our practice is not

19  to instruct people on whether they're alternates or not

20  until the very end of the case.

21          Because we have 12 -- the 12 original jurors

22  are able to deliberate, I'm going to excuse you now from

23  further participation in the case with the thanks of the

24  Court.

25          You -- your presence here was necessary.  In

1    my experience, we lose jurors in the middle of trial and

2    if we lost a juror in the middle of trial and we didn't

3    have an alternate, we'd have to go back and do the whole

4    process over.  So we bring in extra jurors for that

5    purpose.

6              What I would ask you to do, though, is I'm not

7    ready to release you from your oath yet.  I'm going to

8    excuse you.  You can go back in the jury deliberation

9    room, tell the other jurors that you're -- you're

10   alternates that are being excused and say goodbye, but

11   don't discuss the case with them in any way.

12             Surrender your notebooks, gather your things,

13   and you can leave, but don't discuss the case with

14   anyone else yet.  Don't expose yourself to any

15   discussions of the case in the media, don't do anything

16   other than what I've instructed you to do up to now

17   because if we were to lose one of the jurors before the

18   end of deliberations, I might have to bring one of you

19   back.  All right?

20             And as soon as the jury has reached a verdict

21   and the jury has been discharged, the clerk will tell

22   you and you are then released from your oath and you're

23   free to do anything that you want to do with respect to

24   the case.  But until you hear from the juror -- the --

25   excuse me, my deputy, you are still bound by your oath

1    as a juror.

2              And, again, thank you so much for your

3    service.  I know it's a sacrifice and I really do

4    appreciate it.  So thank you and you're excused.

5              All right.

6              Thank you, Vinny.

7                   (Alternate jurors excused.)

8              THE COURT:  So traditionally I give a -- a

9    copy of the indictment to the jury.  Many judges don't

10   do that.  We would need to do a redacted indictment with

11   just one count here.

12             Do you -- do the parties have a view about

13   whether they would like a redacted copy of the

14   indictment to be submitted?

15             MR. SAXE:  Will they be able to tell from that

16   that at some point there had been other counts?

17             THE COURT:  No.  We would redact it so it

18   would just have the one count.

19             MR. AFRAME:  We have no need to submit that

20   unless you want to submit it.

21             MR. SAXE:  No, I don't.

22             THE COURT:  Okay.  I would do whatever -- if

23   the defendant wanted it, I would do it.  If not, I -- I

24   have not prepared a redacted indictment.  It would take

25   30 seconds to do it.  But I do know in consulting with

1    colleagues that it's not a routine matter for the

2    indictment to be submitted to the jury.

3              MR. SAXE:  We're not requesting that.

4              THE COURT:  Okay.

5              MR. AFRAME:  We're not either.

6              THE COURT:  All right.  And I'll just say to

7    those people who are interns working with the court, if

8    you want to come up to my chambers, I'm happy to talk

9    with you about the case and answer any questions that

10   you have, but only interns who are working with the

11   court.  Okay?  Thank you.

12       (Recess taken from 10:19 a.m. until 12:59 p.m.)

13             THE CLERK:  The Court understands that the

14   jury has reached a verdict.

15             Would the foreperson please stand?  The

16   foreperson, please stand and hand your verdict over to

17   the court security officer.

18             Will the defendant please stand?

19             In the matter of the United States of

20   America versus Kurt Carpentino, criminal case number

21   17-cr-157-1-PB, the verdict reads as follows:

22             We, the jury, find the defendant, Kurt

23   Carpentino, guilty as to Count 4 of the indictment dated

24   June 11, 2018, and signed by the foreperson.

25             THE COURT:  Does the defendant wish to have

1   the jury polled?

2           MR. SAXE:  Yes, your Honor.

3           THE COURT:  All right.

4           So, members of the jury, what I'm going to do

5   is I'm going to ask you each individually, I apologize

6   I'll point to help make this clear, and I'll call you 1,

7   2, 3, 4, and I'm going to ask you, was that your

8   verdict.  So if your verdict was guilty, you should

9   answer yes; and if it was not your verdict, you should

10  answer no.  All right?

11          So juror number 1, was that your verdict?

12          THE JUROR:  Yes.

13          THE COURT:  Juror number 2, was that your

14  verdict?

15          THE JUROR:  Yes.

16          THE COURT:  Juror number 3, was that your

17  verdict?

18          THE JUROR:  Yes.

19          THE COURT:  Juror number 4, was that your

20  verdict?

21          THE JUROR:  Yes.

22          THE COURT:  Juror number 5, was that your

23  verdict?

24          THE JUROR:  Yes.

25          THE COURT:  Juror number 6, was that your

```
 1   verdict?

 2             THE JUROR:  Yes, sir.

 3             THE COURT:  Juror number 7, was that your

 4   verdict?

 5             THE JUROR:  Yes.

 6             THE COURT:  Juror number 8, was that your

 7   verdict?

 8             THE JUROR:  Yes.

 9             THE COURT:  Juror number 9, was that your

10   verdict?

11             THE JUROR:  Yes.

12             THE COURT:  Juror number 10, was that your

13   verdict?

14             THE JUROR:  Yes.

15             THE COURT:  Juror number 11, was that your

16   verdict?

17             THE JUROR:  Yes.

18             THE COURT:  Juror number 12, was that your

19   verdict?

20             THE JUROR:  Yes.

21             THE COURT:  All right.  Thank you.  You can be

22   seated, sir.

23             On behalf of everybody, I want to thank you.

24   It is -- it is never an easy thing to be asked to pass

25   judgment on another person.  It's a challenge.  It's
```

1   stressful.  And I recognize that.  And I appreciate your

2   service.  And on behalf of everybody here, I want to

3   thank you.

4           I'm going to excuse you now.  I'd ask you if

5   you'd remain in the jury deliberation room for a short

6   time.  I want to finish some business here and then I'd

7   like to come in and thank you individually and answer

8   any questions you may have.  So if you could just wait

9   for me in the jury deliberation room.

10          You are now charged and free from your oath.

11  You can say anything to anybody you want about your

12  deliberations.  Okay?

13          THE CLERK:  All rise for the jury.

14                      (Jury excused.)

15          THE CLERK:  Please be seated.

16          THE COURT:  The defendant is in custody.  I

17  see no reason to change his custody status.

18          Do we have a date for sentencing yet?

19          THE CLERK:  September 19th at 10:00 a.m.

20          THE COURT:  The defendant will be sentenced

21  September 19th at 10:00 a.m.  Parties should consult

22  local rules for other dates bearing on the sentencing

23  process.

24          Is there anything else that either of you

25  needs from me today?

1          MR. AFRAME:  No.

2          MS. GRAHAM:  No, your Honor.

3          THE COURT:  All right.  Thank you.  That

4    concludes this proceeding.

5          (Proceedings concluded at 1:03 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 11/9/18

Liza Dubois, RMR, CRR
Licensed Court Reporter No. 104
State of New Hampshire