UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   17-cr-157-01-PB
              v.                  *   June 8, 2018
                                  *   1:30 p.m.
KURT CARPENTINO                   *
                                  *
* * * * * * * * * * * * * * * * * *


DAY 3 - AFTERNOON SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE PAUL J. BARBADORO
AND A JURY



Appearances:

For the Government:    Seth R. Aframe, AUSA
                       Georgiana L. Konesky, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301


For the Defendant:     Jonathan R. Saxe, AFPD
                       Dorothy E. Graham, AFPD
                       Federal Public Defender Office
                       22 Bridge Street
                       Ralph Pill Building
                       Concord, NH  03301


Court Reporter:        Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454

```
1                        I N D E X

2

3   Witness                Direct   Cross   Redirect   Recross

4
    FRANK BROWN
5
    By Mr. Saxe             23
6   By Ms. Konesky                  32

7
    KURT CARPENTINO
8
    By Mr. Saxe             34                 86
9   By Ms. Konesky                  67

10

11

12

13

14

15  Exhibits                                ID        Evid.

16  Defendant's Exhibits A and A-1                    44

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2              THE COURT:  Mr. Saxe, do you wish to press
 3    your arguments in light of the opinions in State versus
 4    Belanger and State versus Gerry?
 5              MR. SAXE:  Yes.
 6              THE COURT:  Okay.  Were you aware of these
 7    decisions before this --
 8              MR. SAXE:  I am now.
 9              THE COURT:  No, were you -- I'm asking a
10    specific question.  Were you aware of these decisions
11    before you got up to make your argument?
12              MR. SAXE:  No.
13              THE COURT:  Okay.  All right, so, explain to
14    me your thinking.
15              MR. SAXE:  Okay.  On State v. Gerry, it's a
16    very short opinion, they said it's not an element and it
17    need not be put in the charging document because that's
18    what the defendant had argued that the charging
19    documents would be dismissed.  Nonetheless in the
20    opinion, which is very short, the prosecutor informed
21    the jury that it must find the parties were not married
22    and the jury was given instruction, the entire text of
23    the statute.  So, I would submit that while it's
24    apparently an exception and not an element, the
25    prosecutor in the state of Vermont told the jury that
```

1    they would have to find that the parties were not

2    married.

3              THE COURT:  Why should, in light of what

4    you're telling me, should I grant judgment as a matter

5    of law?

6              MR. SAXE:  Because the government has not

7    entered sufficient evidence to show --

8              THE COURT:  That is relevant only if it is in

9    fact an element, isn't it?

10             MR. SAXE:  I don't think --

11             THE COURT:  See, if it's not an element, the

12   government doesn't have to prove it in order to survive

13   the motion for judgment as a matter of law.  You're

14   saying in Gerry, the jury was given the full text of the

15   statute on jury instruction.  Maybe you're right on

16   that.  I think you're wrong.  But maybe you're right.

17   But that isn't an argument for granting motion for

18   judgment as a matter of law, is it?

19             MR. SAXE:  I think that the issue is a matter

20   of state law in Vermont, did they prove that he violated

21   that state law --

22             THE COURT:  Right, if it's not an element --

23   does the prosecutor have to prove things that aren't

24   elements?

25             MR. SAXE:  In the Vermont case or in this

1    case?

2              THE COURT:  In any case.  In a criminal case

3    in the United States, does a prosecutor have a burden to

4    prove things that are not elements in order to survive a

5    motion for judgment as a matter of law?

6              MR. SAXE:  In this case in Gerry the

7    prosecutor informed the jury that yes, they must find

8    that, yes.

9              THE COURT:  Do you have a hearing problem?  I

10   asked you a specific question.  Could you answer that?

11   You didn't -- all right.  I'll try again, okay.

12             You are telling me that Gerry doesn't support

13   the government's position, and the reason you're telling

14   me that is because you say, ahh, there's an important

15   fact in Gerry.  The jury instructions included the

16   complete text of the statute.  Okay.  So if I give the

17   complete text of the statute, that means I shouldn't

18   grant judgment as a matter of law, right?

19             MR. SAXE:  The jury was informed in Gerry by

20   the prosecutor that they must find that the parties were

21   married.  That's what it says in the case, unless I

22   misremembered it.  I wrote it down.

23             THE COURT:  Let's try the most recent Vermont

24   Supreme Court case which is Belanger, okay.

25             MR. SAXE:  I don't have that one because we

1  had limited --

2          THE COURT:  You haven't read it yet?

3          MR. SAXE:  No, I haven't.

4          THE COURT:  Okay.  Belanger -- you've read

5  Belanger, right?

6          MR. AFRAME:  (Nods affirmatively.)

7          THE COURT:  Okay.  Belanger ia a little more

8  complicated case because Belanger involved a charge of

9  what we would consider Class A felony sexual assault,

10  whereas the charge here is a Class B felony sexual

11  assault.  You think those analogies would hold based on

12  what you know?

13          MR. AFRAME:  Yes.

14          THE COURT:  Yeah, so, Belanger was a case in

15  which there was an aggravated charge, and under the

16  aggravated charge you have to say the sex was compelled

17  and without consent.

18          MR. SAXE:  I understand.

19          THE COURT:  Right?  Do you agree?

20          MR. AFRAME:  Yes.

21          THE COURT:  Okay.  And the prosecutor in that

22  case wanted to get from the judge an instruction on

23  consent cannot to be had -- you can presume that there

24  was no consent if the person was under 16, okay?  And

25  for that presumption they relied on the regular, the B

1    felony case of sexual assault.  And in addressing the

2    issue of why it was appropriate to require proof of

3    marriage in that case, the court said this.  Requiring

4    the state to prove that the parties are unmarried does

5    not come from the language of the charge against the

6    defendant, rather it arises whenever a defendant is

7    charged with committing nonconsensual sexual acts on a

8    person under 16 and the court gives an instruction

9    authorizing the jury to presume nonconsent because the

10   child was under 16.

11          It's quite clear that in this 2018 case, the

12   Vermont Supreme Court is saying that this is not an

13   element of the offense.  And I guess -- why don't we

14   take a few minutes, I'll give you the case, you should

15   read it.  Let me just hear the government's comments on

16   Belanger because that's how I read Belanger.

17          MR. AFRAME:  That's how I read Belanger as

18   well.  And then I also -- so I agree with everything you

19   just said.  And then my additional point is that the

20   kind of facts that they found in that case when they

21   said because of those circumstances of a jury

22   instruction that don't exist here, the facts that they

23   said were sufficient are very much like the facts that

24   we have here.  That's the additional point I would just

25   point out to you.

1              THE COURT:  There was no --

2              MR. AFRAME:  The facts and circumstances of

3     the relationships and who was living with who were so

4     inconsistent with the idea of marriage --

5              THE COURT:  So there are three issues that

6     come up in order.  Number one, as a matter of Vermont

7     law, is there any obligation on your part to prove that

8     they were not married?

9              MR. AFRAME:  No.

10             THE COURT:  That's the first, that's the legal

11    question.

12             MR. AFRAME:  And no.

13             THE COURT:  The second question is, is there

14    sufficient evidence in this record from which a jury

15    could conclude beyond a reasonable doubt that they were

16    in fact not married.  I would say the answer is

17    absolutely yes and I could point out abundant evidence

18    from his letter talking about you've got to go when

19    you're 18 and stay in the house because people will find

20    you and all of the evidence about throwing the rock up

21    against the window and getting her, sneaking her out of

22    the house and her being in separate -- living in her own

23    bedroom in her mother's house.

24             MR. AFRAME:  Right.

25             THE COURT:  I mean, there's abundant evidence

1    from which, I mean, part of me would like to see Mr.

2    Saxe argue to the jury that they should find that the

3    defendant is not guilty because the government hasn't

4    proved that they weren't married.  It would be

5    interesting to see whether he would want to make that

6    argument and it would be interesting to see what you

7    would say in response, but it seems to me that there is

8    abundant evidence to support a finding that they were

9    not in fact married.  And then the third issue is should

10   I permit you to reopen, which I believe under the

11   authority I have the absolute power to do, so that you

12   could call some witness who knows them and say were they

13   married?  No, they weren't.  Thank you, no further

14   questions.  All of those seem to be issues and options,

15   but I want to focus on the legal question because,

16   again, my view is when a lawyer stands up in court to a

17   judge and presents a legal argument, you can't blind

18   yourself to the absence of bad case law by refusing to

19   do any research.  You can't just stand up and say

20   something if you're, and obviously he had planned to say

21   this for some time because he had marshaled all of his

22   arguments about why I shouldn't allow you to reopen.

23   Fine, he's allowed to do that.  I accept that.  He can

24   try to wait until the end, last minute.  But I'm very

25   concerned about an officer of the Court who stands up

1    and makes an argument deliberately without doing any

2    research and blinds himself to knowledge of evidence

3    that flatly legally refutes his argument.  I'm very

4    concerned about that.

5          MR. AFRAME:  And I would also point out just

6    as we're talking about the law, that the crime is -- the

7    federal crime is interstate transportation of a minor

8    for sexual activity for which a person can be charged

9    with a criminal offense.  Charged.  And Gerry makes very

10   clear a person can be charged with a criminal offense of

11   statutory rape without an allegation of non-marriage.

12         THE COURT:  I'm concerned about, Mr. Saxe.  I

13   will say, again, I'm not trying to be critical, but

14   someone in your position should have asked the victim

15   were you married, you know, that would have been the

16   right thing to do and we would not be here.

17         MR. AFRAME:  I understand.

18         THE COURT:  But I'm more concerned about a

19   lawyer who doesn't do any research on an issue of

20   Vermont law that the Court wouldn't necessarily be

21   familiar with when there's an obvious reason to ask

22   yourself that because the statute is phrased in terms of

23   except, which is an alert signal to anybody who knows

24   about legal drafting that that might be an affirmative

25   defense.  That's why when someone springs it on me with

1  a jury waiting in the other room and asking me to throw

2  out a case without doing any legal research, it's

3  problematic to me.  But I'm going to wait until Mr. Saxe

4  finishes his case so we can further discuss it.

5          MR. SAXE:  Your Honor, I'm not going to

6  withdraw the motion.

7          THE COURT:  I don't care if you -- I'm not

8  asking you to withdraw the motion.  I asked you if you

9  wanted to and you said no.  Are you telling me you're

10  refusing to engage with me in legal argument?

11          MR. SAXE:  No, do whatever you want.

12          THE COURT:  All right, well, why don't you do

13  some legal argument.  Why don't you do what a lawyer

14  should do and tell me why in light of that case I should

15  nevertheless grant your motion for judgment as a matter

16  of law.

17          MR. SAXE:  I haven't -- okay, so I'm not

18  finished with the case --

19          THE COURT:  Take your time, sit down and take

20  as much time as you need.

21          (Pause.)

22          MR. SAXE:  Well, it says in this case the jury

23  was correctly instructed it could not find consent as a

24  matter of law because DH was under 16.  The jury was

25  also correctly instructed that in order to do so it must

1  find that the defendant and DH were not married.  The

2  need for this instruction did not come from subsection

3  3252 incorporated into the charge against the defendant

4  as the state argued below but as a necessary corollary

5  to the non-consent instruction.

6          So, they gave the instruction.

7          MR. AFRAME:  Right.

8          MR. SAXE:  And then went to --

9          THE COURT:  Maybe you didn't hear what we were

10  just saying.  So, you're a former New Hampshire state

11  public defender, so you know there's a difference

12  between aggravated sexual assault and sexual assault in

13  New Hampshire law, right?

14          MR. SAXE:  Well, I wasn't a former New

15  Hampshire state public defender.

16          THE COURT:  You weren't?

17          MR. SAXE:  No.

18          THE COURT:  How did you get to the federal

19  defenders office?

20          MR. SAXE:  I worked at a private law firm.

21          THE COURT:  Oh, okay, interesting.  I didn't

22  realize that.  I assumed you came out like everybody

23  else from the public defenders office.

24          MR. SAXE:  Maybe I should have.

25          THE COURT:  And listen, I want you to

1    understand something.  This isn't personal.  I really,

2    really like you.  I mean as a person, someone I -- it

3    isn't personal.  I think you're a good guy and I like

4    having you in this Court, but I'm very concerned about

5    what you've done here, and I have to make clear my

6    position in spite of it, but believe me, it's not that I

7    bear you any personal animosity.  I genuinely like you.

8            MR. SAXE:  I don't have a problem taking

9    criticism, and I warrant some here, so, I earned it.

10           THE COURT:  No, I appreciate that.  But let me

11   just explain to you.  There's, like New Hampshire law,

12   there is in Vermont law apparently two versions or at

13   least two versions of sexual assault.  There's sexual

14   assault and there's aggravated sexual assault.

15           MR. SAXE:  I understand.

16           THE COURT:  Okay.  And sexual assault is set

17   out in 3252, and that's the crime that the government

18   argues the defendant crossed state lines with the intent

19   to commit, okay.  That's what they allege here.  There's

20   also an aggravated form of sexual assault that's called

21   -- is in 3253(a), okay.

22           MR. SAXE:  I understand.

23           THE COURT:  And the case I just gave you is an

24   aggravated sexual assault case.  And again, my reading

25   of it, and I had less time to read it than you did but

1    my clerk independently found it, the government produced

2    it and I read it before I came down here, here's my

3    reading of it.  If I've misread it, you'll tell me.  But

4    what the court was addressing there was a case in which

5    the government was charging aggravated sexual assault

6    and would have to prove that -- (pause) -- can I see the

7    case back?  I have to get a specific subsection.  Thank

8    you -- (pause) -- okay, in this case the defendant was

9    charged with aggravated sexual assault under section

10   3253(a)(A)(8).  That crime is committed when the victim

11   is subjected by an actor to repeated nonconsensual

12   sexual acts as part of the same occurrence where the

13   victim is subjected to repeated nonconsensual sexual

14   acts as part of the actor's common scheme or plan.  The

15   charge in this case was that the defendant, being at

16   least 18 years of age, engaged in a sexual act with a

17   child under the age of 16, engaged in a sexual act with

18   another person, and compelled the other person to

19   participate in a sexual act without the consent of the

20   other person, and the victim was subjected to repeated

21   nonconsensual sexual acts as part of the same

22   occurrence.

23          That was what was charged, okay.  And in

24   addressing that charge the court concluded that you did

25   have to -- in the circumstances of this case, I'll add

1    one other thing.  The prosecutor was asking that the

2    jury be told that nonconsent is presumed because of the

3    person's age.  And what the Vermont Supreme Court

4    concluded in 2018 was that in that kind of case where

5    there is, again, going back to the relevant language,

6    where the person is charged with committing

7    nonconsensual sexual acts on a person under 16 and the

8    court gives an instruction authorizing the jury to

9    presume nonconsent, and only in that case do you have to

10   prove marriage to get the benefit of the instruction on

11   presumption of nonconsent.  What they say, it's not an

12   element of ordinary sexual assault.  That's the way I

13   read the case, so, and I don't get to overrule the

14   Vermont Supreme Court, okay.  I have to follow the

15   Vermont Supreme Court on this.

16          I don't expect you to withdraw it because

17   you're not going to, no matter how much clear evidence

18   there is that the law is not with you, you're apparently

19   pressing it.  But you can press it.  You have a right to

20   make any argument you want.  Whether someone will judge

21   it frivolous, we'll wait and see, but it clearly is

22   contradicted by 2018 Vermont Supreme Court precedent.

23   That's the way I view it.  And what troubles me is not

24   that we couldn't disagree about that.  We perhaps could.

25   But that before you stood up and asked me to throw out a

1    case that you haven't looked at what the relevant law

2    was.

3              MR. SAXE:  That's a fair criticism, your

4    Honor.  I looked at the relevant law but not all the

5    relevant law that I should have.  I apologize for that.

6    I agree with you.  I should have had that before I filed

7    the motion, but I didn't.

8              THE COURT:  Now, so, as I said, option one is

9    the law simply doesn't require you to prove the absence

10   of marriage here.  So, I mean, I guess you could say,

11   judge, we just want you to deny that motion and that

12   will be the end of it.  And I'm telling you if you

13   wanted to reopen, and I'm not in any way suggesting that

14   you should, I am open to hearing an argument from Mr.

15   Saxe why I should not use my discretion to grant that or

16   I'm willing to consider it.  If you're willing to let

17   the matter ride on the evidence as you have it and the

18   law as you believe it to be, then that's fine, because I

19   construe the law and, again, when this, if he's

20   convicted and this gets to the Court of Appeals, those

21   judges will have weeks of time to look at this

22   particular issue.  I've had about 45 minutes over lunch.

23             MR. AFRAME:  Yup, I understand.

24             THE COURT:  Okay?  I'm not an expert in

25   Vermont law, okay, I'm New Hampshire law.  There's a lot

1    on the line.  This is an important case.  But you're the

2    law guy, you're comfortable with it, I think you're

3    right and I'm willing to go.

4              MR. AFRAME:  I am, too, because I think I'm

5    right, you're right on the law, but I think that even if

6    we were supposed to make some kind of evidentiary

7    showing, we've made it sufficiently for a Rule 29

8    motion.  If he wants to argue to that jury that they

9    were married, then he can.

10              THE COURT:  All right.  But then we're going

11   to confront the question of what kind of jury

12   instruction I should give, and we'll do that after he

13   finishes his evidence later today.  I'm still going to

14   have to -- because if he wants something on marriage,

15   then I have to confront the issue -- if you don't have

16   to prove absence or that they weren't married, and

17   there's no evidence that they were married, would he be

18   entitled to some kind of instruction about marriage.

19   That's something we'll have to face next in line.  I

20   agree, under Rule 29 motion, you can ride just by citing

21   these two cases.  I think you're right as a matter of

22   law.  The word except tells us something significant

23   about whether it's part of the burden of proof or not.

24   It tells us it's not part of the burden of proof.  Since

25   it's not part of the burden of proof, any failure to

1    prove it is not a basis to grant Rule 29, and in any

2    event I've said the evidence construed in a light most

3    favorable to you is sufficient to permit a reasonable

4    jury to conclude that there was no marriage.  So, I

5    should deny the motion.  But we are going to have to

6    move on at some point if he presses it and says, judge,

7    I'd like a jury instruction on that issue.

8              MR. AFRAME:  So the way I think we would

9    probably prove it given that our victim is out of the

10   state, under New Hampshire law they would have to have a

11   court order that they could be married, and we inquired

12   of the court, there's no such record.  That's how we

13   would go about doing it?

14             THE COURT:  Well, there is a way of --

15             MR. AFRAME:  Absence of --

16             THE COURT:  There is a way of doing that.  And

17   if you told me -- and again, I don't care, I'm

18   indifferent.

19             MR. AFRAME:  I understand.

20             THE COURT:  I just want to know what your

21   preferences are because if your preferences were to

22   adjourn until Monday morning and come in with a reopen,

23   then we have to hear an argument from them as to whether

24   I should allow you to do that.

25             MR. AFRAME:  I guess -- I don't want to

1    belabor this, but I want to talk about one legal issue

2    that we haven't talked about.  What the federal statute

3    says is not that we have to prove the crime of Vermont

4    statutory rape --

5              THE COURT:  No, but you have to prove he

6    intended to engage in conduct which would be a crime.

7    When he transported with the intention to engage in

8    conduct that would be a crime.  So, his intention was to

9    go and have sex with her knowing she was under 16 years

10   of age under your theory of the case.  You have to prove

11   that that would be a crime under Vermont law.  And in

12   order to prove that the evidence has to be -- yes, I

13   agree.  So, for example, a hypothetical case in which he

14   was married to her but he got amnesia and didn't think

15   that he was married to her and he took her across state

16   lines because he thought he was -- yeah, under your

17   theory that would be a crime.  But I don't think that

18   helps us with the analysis in any significant way.  I

19   mean you can make your argument about it, but I don't

20   think it does.

21             MR. AFRAME:  I don't want to hold this trial

22   up, judge.

23             THE COURT:  You feel confident that you're

24   right as a matter of law and you stand by your legal

25   argument?

1          MR. AFRAME:  I am a hundred percent certain

2    that the court's going to deny -- the Court of Appeals

3    will deny a Rule 29 motion on this basis.  I am

4    concerned about creating a lot of confusion with jury

5    instructions.

6          THE COURT:  Well, we'll confront that later

7    on.  My initial reaction is to say if it's not a burden

8    -- if you don't have to prove anything about it and

9    there's no evidence of anything about it, why would the

10   defense be entitled to an instruction?  Unless, you

11   could say, well, the evidence is sufficient so the jury

12   --

13         MR. SAXE:  Your Honor.

14         THE COURT:  Yes.

15         MR. SAXE:  I would suggest we just proceed.  I

16   intend to put on a witness and they may want to ask

17   cross-examination questions.

18         THE COURT:  Well, all right, yeah, that may

19   be, that may address the issue.

20         MR. SAXE:  That doesn't address the Rule 29

21   issue, but that would address the jury instruction.

22         THE COURT:  Yeah, I understand.

23         MR. AFRAME:  Yeah, and I think he's going to

24   basically put on someone who lived in the house and we

25   can ask them were they married, and he'll say no I'm

1    sure.

2              THE COURT:  All right.  So, the government is

3    not at this time asking to reopen?

4              MR. AFRAME:  Not at this time, no.

5              THE COURT:  All right.  So, the government has

6    not asked to reopen.  The government has rested.  You

7    made your motion.  I feel I understand it.  It had two

8    bases.  The first was sort of a general they don't prove

9    it argument, and the second was a specific argument

10   about they didn't introduce sufficient evidence to

11   permit a conclusion that she was not married to him at

12   the time.  And I find both arguments to be unpersuasive,

13   construing the evidence in a light most favorable to the

14   defendant here -- excuse me, to the government, a

15   reasonable jury could find that all of the elements of

16   the charged offense have been committed.

17             With respect to the argument about the

18   government failing to prove that they weren't married,

19   it's my judgment based on my reading of Vermont law that

20   there is no requirement in this case that there be any

21   proof introduced by the government to survive a Rule 29

22   motion that the victim was not married to the defendant

23   at the time the crime occurred.  And in any event, even

24   if there were such a requirement, in my view there's

25   ample evidence in the record to permit a reasonable jury

1    to conclude beyond a reasonable doubt that they in fact

2    were not married at that time.  So, for those two

3    reasons the motion needs to be denied.

4             There are alternative grounds.  One is as a

5    matter of law no proof is required.  The other is even

6    if proof is required, there's ample evidence in this

7    record to permit a conclusion that the proof element has

8    been satisfied.

9             I will reserve until after the evidence in the

10   case is concluded any judgment as to how jury

11   instructions, what jury instructions I may be required

12   to give in light of the evidence that is available to

13   the jury at the time they get the case.

14            So, the defendant's motion is denied for those

15   reasons.  Does anybody need for me to further explain my

16   ruling?

17            MR. SAXE:  No, your Honor.

18            THE COURT:  No?

19            MR. AFRAME:  No.

20            THE COURT:  Okay.  Your witness is ready?

21            MR. SAXE:  Yes.

22            THE COURT:  You have one witness?

23            MR. SAXE:  One possibly two.  We should be

24   done today.

25            THE COURT:  Okay.  All right, good.  So let's

1    bring the jury in.

2                        BEFORE THE JURY

3              THE COURT:  All right, the defense will call

4    its first witness.

5              MR. SAXE:  The defense calls Frank Brown.

6              THE COURT:  Mr. Brown, come right up here,

7    stand by the witness stand, raise your right hand,

8    please.

9              THE CLERK:  Raise your right hand.

10                        FRANK BROWN

11        having been duly sworn, testified as follows:

12             THE CLERK:  Thank you.  Would you please state

13   your name and spell your last name for the record.

14             THE WITNESS:  Frank Brown, B-R-O-W-N.

15             THE CLERK:  Thank you.

16             THE COURT:  Do you want the clerk to enable

17   something?

18             MR. SAXE:  There's a little red mark on here.

19   I'm not sure how to get it off.

20             THE COURT:  Oh.  Can you make that go away?

21                    DIRECT EXAMINATION

22   BY MR. SAXE

23        Q.   Mr. Brown, where do you live right now?

24        A.   I live in Winchester, New Hampshire.

25        Q.   Okay.  Where did you live in 2016 and 2017?

1       A.    On Glen Street.

2       Q.    What was the address?

3       A.    76 Glen Street.

4       Q.    Okay.  And who lived there with you?

5       A.    There was me, my girlfriend at the time

6   Carol --

7       Q.    Excuse me, was that Carol Pino?

8       A.    Yes.

9       Q.    Okay.

10      A.    Her two younger kids and her oldest son with

11  his wife and their kid.

12      Q.    Do you know the names of those people?

13      A.    There was -- well, the two little kids, there

14  was Mackenzie --

15      Q.    Okay, not the two little kids, but did

16  Mackenzie live there?

17      A.    Yeah.

18      Q.    Okay.

19      A.    And her son Michael and his wife Kaitlynne and

20  their son, and we had a tenant upstairs.

21      Q.    When you say you had a tenant upstairs, what

22  do you mean by that?

23      A.    We had somebody we work with that was living

24  upstairs, renting the upstairs, there was like a little

25  room.

1      Q.   That's in the attic?

2      A.   Yes.

3      Q.   Could you pull up Defendant's Exhibit M-2.

4           Okay, now, I just want to clarify, when did

5  you first move in to this address at 76 Glen Street,

6  roughly?

7      A.   I think it would have been four years ago now.

8      Q.   Okay.  So you lived there for quite some time?

9      A.   Yeah.

10     Q.   Now, did you live there continually during

11 2016 to 2017 or was there a period of time when you were

12 not living there?

13     A.   There was a period of time when I wasn't

14 living there.

15     Q.   What was that period of time?

16     A.   It was within the first week, week and a half

17 of October I moved out, and I didn't move back in until

18 right after Thanksgiving, right around that time.

19     Q.   Why was that?

20     A.   Me and Carol had a dispute, so, a little

21 disagreement.

22     Q.   Okay.  At that point in time how long had you

23 had a relationship with Carol?

24     A.   At that point?  About eight years.

25     Q.   So a fairly long time?

1          A.    Yeah.

2          Q.    And you're not having a relationship with her

3     anymore; correct?

4          A.    No, we broke up over the summer.

5          Q.    Okay.  So, all right, so I want to take a look

6     at what's on the monitor there.  Could you tell me what

7     that is?

8          A.    The vent, or are you talking about --

9          Q.    That picture?

10         A.    You had your hand over the vent, so I didn't

11    know if you -- that's the backside of the house.

12         Q.    Okay.  And that's Exhibit M-2 and that's 76

13    Glen Street where you just said you lived?

14         A.    Yes.

15         Q.    All right.  So, can you tell from that photo

16    where your room was?

17         A.    It was the first window.

18         Q.    If you touch it it will show up red.

19         A.    Oh, okay.  This window here.

20         Q.    Okay.  And who did you live in that room with?

21         A.    Me and Carol lived in there.

22         Q.    Do you know where Mackenzie's room was?

23         A.    Yeah, it was the other one right over here.

24         Q.    Okay.  And could you show me where the attic

25    room was?

1      A.   It's right there.

2      Q.   Okay.  Now, the attic looks kind of long.  Is

3 that where the attic room was on that side of the house

4 where you drew that triangle?

5      A.   Right there.  And this side was storage.

6      Q.   Okay.  So, and you said earlier that there was

7 some guy living up there.  Do you know what his name

8 was?

9      A.   Jason, I forget his last name.

10      Q.   And how was Jason related to the people in the

11 house?

12      A.   We just knew him through work.  We work with

13 him over at Wal-Mart.

14      Q.   All right.  So, now you said that you moved

15 out for a period of time in the fall of 2016?

16      A.   Ah-hum.

17      Q.   Okay.  Was Jason living there in the attic

18 before you left?

19      A.   I can't -- I can't remember.

20      Q.   Was he living in the attic when you got back?

21      A.   I think he was there both times, but I can't

22 pin down when he moved in.

23      Q.   Okay.  So, did he live there -- so you lived

24 there from November all the way through to April 27th;

25 right?

1          A.   Yes.

2          Q.   All right.  Was he living there during that

3     period of time?

4               THE COURT:  Excuse me, sir.  I think you said

5     originally you moved there the first -- you moved out

6     the first week in October?

7               THE WITNESS:  Yes.

8               THE COURT:  You said something.  Could you

9     just --

10         Q.   Oh, I'm sorry.  I'm not trying to -- okay.

11    So, you moved out for a period of time?

12         A.   Yeah.

13         Q.   My question was just to clarify the record,

14    before you moved out for that period of time was this

15    Jason fellow living in the attic?

16         A.   I forget if he was.  I forget if he moved in

17    before I moved out or when I moved back in.

18         Q.   All right.  And then when you moved back in

19    was he living there then?

20         A.   Yeah, he was living there.

21         Q.   Did he continue to live in that attic room all

22    the way through to April, the end of April?

23         A.   Yeah, until we all moved out, he moved out

24    too.

25         Q.   Okay.  Okay, so do you know Kurt Carpentino?

1    A.   Yes.

2    Q.   Do you see him in the courtroom today?

3    A.   Yes.

4    Q.   Can you just identify him?

5    A.   Yeah, he's right over there.

6    Q.   Okay.  Who is he?

7    A.   He was our landlord.

8    Q.   Did he come over to visit?

9    A.   Yeah.

10    Q.   How often would he come over to visit?

11    A.   A few times a week.  Because he worked in

12 Keene, he'd swing over.  He would come over and work

13 around the house and stuff.

14    Q.   Did he ever stay overnight?

15    A.   Not that I can remember, I don't, you know --

16    Q.   Did he live there?

17    A.   No.

18    Q.   Did he have a room in the attic?

19    A.   No.  He didn't have a room in the attic.

20    Q.   All right.  So, what was your relationship

21 with Mackenzie?

22    A.   Not a very good one.  We butted heads.

23    Q.   All right.  And did you ever -- so you worked

24 during the day?

25    A.   Yeah.

1      Q.    And did you sleep at the house every night?

2      A.    Yeah.

3      Q.    And did you ever observe Kurt in the house?

4      A.    Yeah.

5      Q.    Did you ever observe anything with respect to

6 a problem with him and Mackenzie?

7      A.    No.

8      Q.    Based on your observations, what was

9 Mackenzie's relationship with her mother Carol?

10      A.    She was glued to her hip.

11      Q.    What do you mean by that?

12      A.    Wherever Carol went, that's where Mackenzie

13 was.

14      Q.    Okay.  And did Carol work?

15      A.    No, she stayed home.

16      Q.    Did Mackenzie have -- was there Wi-Fi in the

17 house?

18      A.    Yeah, there was.

19      Q.    Did Mackenzie have access to the Wi-Fi?

20      A.    No, she didn't.  The only time she was able to

21 use an electronic was if she was going to be texting her

22 father off of her mother's cell phone and she would be

23 sitting right there with Carol.

24      Q.    Was Mackenzie allowed to have access to a cell

25 phone?

1      A.    No.

2      Q.    Now, were there security cameras in that

3  house?

4      A.    Yeah, there was.  They got ripped down,

5  though.  They were no good.

6      Q.    Did you put them up?

7      A.    Yeah, I put them up.

8      Q.    Do you remember when you put them up?

9      A.    Two and a half years ago, yeah, it was about

10 two and a half years ago.

11     Q.    When you put them up did they work?

12     A.    Briefly, but it was an old system I picked up

13 on clearance, so I don't know what was wrong with it.

14     Q.    So it stopped working?

15     A.    Yeah, we actually had issues with people

16 messing with vehicles, so that's why I put them up, but.

17     Q.    And so how many -- did they stop working years

18 ago?

19     A.    Yeah, it was shortly after they --

20           MR. SAXE:  Can I have a second, your Honor?

21           THE COURT:  Yes.

22           (Pause.)

23     Q.    Did you ever observe any instances of

24 Mackenzie being involved with stealing things or taking

25 things that didn't belong to her?

1      A.    Yeah, I was --

2      Q.    Tell me about that?

3      A.    We were always findings things in her room

4  that she wasn't supposed to have.

5      Q.    Was it ever cell phones?

6      A.    No.  It was just like her mother's makeup, you

7  know, just little petty things, but.

8      Q.    Okay.

9            MR. SAXE:  I don't have any further questions.

10           THE COURT:  Thank you.  Cross-examination?

11           MS. KONESKY:  Thank you, your Honor.

12                         CROSS-EXAMINATION

13  BY MS. KONESKY:

14     Q.    Mr. Brown, you testified that someone named

15  Jason was living in the attic?

16     A.    Yeah, yeah, Jason was.

17     Q.    At least a few months you testified; correct?

18     A.    Yeah.

19     Q.    And is there a kitchen up in the attic?

20     A.    No.

21     Q.    You would share a common kitchen?

22     A.    Yeah, he'd come downstairs and sometimes he'd

23  eat with us or he would go out to the grocery store and

24  just like grab a grinder or something.

25     Q.    But you don't know his last name?

1    A.    I'm trying to remember what his last name is.

2  He wasn't really my friend, he was Mikey's friend from

3  work, so, and I just knew him and would see him around

4  work.  And at work we only wear the name tags that says

5  your first name on it, so.

6    Q.    And it's true you didn't always sleep in the

7  same room as Carol?

8    A.    No.  Once in a while I would hang out with my

9  son and watch TV and stuff and sometimes fall asleep in

10  there.

11    Q.    Okay.  And you observed Mr. Carpentino at the

12  house a few times a week you said?

13    A.    Yeah, he'd swing by every so often, yeah.

14    Q.    And you never observed him, you said, have any

15  sexual relationships with Mackenzie?

16    A.    No.

17    Q.    And he and Mackenzie weren't married?

18    A.    That's all, like, yeah, no.

19    Q.    You would have known that?

20    A.    I would hope I would know that.

21    Q.    Okay.  Thank you.

22         MS. KONESKY:  May I have a minute, your Honor?

23         MR. SAXE:  Nothing further.

24         THE COURT:  You all set?

25         MS. KONESKY:  Thank you.

34

1          THE COURT:  No redirect?

2          MR. SAXE:  None, your Honor.

3          THE COURT:  All right, thank you, sir, you're

4    all set.

5          THE WITNESS:  All right, thank you.

6          THE COURT:  Did you want to call any other

7    witnesses?

8          MR. SAXE:  Yeah, Kurt Carpentino, your Honor.

9          THE CLERK:  Raise your right hand.

10                    KURT CARPENTINO

11      having been duly sworn, testified as follows:

12          THE CLERK:  Thank you.  Please state your name

13    and spell your last name for the record.

14          THE WITNESS:  My name is Kurt Carpentino,

15    C-A-R-P-E-N-T-I-N-O.

16                    DIRECT EXAMINATION

17    BY MR. SAXE:

18       Q.   So Kurt, why don't tell us a little bit about

19    your background.  Where were you born?

20       A.   I was born in Keene, New Hampshire.  I was

21    raised by my mother and father.  I lived in Hinsdale,

22    went to Hinsdale High School.

23       Q.   And did your father and mother live together

24    or?

25       A.   They separated, yes.

1          Q.    So who raised you?

2          A.    It was joint custody.  My father at the time,

3    he was living in Hill, New Hampshire, my mother was in

4    Hinsdale, New Hampshire.  Sometimes I'd do half a school

5    year in Hinsdale and then half a school year in Hill.

6          Q.    Okay.  And did you have a good relationship

7    with both your parents?

8          A.    Yes, sir.

9          Q.    All right.  And so, are your parents still

10   alive?

11         A.    No, they're not.

12         Q.    When did your father die?

13         A.    2006, June.

14         Q.    And when did your mother die?

15         A.    2012 in December.

16         Q.    And when your mother died did she have any

17   property?

18         A.    Yes, she did.

19         Q.    And do you have a sister?

20         A.    Yes, I do.

21         Q.    Do you have any other siblings?

22         A.    No, I do not.

23         Q.    So, when your mother died what happened with

24   the property?

25         A.    The properties got split between me and my

1    sister.  I got half the properties and my sister got

2    half the properties.  There were six total.

3         Q.   So what properties did your sister get?

4         A.   She got I think 150 -- I forget the street

5    address, but it's in Walden, New Hampshire.

6         Q.   Could you slow down, please, just a little

7    bit?

8         A.   Yeah.  Walden, New Hampshire house, there was

9    a -- not New Hampshire, sorry, Walden, Vermont; 12 Alden

10   Road, and there was a house in Springfield.

11        Q.   And 12 Alden Road, was that the motel?

12        A.   Yes, that was the motel.

13        Q.   And what property did you receive?

14        A.   I received the 784 Missing Link Road in

15   Rockingham, Vermont; I received 12 Oak Hill, Hinsdale,

16   New Hampshire; 76 Glen Street, Hinsdale, New Hampshire.

17        Q.   Okay, and were these all rental properties?

18        A.   Yes, they were rental properties.

19        Q.   Okay.  And was there any mortgages on any of

20   these properties?

21        A.   There was one mortgage left over on 76 Glen

22   Street.

23        Q.   And so you had a tenant in the Vermont

24   property?

25        A.   Yes, I did.

1     Q.   Who was that?

2     A.   It was Tim Olmstead.

3     Q.   All right.  And was he, I assume you charged

4 him; right?

5     A.   Yes, I did.

6     Q.   Was there leases or was there just agreements

7 that they would stay there?

8     A.   There was leases.

9     Q.   All right.  So, was Mr. Olmstead current in

10 his rent?

11     A.   He was, yes.

12     Q.   And who lived at the Oak Hill address in

13 Hinsdale?

14     A.   Oak Hill was Tabatha Donohue, Jesse McQuestion

15 and their three kids.

16     Q.   And how much was the rent there?

17     A.   950 a month I believe.

18     Q.   Okay.  And who lived at 76 Glen Street?

19     A.   It was Carol Pino and her family.  There were

20 several individuals living there.  Do you want me to

21 name them off?

22     Q.   So, you've seen pictures of the property, know

23 what the property looks like, you owned it right?

24     A.   Yes, sir.

25     Q.   So, did you have -- it looked kind of run

1   down, did it have to be repaired and painted?

2       A.   Yeah, there was some upkeep that needed to be

3   done and I was doing it.

4       Q.   Okay.  And so you did it?

5       A.   Yes.

6       Q.   Was it Oak Hill property as well that needed

7   repair or was it primarily 76 Glen Street?

8       A.   Oak Hill needed some work.  It was done.

9       Q.   Okay.  And in that photo of 76 Glen Street it

10  looks like it was being painted; right?

11      A.   There was, yes, I was in the middle of that.

12      Q.   Okay.  And is that what you were doing in

13  April of 2017?

14      A.   Yes, that's correct.

15      Q.   All right.  So, at some point did any of your

16  tenants start falling behind in their rent?

17      A.   Yes, they did.

18      Q.   Why don't you tell me about that?

19      A.   I believe it was 12 Oak Hill started falling

20  behind in December and they stopped paying until I filed

21  the eviction notice.  76 Glen Street started falling

22  behind in rent on January 2017.

23      Q.   So did you -- let's just focus on Glen Street

24  for now.  And Carol Pino was the responsible party?

25      A.   Yes.

1    Q.   All right.  So, did she pay rent in January of

2    2017?

3    A.   No.

4    Q.   February?

5    A.   No.

6    Q.   March?

7    A.   No.

8    Q.   April?

9    A.   No.

10   Q.   Did you have discussions with Carol Pino about

11   paying the rent?

12   A.   Yes.

13   Q.   Why don't you just tell the jury about that?

14   A.   As the rent came due I asked for the rent and

15   I explained to them that I have upkeep to do on the

16   house, I have a mortgage to pay, so it's not just rent

17   income.  And we kind of argued about it, butt heads

18   about it because she was saying she has bills to pay

19   herself, and I let it go for a little while.

20   Q.   So, did you tell her that you might have to

21   evict her?

22   A.   Yes.  I did inform her if she did not become

23   current I would have to file the paperwork to evict her.

24   Q.   And what was the situation with Tabatha at Oak

25   Hill residence?

1        A.   It was the same.  I informed them if they

2   didn't come current on their rent I'd have to file

3   paperwork to evict them.

4        Q.   So, did they respond by paying rent?

5        A.   No.  They responded with excuses.  I'll pay

6   you later.

7        Q.   All right.  So, did you eventually file an

8   eviction notice?

9        A.   I did.

10            MR. SAXE:  Your Honor, I'd like to seek to

11   introduce Defendant's Exhibit A and A-1.  A being the

12   eviction notice to Carol Pino and A-1 being the eviction

13   notice to Tabatha McQuestion.

14            THE COURT:  Any objection?

15            MS. KONESKY:  Yes, your Honor, hearsay.

16            THE COURT:  Come up to sidebar and bring them

17   up with you, please.

18                        AT SIDEBAR

19            THE COURT:  Give me the documents.

20            (Pause.)

21                      BEFORE THE JURY

22            THE COURT:  All right, members of the jury,

23   why don't you take a break.  We'll come and get you in a

24   bit.

25            (Jury exited the courtroom.)

1          THE COURT:  All right, hand the documents to

2     the clerk, please.

3          THE CLERK:  I'll grab them.  A and A-1?

4          MR. SAXE:  Yes.

5          (Pause.)

6          THE COURT:  All right, what is your argument

7     that these are inadmissible?

8          MS. KONESKY:  Well, your Honor, that he filed

9     it doesn't make it true.  These were created after --

10          THE COURT:  Yeah, but his whole theory is that

11     this was made up because -- I mean, you understand his

12     theory, right?  The charge is made up to try to

13     retaliate against him because he's trying to evict them,

14     right?

15          MS. KONESKY:  There's no evidence, your Honor,

16     these were ever served or received by --

17          THE COURT:  Okay, that's what I -- you've

18     known about this, right?  These have been marked before

19     trial and you understood all this was going on, right?

20          MR. AFRAME:  We certainly didn't understand

21     their theory.

22          THE COURT:  All right.  Well, they gave an

23     opening statement and it became clear after the opening

24     statement, okay.  So, to me it's not the content of

25     whether they were behind in the rent or not that's at

1   issue, right, you want to try to say these were served

2   on them.  They were going to be evicted.  They knew

3   about it.  And that gives, helps -- I assume he's going

4   to tell some version of events in which in his mind none

5   of this happened and they came after him for

6   retaliation.

7           MR. SAXE:  Yeah, the issue is --

8           THE COURT:  What's his testimony going to be?

9           MR. SAXE:  That in fact he served these

10  documents.

11          THE COURT:  That he personally served them?

12          MR. SAXE:  Yeah.

13          THE COURT:  Okay.  All right.  And how does

14  that fit into the case?

15          MR. SAXE:  Because it shows that he evicted

16  them and then therefore that substantiates the theory

17  that there was some anger and retaliation against him,

18  and Mackenzie testified that she was present when Carol

19  Pino --

20          THE COURT:  Yeah, I remember that.  So his

21  argument is this is a motive, right?  It would be a

22  motive whether they were behind in the rent or not

23  because even if they weren't behind in the rent, if he's

24  falsely serving them with eviction papers, making a

25  false claim, that would be even a stronger motive for

1   eviction.

2          MR. AFRAME:  That's a non-hearsay purpose, I

3   suppose, they're not admissible for the truth that they

4   owed him $4,000.

5          THE COURT:  No, I agree.  You agree with that?

6          MR. SAXE:  All I care is that the jury --

7          THE COURT:  I assume the government is going

8   to request an obstruction that I'm not admitting these

9   for the purpose of the truth of any of the allegations

10  he made in the documents.  He can testify that they are

11  behind in the rent, but this is not evidence that they

12  were behind in the rent.

13         MR. SAXE:  It is only evidence it was served

14  on them.

15         THE COURT:  You agree with me?  It's not

16  evidence that they were behind in the rent, it's not

17  evidence they were served on them either, unless he

18  says.

19         MR. SAXE:  He's going to say that.

20         THE COURT:  But it is relevant if he's

21  prepared to testify under oath, I filed these, I took

22  them, I served them on them, they were behind in the

23  rent, right?  Everybody agree?

24         MR. AFRAME:  Yes, yes.

25         THE COURT:  Okay  objection withdrawn.  You

1    want a limiting instruction?

2            MR. AFRAME:  Yes.

3            THE COURT:  Okay.  Can we bring the jury back

4    in?  Good to go, all right.

5                     BEFORE THE JURY

6            THE COURT:  Members of the jury, the defense

7    has offered two exhibits, A and A-1.  These documents

8    contain certain representations in them about whether

9    Ms. Pino was behind in the rent or not.  You can't

10   consider these documents for that purpose.  They can't

11   be considered to determine whether she was in fact

12   behind in rent or not, in the rent or not, that's

13   something you have to decide if it's relevant to you at

14   all based on other evidence you receive.  You can

15   consider these exhibits, but you may not consider them

16   for the purpose of determining whether Ms. Pino was ever

17   behind in the rent, which you have to determine if it's

18   relevant to you through other evidence.

19           The objection is -- the identification is

20   stricken, the objection is overruled, the documents will

21   be admitted.

22           (Defendant's Exhibits A and A-1

23           admitted.)

24           MR. SAXE:  Thank you, your Honor.  Could you

25   pull up Exhibit A.

1          Q.    Okay, can you see that?

2          A.    Yes, I can.

3          Q.    Okay, could you scroll down a little.  Okay.

4     So you recognize what that is?

5          A.    Yes, I do.

6          Q.    All right.  And what is it?

7          A.    It's an affidavit of damages and statement of

8     claims.  It's just a formality.  You say what the rent

9     was, when it was due, how much was owed and if it was

10    paid.

11         Q.    Okay.  And did you serve that to Carol Pino?

12         A.    That article was not served to Carol Pino.

13    That was for the courts.

14         Q.    Okay.

15              MR. SAXE:  Could you scroll down again.

16    Scroll down again.  Scroll down again -- well, let me

17    just make sure.  I'm sorry, could you scroll back up.

18    Okay.  Next page.  Next page.  Okay.

19         Q.    Did you serve a demand for rent on Carol Pino?

20         A.    Yes, I did.

21         Q.    Okay.  And go to the fourth page.  You see

22    that document?

23         A.    Yes, I do.

24         Q.    Is that what you served on her?

25         A.    That is what I served on her.

1      Q.    Okay.  When did you serve that?

2      A.    It was April 20th, 2017.

3      Q.    Okay.  And where were you when you served

4  that.  It says it's served in hand?

5      A.    Yeah, I served it in hand.  I went to 76 Glen

6  Street after work and handed it to her.

7      Q.    And did you serve a similar document on

8  Tabatha?

9      A.    Yes, I did.

10      Q.    Okay.  And did you serve it on the same day?

11      A.    I did.

12      Q.    All right.  So, how many discussions did you

13  have with Carol Pino before serving this about the rent?

14      A.    Ten to 15 conversations.

15      Q.    How did she respond?

16      A.    Times were tough, money was tight.  She

17  complained that she wasn't physically working.

18      Q.    All right.  So, you were here when Mackenzie

19  testified that you had a conversation with Carol and

20  Carol said that she would have you arrested if you ever

21  evicted her?

22      A.    Yes.

23      Q.    You were present at that conversation?

24      A.    I was.

25      Q.    Could you tell the jury what happened?

1      A.    So, when I was having the conversation about

2  rent and being paid and if she didn't pay it I would

3  have to forward the documents to the court and follow

4  through with the eviction notice, she turned around and

5  said if you try to evict me I'll just go to the police

6  and tell them you sexually assaulted my daughter.

7      Q.    Where was that conversation?

8      A.    That was in my car.

9      Q.    Who else was there?

10      A.    Mackenzie.

11      Q.    How did you respond?

12      A.    I kind of responded with anger and I blurted

13  out that, well, if you do that Mackenzie will just say

14  that you, would say that you saw an act happen and you

15  were a witness and implicate you in a crime.

16      Q.    Why did you say that?

17      A.    Anger.

18      Q.    All right.  So, and when was that conversation

19  in relation to the serving of the demand for rent

20  April 20 of 2017?

21      A.    I believe that conversation was in March.  It

22  was well before I actually handed the paperwork to her.

23      Q.    Okay.  And so, Carol Pino was your tenant;

24  right?

25      A.    She was the one on the lease, yes.

1       Q.    Did you become friendly with her?

2       A.    I was friends, yes.

3       Q.    Describe the nature -- so was that more than

4   just a tenant relationship?

5       A.    Yeah, I would say so.  I mean, it was

6   friendly.  It wasn't just I would go over there and work

7   and be gone, I would sometimes socialize.

8       Q.    How often would you go over there on a weekly

9   basis?

10      A.    I was over there maybe three, four times in a

11  week.

12      Q.    Over what period of time?

13      A.    It was October to April.

14      Q.    All right.  And --

15      A.    October 2016.

16      Q.    Did you live there?

17      A.    No, I did not.

18      Q.    Did you have a room in the attic?

19      A.    No, I did not.

20      Q.    Did you know whether someone else was living

21  in the attic?

22      A.    Not at the time.

23      Q.    All right.  All right, so I'm going to bring

24  you to April 2017.

25      A.    Yes, sir.

1     Q.    All right?  April 26, 2017.  Did you work that

2  day?

3     A.    I did.

4     Q.    Where do you work?

5     A.    I work at People's Linen in Keene, New

6  Hampshire.

7     Q.    And what time did you get done with work?

8     A.    I believe I got done around 3 p.m., 3:30

9  around about.

10     Q.    What did you do when you were done?

11     A.    I drove to 76 Glen Street.

12     Q.    Why did you do that?

13     A.    To discuss plans of continuing to paint

14  because the following day was my day off and I was going

15  to find out if that was a good time for them.

16     Q.    What happened, without telling me what anybody

17  told you, what happened when you arrived there?

18     A.    When I arrived there there was, seemed to be

19  Jesse McQuestion was there, Mike Pino, they were

20  standing out in the driveway.  I came in, got out of my

21  car, and there was commotion in what sounded like either

22  the kitchen or the living room.  I later found out that

23  there was Carol Pino, Tabatha Donohue and I think

24  Kaitlynne Pino was in the house too, and there was a

25  commotion between the three adults and Mackenzie.  There

1  was an argument and a fight over a cell phone.

2       Q.    Okay.  How long did you stay there?

3       A.    Maybe an hour, hour and a half.

4       Q.    Did you go inside the house that day?

5       A.    No, I did not.

6       Q.    Did any of the people from the inside of the

7  house that were involved in the commotion come out?

8       A.    Yes, they did.

9       Q.    Did you talk to them?

10      A.    Tabatha Donohue briefly, yes.  Carol I talked

11  to and Mackenzie was there with her.

12      Q.    So, and you said you stayed there for an hour.

13  What did you do then?

14      A.    I was just, I don't know how long the period

15  of commotion went to, so I was sitting there waiting for

16  that.  When they came out and talked, Tabatha and Jesse

17  ended up leaving.  They said that they needed -- well,

18  before they left they said that they needed paperwork

19  signed for medical so he could have the electrical

20  company keep the electric on in the house.  They were

21  behind in that bill.

22      Q.    Okay, so where did you go after you left?

23      A.    I'm sorry?

24      Q.    Where'd you go after you left?

25      A.    Oh, after I left I went back to my apartment

1    in Manchester.  I had an appointment.

2         Q.    And what time was that appointment?

3         A.    It was at 7 p.m.

4         Q.    Then what did you do?

5         A.    After the appointment I went back to the

6    apartment.  I looked at my cell phone, I noticed I had

7    some missed calls from Ms. Pino, and so I called her

8    back.  She seemed agitated.  She said that she was

9    halfway to my apartment in Manchester and that we needed

10   to talk and -- yeah, so.

11        Q.    So what happened?  What did you do?

12        A.    I kind of said save it for tomorrow.  I hung

13   up the phone.  I turned it off because I didn't want to

14   deal with it.  I ended up taking a shower.  After the

15   shower I just went out and drove around.

16        Q.    Why did you do that?

17        A.    Driving helps me relax.  I do it for a living

18   and do it for enjoyment.

19        Q.    So, what was the stress about?

20        A.    Mortgages, back taxes, people not paying their

21   rent, the agitation between that, work was hectic.

22        Q.    Was the conversation with Carol Pino part of

23   the stress?

24        A.    Yes, it was.

25        Q.    So, when you drive around where do you

1    typically go?

2        A.    I usually drive around a bit in Manchester.  I

3    get on the highway, I'm not sure of the route, I just

4    know the area.

5        Q.    Okay, so where'd you go that night?

6        A.    I went into Keene from Route 101 I believe, I

7    know that route, drove the back roads of Hinsdale, I

8    drove into Keene, I did that for a good period at night.

9    I think Route 119 leads to Route 63 between Keene and

10   Brattleboro, and Route 63 would lead into Hinsdale

11   again.  I went down that road.  There was a little pull

12   off area where a trail is and I stopped there and napped

13   for a little bit.

14       Q.    How long is a little bit?

15       A.    I wasn't keeping track of time.  Maybe an

16   hour.

17       Q.    All right.

18       A.    Then I ended up driving in to Walpole, New

19   Hampshire.  I stopped at Jiffy Mart.  I remember that

20   was around 7 a.m.  I got some water, a sandwich, gassed

21   up.  Still had some more time to kill because I was

22   going to go to Rockingham to discuss some plans I had

23   with Tim Olmstead and check on the properties of my

24   sister's.  So before that I ended up going to Keene, New

25   Hampshire, I went into Wal-Mart, bought some soap

1  because I was out of soap at my apartment, I walked to

2  the cash checkout machine, the one you can put money

3  into, and you swipe what you have, and that stalled me

4  up for a little bit because it wasn't returning the cash

5  that I wanted.  The clerk came over to help me out.  I

6  left Wal-Mart probably about 7:45, went over to Rite Aid

7  which is right in the same parking lot.  They did not

8  open until 8 a.m., so I had to sit there and wait until

9  they opened up, and I got some vitamins, male vitamins

10  and stuff.  At that point I left Rite Aid about, you

11  know, maybe like five, ten after eight, and so I drove

12  into Rockingham, Vermont.

13       Q.   Okay.  Did you ever go back to Hinsdale?

14       A.   I might have drove through it, yeah, Plain

15  Road, I went on to Plain Road.

16       Q.   Did you go back to 76 Glen Street?

17       A.   No.

18       Q.   All right.  So, you drive up to Rockingham.

19  What happens?

20       A.   As I'm coming up Route 5, I was coming down

21  Route 5 or also Missing Link Road, and as I was coming

22  up to 12 Alden Road I noticed that Carol was parked on

23  the side of the road.

24       Q.   Why don't you hold on a second.  Could you

25  pull up O-1, please.  Okay.

54

1          So, all right, so, at some point did you

2     arrive in this area?

3          A.   Yes, I did.

4          Q.   Okay.  So, what happened when you arrived in

5     this area?

6          A.   When I was driving by I noticed that Carol

7     Pino and Tabatha were on the side of the road.

8          Q.   Where were they -- tell me where they were,

9     point it out, just put your finger on there?

10          A.   Right about there.

11          Q.   So they are on Alden Road, the corner of Alden

12     and Missing Link?

13          A.   Yes.

14          Q.   All right.  So describe what you saw?

15          A.   I saw Carol in the car and Tabatha was waving

16     her arms and she had a cell phone in her hands.

17          Q.   Okay.  So you know them, why didn't you stop?

18          A.   Well, because the night before when Carol said

19     she was coming to my apartment, I told her I didn't want

20     to and she was insisting, I just felt like she was

21     chasing me down.

22          Q.   For what?

23          A.   To discuss not evicting her.

24          Q.   All right.  So, just to change the subject for

25     a second, if you look at the middle of that it stays 626

1    Missing Link Road?

2         A.    Yes.

3         Q.    Where was the apartment that you rented to Tim

4    Olmstead?

5         A.    It was right around that area.

6         Q.    Was it --

7         A.    About right there.

8         Q.    Okay.

9         A.    If I'm correct on the map.

10        Q.    All right, so, when you saw them and you

11   didn't stop, where'd you go?

12        A.    I went straight up like -- you want me to

13   draw?

14        Q.    Yeah, sure.

15        A.    I went straight up that way.

16        Q.    Okay.  Did you ever drive on Alden Road that

17   day?

18        A.    No, I did not.

19        Q.    Okay.  So then where did you go from there?

20        A.    There was a dirt road on the left side.  I'm

21   not sure the name of the road.

22        Q.    It's not on this map; right?

23        A.    It's not on the map, no.  I took the dirt road

24   and got on to another major route.  I apparently found

25   out that that was part of Springfield.

1      Q.    Okay.  So, did you go to Springfield?

2      A.    Yes, I ended up in Springfield.

3      Q.    What happened in Springfield?

4      A.    An officer pulled out behind me and ended on

5   turning on his blues or green, yeah, blues I think it

6   was.

7      Q.    What's the first thing this officer said to

8   you when he pulled you over?

9      A.    He comes up to the window and aggressively

10  says where's the girl that was in your car.

11     Q.    So, what did you think about that?

12     A.    I was dumbfounded.  I didn't know.

13     Q.    Okay.  So, did you let him search your car?

14     A.    Oh, absolutely.

15     Q.    So, you heard them, the officers testify that

16  you were detained along on the road; correct?

17     A.    Correct.

18     Q.    All right.  And so at some point Trooper

19  Sorensen came?

20     A.    Yes.

21     Q.    And you were eventually arrested?

22     A.    Yes, I was.

23     Q.    After you were arrested where were you

24  brought?

25     A.    To the Westminster Barracks in Vermont.

1    Q.    And then what happened after you were brought

2  there?

3    A.    Logged in and put into a cell.

4    Q.    Okay.  And how -- at some point detectives

5  came to talk to you; right?

6    A.    Yes, they did.

7    Q.    How long were you in the cell before the

8  detectives came to talk to you?

9    A.    I believe it was about four hours.

10   Q.    All right.  Did anybody bring you any food?

11   A.    No.

12   Q.    Okay.  Could you get water in the cell?

13   A.    No, the water was off.

14   Q.    Okay.  You saw the picture with the cup in the

15  sink; right?

16   A.    Yes, that was after the first interview.

17   Q.    Okay.  So were you provided with water after

18  the first interview?

19   A.    Yes, I was.

20   Q.    All right.  So, the officers or Detective

21  Albright brought you into the interview room; right?

22   A.    Yes, they did.

23   Q.    Did they advise you of your Miranda rights?

24   A.    Yes, they did.

25   Q.    All right.  Do you think you understood those

1   rights?

2       A.   I thought I did, yes.

3       Q.   What do you mean, what did you think?

4       A.   Well, I thought I was able to communicate with

5   a lawyer prior to any interview, call a lawyer and have

6   a lawyer present at the interview.

7       Q.   Okay.  But before the first interview you

8   didn't request that; right?

9       A.   No, no, I did not.

10      Q.   So when you got in the room, in the interview

11  room, it was recorded; correct?

12      A.   Yes, it was.

13      Q.   And you just described to the jury where you

14  had been prior to that time on the 27th; right?

15      A.   Correct.

16      Q.   All right.  And is that the same thing you

17  told the officers essentially?

18      A.   It was, yes.

19      Q.   All right.  And did they appear to believe

20  you?

21      A.   No, they did not.

22      Q.   All right.  So what was their demeanor when

23  they were first asking you questions?

24      A.   When they first started out it was casual, you

25  know, and polite.  They wanted to know my side of the

1   story and what was going on so they could piece together

2   this investigation.

3        Q.   Okay.  So at some point, and we heard the

4   transcripts of this, at some point did they become a

5   little more aggressive?

6        A.   Yes, they did.

7        Q.   At some point did they act like they didn't

8   believe what you were saying?

9        A.   Yes, they did.

10        Q.   Did they tell you that they had a different

11   story?

12        A.   Yes, they did.

13        Q.   Did they tell you some of the details of that

14   story?

15        A.   Yes, they did.

16        Q.   So, at that point what did you feel?

17        A.   I felt scared and invoked my lawyer right.

18        Q.   Did they stop the interview?

19        A.   Yes, they did.

20        Q.   And so what did you expect would happen at

21   that point?

22        A.   That I'd be able to call my lawyer.

23        Q.   All right.  So, where did you go after the

24   interview?

25        A.   Back to the cell.

1        Q.    And what was your expectation when you were

2   back in the cell?

3        A.    That at some point I would be getting a phone

4   call or be allowed to use the phone.

5        Q.    And how long were you in there before -- at

6   some point you signaled you wanted to talk to them;

7   right?

8        A.    Yes, I did.

9        Q.    Do you remember how long you were in there

10  before you did that?

11       A.    There wasn't a clock but I recall it being

12  about 40 minutes.

13       Q.    All right.  And so then you signaled that you

14  wanted to talk to the detectives again?

15       A.    Yes, I did.

16       Q.    All right.  And did the detectives come?

17       A.    Eventually, yes.

18       Q.    All right.  And did they bring you back to the

19  interview room?

20       A.    Yes, they did.

21       Q.    And when they brought you back to the

22  interview room, what did you tell them?  It's on the

23  report.

24       A.    Yeah, I just informed them that I was under

25  the impression I needed their permission to use the

1    phone to call my lawyer, and that's why I wanted to talk

2    to them.

3         Q.   So you thought you could have a lawyer there

4    when you were present when you were discussing things

5    with them?

6         A.   Yes.

7         Q.   And then they told you no, you can either have

8    the lawyer or you can talk to us, you can't have both?

9         A.   That is correct.

10        Q.   All right.  So, why did you agree to talk to

11   them without a lawyer?

12        A.   I felt like they weren't letting me leave.  I

13   wasn't being able to go use the phone, so I got scared

14   and just talked to them.

15        Q.   All right.  So, now during the first half of

16   that interview what did you tell them?

17        A.   The same very thing I told them the first

18   time.

19        Q.   All right.  So at some point did they become

20   more aggressive?

21        A.   Yes, they did.

22        Q.   At some point did you change your story?

23        A.   Yes, I did.

24        Q.   And you told them the things that the jury

25   heard on that interview?

1       A.   Yes, I did.

2       Q.   Okay, about the sex in the attic in November;

3  right?

4       A.   Yes.

5       Q.   Did that actually happen?

6       A.   No, that did not.

7       Q.   Why did you tell them that happened?

8       A.   Because at the time I was starting to piece

9  what was going on and I assumed that Carol was behind

10  this, so I wanted to implicate her in a crime too.

11       Q.   Okay.  So, all right, so you told them the

12  story about what happened in the attic and then they

13  started asking you questions about that night, about

14  whether you had taken Mackenzie to Vermont to have sex

15  with her; right?

16       A.   Correct.

17       Q.   And they told you exactly what the allegations

18  were; right?

19       A.   Verbatim.

20       Q.   All right.  So, then you told them that you

21  took her to Vermont and had sex.  Why did you tell them

22  that?

23       A.   Because they kept telling me they knew it and

24  they were going to do all this forensics and they knew

25  that I did it, so I was like, whatever.

1    Q.    But if you didn't-- did you do it?

2    A.    No, I didn't.

3    Q.    Okay.  So if you didn't do it, why did you

4    tell them that you did do it?

5    A.    Because they said they were doing forensics.

6    They said they were getting a warrant and investigate

7    crime scene.  They were going to investigate my car.

8    They were 100 percent sure that they were going to pull

9    my DNA off of Mackenzie.  So I figured, you know,

10   forensics has a big deal in criminal courts, so, let the

11   forensics speak.

12   Q.    All right.  So, you heard your lawyer testify

13   today; right?

14   A.    I did.

15   Q.    Mr. Olmstead.  Was he your lawyer?

16   A.    He was.

17   Q.    All right.  And there was some testimony about

18   a letter that you wrote him on May 8th; right?

19   A.    Correct.

20   Q.    And there was some testimony about a letter

21   that you wrote him on May 19th; right?

22   A.    I believe it was May 19th, yes.

23   Q.    Did you write that letter?  You've seen that

24   letter on May 8th.  Let's talk about that one first.

25   Did you write him that letter?

1        A.    Write a letter to him, yes.

2        Q.    Okay.  And you were telling him to send a

3  document to who?

4        A.    Jasmine Baker.

5        Q.    Who is Jasmine Baker?

6        A.    A friend that I made while I was in Hinsdale.

7  I met her while I was working over at 76 Glen Street.

8        Q.    And so why were you trying to have a letter

9  forwarded from your lawyer to Jasmine?

10       A.    Because I wanted to discuss some things that

11 happened to me and why I was being arrested and let her

12 know what was going on and if she still wanted a place

13 to rent.

14       Q.    So you saw the government exhibit, which is

15 the letter that they say that you wrote to Jasmine Baker

16 and that you included in the envelope to Mr. Olmstead;

17 right?

18       A.    I saw that, yes.

19       Q.    Was that the letter that you sent to Mr.

20 Olmstead?

21       A.    That was not the letter I sent.

22       Q.    What was in the letter that you sent?

23       A.    The letter I sent to Jasmine informed her that

24 I was incarcerated because of Mackenzie's statements.

25 There was some details about the case that I put in

1   that.  I was concerned that there might be DNA found on

2   her, and I told this to Jasmine, and I explained that

3   there was an issue that I was informed by Carol that

4   Mackenzie snuck into my car, and all I could think about

5   was I left a used condom in my car and I was scared.

6          Q.   All right.  And there was another letter that

7   you sent to Mr. Olmstead; right?

8          A.   Yes, there was.

9          Q.   And did you send -- and you told him to send a

10  letter to Jazzy; right?

11         A.   Yes, I did.

12         Q.   All right.  And was the letter that the jury

13  saw, the letter that was in that envelope?

14         A.   No, it was not.

15         Q.   What was in the letter that you actually sent

16  Mr. Olmstead?

17         A.   The exact content I don't remember.  I know

18  Jasmine was having a birthday coming up so I had

19  mentioned that, wishing she was having a good birthday.

20  I did write, you know, I love you on it, but it was a

21  friend love.  I say that to friends.  I discussed issues

22  about what was going on and that I was filing the

23  paperwork in the courts to have Carol Pino forcefully

24  evicted, that if she wanted to move over there instead

25  of going to Brattleboro, I would be willing to let her

1    rent that place and at a much lower cost.

2        Q.   Okay.  All right, we also heard some evidence

3    regarding some cell phones; right?

4        A.   Yes.

5        Q.   And that a picture of Mackenzie was found on

6    your cell phone?

7        A.   Yes.

8        Q.   Did you ever see a -- first of all, did you

9    ever ask Mackenzie to take a picture of herself and send

10   it to you?

11       A.   No, I did not.

12       Q.   Did you ever see a picture on your cell phone

13   of Mackenzie?

14       A.   No, I did not.

15       Q.   All right.  Did you have any text messages or

16   other communications with Mackenzie in which you were

17   talking about bringing her to Vermont?

18       A.   No, I did not.

19       Q.   On any cell phone?

20       A.   Not on mine.

21       Q.   At any point?

22       A.   No.

23       Q.   Now, Carol Pino was your tenant.  You said it

24   was more than just a tenant/owner relationship, you were

25   friendly?

1    A.   Yeah.  She was there for a couple years, I

2  think it was about two years, so she's always been

3  friendly and always invited me to dinner, some holiday

4  events and birthday parties, yeah.

5    Q.   She was living with Frank, right?

6    A.   Yeah, Frank was her boyfriend.

7    Q.   At some point did she try to make it more than

8  that?

9    A.   I got the feeling, yes.

10    Q.   How'd you get that feeling?

11    A.   She'd offered for me to come live with her and

12  she'd make comments like she'd kick Frank out.

13    Q.   All right.  So, did you want to do that?

14    A.   No, I did not.

15    Q.   All right.

16         MR. SAXE:  Can I have a second, your Honor?

17  No further questions, your Honor?

18         THE COURT:  Thank you.  Cross-examination.

19                   CROSS-EXAMINATION

20  BY MS. KONESKY:

21    Q.   Mr. Carpentino, how old are you?

22    A.   I'm 34.

23    Q.   And you said you had an apartment in

24  Manchester; correct?

25    A.   Correct.

1        Q.    What was the address of that apartment in
2   Manchester?
3        A.    43 Walnut Street, Apartment 9.
4        Q.    Okay.  And you're most recently employed as a
5   driver for People's Linen?
6        A.    Correct.
7        Q.    You also get some income from collecting rent
8   from your tenants?
9        A.    Correct.
10       Q.    Carol Pino is one of those tenants?
11       A.    Yes.
12       Q.    Tell me about what kind of a person Carol Pino
13   is?
14       A.    Seemed nice, I mean, she seemed like a decent
15   person.
16       Q.    You think she's a smart person?
17       A.    Yeah.
18       Q.    Okay.  Now, it's your testimony today that you
19   never had any sexual relationship with Mackenzie Harvey?
20       A.    Correct.
21       Q.    And yet you just confessed to that.  You told
22   the police that you had?
23       A.    I did.
24       Q.    Let's talk a little bit about that.  Now, in
25   the, right in the beginning of the interview that we

1  listened to today your first question to the officers

2  was what's the maximum punishment for this offense,

3  correct?

4        A.   Yes, sir.

5        Q.   But you didn't do it?

6        A.   Correct.

7        Q.   But you asked what the maximum punishment

8  would be?

9        A.   Yes.

10       Q.   And in that confession the troopers were

11  questioning you about Mackenzie's abduction just the

12  night before; correct?

13       A.   Yes, they were.

14       Q.   And they told you a bunch of things they said

15  that they knew?

16       A.   Yes.

17       Q.   About her statement?

18       A.   Yes.

19       Q.   And a witness who saw you in the woods with

20  her that day; correct?

21       A.   Correct, that's what they said.

22       Q.   DNA on Mackenzie?

23       A.   Yes.

24       Q.   And all of that is to prove that you abducted

25  Mackenzie the night before, correct, you took her to

1   Vermont?

2        A.   I'm sorry?

3        Q.   It's all -- that was all about taking

4   Mackenzie the night before to Vermont for sex; correct?

5        A.   The evidence?

6        Q.   The evidence they told you about?

7        A.   Yes.

8        Q.   Right.  And everything they told you is

9   focused on the events of that day and the day before?

10        A.   Correct.

11        Q.   Okay.  Let's review some of the things that

12   you said.  When you started, when you started to confess

13   you said let me start from the very, very beginning;

14   correct?

15        A.   Yes.

16        Q.   But they were talking about the night before?

17        A.   Correct.

18        Q.   But you wanted to start from the beginning?

19        A.   Yes.

20        Q.   Okay.  And the first thing you told the

21   officers was about sex that happened in November, you

22   said?

23        A.   Correct.

24        Q.   They just asked you about the night before but

25   you talked about November?

1        A.    That's correct.

2        Q.    Okay.  And when the officers were telling you

3   about what they believed they knew at the time, they

4   never mentioned an attic, did they?

5        A.    I do not believe so.  I don't recall.

6        Q.    And yet you told them you had sex with

7   Mackenzie in the attic?

8        A.    Yes.

9        Q.    But you just made that up?

10       A.    Yes, I did.

11       Q.    And that just happened to be what Mackenzie

12   said as well?

13       A.    Yes, because I informed her to say that.

14       Q.    I'm sorry?

15       A.    Yes, because I informed her to say that when I

16   was talking with Carol in the car when she said that she

17   was going to press charges against me if I evicted her.

18       Q.    You informed Mackenzie to say that it happened

19   in the attic?

20       A.    Yeah, and the mother caught us.

21       Q.    Okay.  You also talked about a hayride on

22   Halloween?

23       A.    Correct.

24       Q.    And the officers didn't tell you they knew

25   anything about that; did they?

1        A.    No.

2        Q.    But you made that up?

3        A.    That was not made up.

4        Q.    The hayride was not made up?

5        A.    No, the hayride was not made up.

6        Q.    Okay.  But it was made up that you had sex

7   after the hayride?

8        A.    Yes.

9        Q.    Okay.  And Mackenzie talked about the hayride

10  as the first day that you had sex as well; correct?

11       A.    I do not believe so, but I might be wrong.

12       Q.    Okay.

13       A.    I don't know when she said it happened.

14       Q.    But you don't recall Mackenzie testifying

15  about the hayride?

16       A.    No -- yes, she testified about it, yes.

17       Q.    Okay.  And is that something you told her to

18  say in the car with Carol that day as well?

19       A.    No, that was not.

20       Q.    Okay.  So, the moment between you two that she

21  discussed on the hayride, that was something you both

22  just happened to talk about?

23       A.    Yes.

24       Q.    Okay.  Now when the officers were questioning

25  you they didn't say anything about train tracks, going

1    down the train tracks, did they?

2         A.   Yes, they did.

3         Q.   They did?

4         A.   Yes.

5         Q.   That's in the report, the officers said they

6    knew you took Mackenzie down the train tracks?

7         A.   Yes.

8         Q.   Okay.  So if we listen to that recording we

9    will hear them say you took Mackenzie on the train

10   tracks?

11        A.   Yes, I believe the tracks were involved, yes.

12        Q.   Okay.  Now, let me talk about a few other

13   things you said in your statement.  At one point you

14   told the officers you were talking to Carol and you told

15   her this is like way too fucked up, I love you and I

16   care about you, and how would you want a relationship

17   with someone that's just had your daughter on them.

18             Now, you made up that specific statement?

19        A.   Yes, to try to get her in trouble.

20        Q.   Okay, you just wanted to get her in trouble?

21        A.   Yes, I did.

22        Q.   Okay.  All right, let's talk about -- I'm

23   going to go back and ask you about the train tracks.

24        A.   Ah-hum.

25        Q.   I'm showing you what is one of the transcripts

1   for, this is the audio that we listened to, Government's

2   11f, and ask if you could just review that and tell me

3   if you see anything that the officers say about train

4   tracks in there.

5       A.   (Witness reading document.)  I'm not --

6       Q.   You can keep reading the rest of it.

7       A.   (Witness reading document.) Not from that page

8   on.

9       Q.   Would you like to read the rest of the

10  transcript?

11      A.   I believe it was in the first interview.

12      Q.   The first interview, okay.

13      A.   They mentioned train tracks.  I'm not sure

14  what interview it was mentioned.

15      Q.   Okay.

16      A.   But they did explain that they had all this,

17  like we know you did this, we know you did that.

18      Q.   And he thought you misremembered and wanted

19  you to make your story more believable?

20      A.   No, that was what they were looking for me to

21  lineup my, what I would say -- they wanted what I would

22  say to lineup with everyone else's statements.

23      Q.   Okay.

24      A.   They said that verbatim.

25      Q.   And that was all to just get Carol Pino in

1  trouble?

2       A.   That part wasn't, no.

3       Q.   Okay, and why was that part?

4       A.   That part was just give them what they wanted

5  so I could go back to my cell and wait to get ahold of

6  my lawyer and then, you know, do the investigation.

7       Q.   Okay.  Let's talk about the letter sent to

8  Jasmine Baker.  Now, you heard Attorney Olmstead's

9  testimony today; correct?

10      A.   Yes, I did.

11      Q.   And you heard that he said he read on the

12 instructions that those were to be sent to Mackenzie?

13      A.   I believe he made that comment, yes.

14      Q.   Okay.  But you say that was not in the letter

15 that you sent?

16      A.   I never instructed him to send anything to

17 Mackenzie.

18      Q.   Okay.  So that wasn't written in the letters

19 that were attached to what you sent?

20      A.   So you're talking about the letter to Jasmine?

21      Q.   Yes.

22      A.   Yeah, I never said that to Jasmine.  I never

23 told her to forward anything to Mackenzie.

24      Q.   And the letters we saw today, how do you

25 suppose those came to Attorney Olmstead's possession?

1          A.    The letters that he had?

2          Q.    The letters that we've seen.  I can show them

3    to you.

4          A.    No, understand the letters, but you asked me

5    how they came to the attorney's possession.

6          Q.    Yeah, how did he get the letters that we saw

7    today that said please forward to Mackenzie?

8          A.    The one that said forward to Mackenzie, as far

9    as I know, he got the copy from the officers.

10         Q.    You think he got that from the police

11   officers?

12         A.    He said that, yes.

13         Q.    Okay.  So you believe he never got a letter

14   that said send to Mackenzie?

15         A.    Correct.

16         Q.    Okay.

17               MS. KONESKY:  And could you pull up 17a,

18   please, Dena.

19         Q.    Mr. Carpentino, where do you think these

20   letters came from?

21         A.    That I am not sure.

22         Q.    No?  I'm going to point out some things that

23   this letter discusses, worse comes to worse you found a

24   used condom in my car.  Now, there was a used condom in

25   your car; correct?

1      A.    Correct.

2      Q.    And whoever wrote this letter knew that?

3      A.    Yes, so.

4      Q.    Okay.  But it wasn't you, you didn't write the

5  letter?

6      A.    No, I wrote a letter to Jasmine discussing

7  concerns.

8      Q.    But it wasn't this one?

9      A.    No, it was not.

10      Q.    Okay.  Now, this page of the letter says,

11  please remember our hayride, our first kiss, our first

12  love letter.  You didn't write this one either, did you?

13      A.    No, I did not.

14      Q.    But whoever did knew about the hayride as

15  well?

16      A.    Must have.

17      Q.    Okay.  A few lines down, remember how I

18  carried you down the train tracks.  Whoever wrote this

19  knew about the train tracks as well?

20      A.    The train tracks are right behind the house.

21      Q.    Okay.  Now, the first page, let's go back to

22  the first page of 17, Dena.  Thank you.

23            This is writing about the third line down, I'm

24  sure Carol will move out soon, I can rent you the house

25  real cheap.  So whoever wrote that must have known about

1    the properties that you owned as well?

2        A.   Yes.

3        Q.   And renting them?

4        A.   Yes.

5        Q.   To Carol.  But it wasn't you?

6        A.   No.

7        Q.   Okay.  And you were here for the testimony of

8    the individual from the jail in Vermont; correct?

9        A.   Yes, I was.

10       Q.   Okay.  And you heard that the letters went out

11   from the jail, the letters went from you from the jail?

12       A.   I heard that letters went from me to my

13   attorney from jail, yes.

14       Q.   Okay, and those were the letters to Jasmine?

15       A.   The letters I sent to Jasmine, yes.

16       Q.   Okay.  Now, let's pull up -- actually I'm

17   going to have you take a look, I don't think we have

18   them on here, defense exhibit, those eviction notices.

19            All right, these are defense exhibits A and B,

20   I believe, or A and A-1.  Could you just take a look at

21   this again.

22            Now, those purport to say that on April 20th

23   you served Ms. Pino with an eviction notice.  Is that

24   correct?

25       A.   That is correct.

1      Q.   Okay.  And can you look at the handwriting on

2  that.  Is that all your handwriting?  Did you write

3  that?

4      A.   Yup.

5      Q.   It is.  And is that your signature, did you

6  sign that document?

7      A.   Yes.

8      Q.   Okay.  And just to be clear.  The person who

9  filled out that, the certification that was served on

10  Carol Pino, that was you; correct?

11     A.   Correct.

12     Q.   Okay.  So we're taking your word for it that

13  you served her on April 20th?

14     A.   Correct.

15     Q.   Okay.  So this was filed with the court;

16  right?

17     A.   That was filed with the court and then the

18  court would issue the order and then would be subpoenaed

19  by a deputy, so the deputy --

20     Q.   Okay -- I'm sorry, go ahead.

21     A.   So the deputy would make an official like

22  court appearance.  So the process in New Hampshire, from

23  what I understood, is you make a hand-delivery notice of

24  demand for rent and the eviction notice informing the

25  tenant that you plan on going forward with the legal

80

1    process.

2         Q.   Okay.  And filing with the court was on

3    July 27, 2017; correct?

4         A.   Correct.

5         Q.   And then after you were arrested?

6         A.   Correct.

7         Q.   Okay.  So the only documentation on here that

8    this was served on April 20, 2017, is you signed that,

9    correct, we're taking your word for that?

10        A.   Yes.

11        Q.   Okay.  And now it's your testimony that as of

12   April 20, at least, you intended to evict Carol Pino;

13   correct?

14        A.   Correct.

15        Q.   Now, let's pull up Government Exhibit 19.  Now

16   Mr. Carpentino, you agree that you sent this letter to

17   Mr. Olmstead; correct?

18        A.   That is correct I did.

19        Q.   Okay.  Dena, could you please blow up this

20   paragraph here.

21             Now, this is an instruction you gave to

22   Attorney Olmstead; correct?

23        A.   That is correct.

24        Q.   And it says for 12 Oak Hill Road and 76 Glen

25   Street, Hinsdale, New Hampshire, please send a letter

1    requesting rent to be sent to you and ask if they both

2    plan on continuing to rent.

3              Did I read that correctly?

4        A.   Yes, that's correct.

5        Q.   Okay, but you had already served a notice of

6    eviction on them?

7        A.   All they had to do was pay.

8        Q.   Okay.  And then you were telling him that you

9    were just questioning did they both plan to continue.

10   You had already served the eviction?

11       A.   Yes.

12       Q.   Okay.  But in this, in the letter you didn't

13   request any help from your real estate attorney about

14   getting them evicted?

15       A.   No, that was just a formal letter to find out

16   if they were going to pay.

17            MS. KONESKY:  Can I just have one moment, your

18   Honor.  I just have a few more questions.

19            (Pause.)

20       Q.   Mr. Carpentino, you testified that the reason

21   you lied to the police during that second interview was

22   because you wanted to get back to your cell?

23       A.   Yes, they brought me into the interrogation

24   room and continued to ask me questions when I believed I

25   was asserting my rights to my attorney, and they

1    continued to ask me questions and --

2        Q.    But you just testified a minute ago that you

3    lied to them because you thought that would let you go

4    back to your cell; correct?

5        A.    No, that wasn't the main reason why.

6        Q.    That wasn't the main factor?

7        A.    Yes, it is a factor, because I just wanted to

8    get out of the interrogation room.  They were badgering

9    me, you know, we know this, we just want you to lineup

10   everything everyone else is saying, so I said, you know

11   what, here you go.

12       Q.    You know during the first interview, when you

13   requested a lawyer, they took you back to your cell

14   immediately?

15       A.    No, and they didn't take me back the second

16   time.  I said I wanted to call my lawyer.  I said that's

17   why I was there.  I was under the impression that they

18   couldn't keep questioning me when I invoked a lawyer,

19   and they kept questioning, well, do you want to talk to

20   me.  No, I want to call my lawyer.

21       Q.    And all that conversation we heard is on the

22   recording; right?

23       A.    Yes.

24       Q.    Okay.  Mr. Carpentino, you heard Patrick

25   Elmore's testimony that he saw a man in the woods with

1    Mackenzie; correct?

2         A.   Yes.

3         Q.   That wasn't you?

4         A.   No.

5         Q.   Okay.  So I just want to get all of this

6    straight.  It's your testimony that the letters we

7    looked at forwarded by -- or I guess you dispute that

8    they were forwarded, but the letters that we just looked

9    at to Mackenzie through Jasmine, those are fake;

10   correct?

11        A.   Correct.

12        Q.   All right.  So somebody made those up to set

13   you up?

14        A.   Correct.

15        Q.   Okay.  And it's your testimony that Mackenzie

16   committed perjury when she came in here and testified?

17             MR. SAXE:  Object, that calls for legal

18   conclusion, your Honor.

19             THE COURT:  You can say testified falsely.

20        Q.   Testified falsely?

21        A.   Yes.

22        Q.   Okay.  And your initial statement to the

23   police, that was also false?

24        A.   Yes.

25        Q.   Okay.  And you're saying that a different man

1    was in the woods with Mackenzie that day?

2         A.    I'm not saying anything about who was in the

3    woods.

4         Q.    Okay.  Or that Patrick Elmore's story may not

5    be true?

6         A.    Yeah.  He definitely didn't see me.

7         Q.    Okay.  And your testimony is that it was just

8    a coincidence that you were in the area around that time

9    that morning?

10        A.    It's not a coincidence.  Carol and Tabatha

11   knew I was going to be in that area around that time.

12        Q.    Okay.  All right.  So they knew at that time?

13        A.    Not at that time.  Around the morning time.

14   Because like I was saying, the prior day Tabatha knew or

15   requested that I come back and sign some paperwork so

16   she could have some documentation to have the power

17   company -- it was a doctor's certifying that they were

18   renting and it would go to the electrical company and

19   they would not shut off the power, so I said I would

20   stop over in the morning after I stop by Tim Olmstead's

21   and check on the property.

22        Q.    Okay.  So they were there waiting for you?

23        A.    Yes, they were.

24        Q.    Okay.  And Mackenzie was in the woods as part

25   of this scheme?

1        A.    I don't know about that.

2        Q.    Okay.  Government's Exhibit 16.  Do you recall

3  seeing this letter?

4        A.    Only in discovery.

5        Q.    Okay.  And did you write this letter?

6        A.    No, I did not.

7        Q.    No, you didn't, okay.  And this says if we --

8  I hate how mom treats you and seeing you get hurt, she

9  almost told everyone about us -- that's pretty similar

10  to your statements to the police; correct?

11        A.    I never said that.

12        Q.    About Carol threatening to tell people about

13  you?

14        A.    I guess if you're trying to say that she

15  threatened to tell the police about me, yeah.

16        Q.    But you didn't write this letter?

17        A.    No.

18        Q.    Somebody else wrote this?

19        A.    Yes.

20        Q.    Okay.  And all of the detail that you provided

21  in your confession about the train tracks, about

22  Mackenzie and Carol, about the hayride, those were all

23  just details you provided to convince the police of your

24  story?

25        A.    The -- I'm not sure where you're going with

1    that.

2         Q.   Well, you provided a lot of detailed

3    information to the police?

4         A.   Correct, right.

5         Q.   Correct?  And that information was a lot more

6    than what they asked you, they just asked you about the

7    night before; correct?

8         A.   Yes.

9         Q.   And you provided all those details because you

10   wanted to convince them of your story?

11        A.   I wanted them to check in on Carol as a

12   potential, I'm not sure of the legal term, that she

13   committed a crime.

14        Q.   Okay.  Thank you.

15             THE COURT:  Redirect.

16             MR. SAXE:  Briefly.

17                      REDIRECT EXAMINATION

18   BY MR. SAXE:

19        Q.   Did -- when you were, after you were arrested,

20   did law enforcement officials take a DNA swab from you?

21        A.   Yes, they did.

22        Q.   Did they take your fingerprints?

23        A.   Yes, they did.

24             MR. SAXE:  No further questions.

25             THE COURT:  All right, sir, you can step down

1    and go back to your seat, please.

2              Do you have any additional witnesses?

3              MR. SAXE:  No further witnesses.

4              THE COURT:  Defense rests?

5              MR. SAXE:  Yes.

6              THE COURT:  Are you going to put on any

7    rebuttal case?

8              MR. AFRAME:  No, your Honor.

9              THE COURT:  Government rests.  Okay, you've

10   heard all the evidence in the case, members of the jury.

11   What we will do is Monday morning first thing you come

12   in we'll do closing arguments and jury instructions.

13             Now I know you've heard all the evidence in

14   the case, but I want you to keep an open mind even now,

15   because as I said, you haven't heard my jury

16   instructions, haven't heard the closing arguments,

17   haven't heard what other people have to say about it at

18   the jury, so don't spend the night thinking about it,

19   trying to worry about, figure out what happened, you'll

20   have plenty of time to do that.  And keep my general

21   instructions in mind and come back at 9:00 on Monday.

22   And have a nice weekend and we'll get this thing done on

23   Monday, okay?  You're excused.

24             (Jury exited the courtroom.)

25             THE COURT:  So I guess the marriage thing has

1    kind of gone by the wayside.  Did you want to try some

2    other motion?

3              MR. SAXE:  Yes, I don't believe -- I can't

4    make that argument at this point I understand based on

5    the evidence that came in.

6              THE COURT:  You can't.

7              MR. SAXE:  But I just reiterate the other

8    arguments for the same reasons.

9              THE COURT:  I find them to be insufficient to

10   warrant judgment as a matter of law.

11             MR. SAXE:  Just so I'm clear, my argument is

12   that the government hasn't submitted sufficient evidence

13   taken in a light most favorable to the government that a

14   reasonable trier of fact could find a defendant guilty.

15             THE COURT:  That's what I understand you're

16   saying and I respectfully disagree and deny the motion.

17             All right, so we've got to go over jury

18   instructions.  I've been trying to do some editing, but

19   I've had to do all this other stuff in the meantime.

20   Wait around and when I'm ready for you I'll call you up

21   into chambers and we'll go over the proposed

22   instructions.

23             Anybody have to talk to me about anything

24   else?

25             MR. SAXE:  No, your Honor.

1          (Recess at 3:20 p.m.)

2                IN CHAMBERS

3          THE COURT:  Okay, so I have not edited these.

4    I will edit them over the weekend.  I've been trying to

5    develop them on the fly as well as responding to legal

6    arguments being thrown at me at the last minute, so I

7    reserve the right to make changes to them on my own

8    initiative as I edit them over the weekend.

9          What I want to do now is I'll tell you that

10   the bulk of this instruction is boilerplate that I give

11   in virtually every case, so I don't want to spend time

12   with you on these now.  Instead I intend to have you

13   turn to page nine and to go over the core elements with

14   you, and then I will ask you to email to the clerk by

15   5 p.m. tomorrow any additional objections or requests

16   that you have.

17         If you object to an instruction I propose to

18   give, I want you to propose the language you believe I

19   should provide in substitution for the language that you

20   object to unless you conclude that there is no language

21   that should be given.  You should specify what language

22   you're objecting to and you should propose an

23   alternative if you have an alternative.

24         If I've omitted something you propose that I

25   give, you should provide a full copy of what you propose

1    I give as well as any authority you have to support it.

2    I'll come in on Sunday and edit it up and I will meet

3    with you Monday morning before closing arguments to tell

4    you finally what I propose to give.

5            Does everybody understand what I want to do?

6            MS. GRAHAM:  Yes.

7            MR. SAXE:  Yes.

8            THE COURT:  Okay.  So let's start on page

9    nine, causing the transportation of a minor with intent

10   to engage in sexual activity.  The defendant has been

11   charged with a violation of 18 USC Section 2423(a) which

12   makes it a crime for a person to knowingly transport an

13   individual who has not attained the age of 18 years in

14   interstate commerce with the intention that the

15   individual engage in any sexual activity for which any

16   person can be charged with a criminal offense.

17           That's just my paraphrasing of the statute.

18   Does anybody have any problem with that?  Again, you can

19   make a final decision as you review things more

20   carefully over night, but it helps if you tell me now if

21   you see a problem, okay?

22           Essential elements of the offense.  I think

23   there are three.  In order for the defendant to be found

24   guilty of this charge the United States must prove each

25   of the following elements beyond a reasonable doubt.

1   First, that the defendant knowingly transported

2   Mackenzie Harvey in interstate commerce.  Second, at the

3   time of the transportation Harvey was under the age of

4   18 years.  And third, at the time of the transportation

5   the defendant intended that Harvey would engage in

6   sexual activity for which any person could be prosecuted

7   under Vermont law.

8          Any problem with way I've stated the essential

9   elements?

10        MR. SAXE:  Well, that's what the statute says,

11   but I did research this and there wasn't an instruction

12   in the First Circuit that I could find, so there's the

13   issue of if they could just be prosecuted for it, is

14   that enough or does the person have to have -- well, I

15   have to look into it.  In my mind it's complicated.

16        THE COURT:  Okay, I'm not sure where you're

17   going.

18        MR. SAXE:  Neither am I, that's why --

19        THE COURT:  I won't speculate, then, until I

20   know.  I have had enough trouble understanding arguments

21   that you made in this case, Mr. Saxe, so I will let you

22   try to present it in writing to me overnight, okay?

23        Does anybody have any other concerns that leap

24   out at them as they read through this statement?  As I

25   said, I revised slightly the government's proposal

1    because I feel the way I have it more accurately

2    captures the offense, and I was concerned that, as

3    stated by the government, that it might mislead the jury

4    into thinking that unless Harvey had engaged in criminal

5    acts herself or it was an intention that Harvey engage

6    in criminal acts, that the defendant couldn't be

7    convicted.  And I think the statute deals with that with

8    the any person language.

9              Transportation in interstate commerce.  I

10   instruct you that a person is transported in interstate

11   commerce if the person is transported between New

12   Hampshire and Vermont.

13             Anybody have a problem with that?  Seems

14   pretty straightforward.

15             Okay, let me explain how I've dealt with the

16   issue I raised with you during the trial.  As I looked

17   at the statute and tried to parse it, I was concerned

18   that -- it was unclear to me as to whether in order for

19   there to be criminal activity there must be both sexual

20   activity as that term is defined in federal law and a

21   Vermont law violation, and so I have set them out and it

22   seems redundant because the elements are virtually

23   identical.  There's a little, one little clause phrasing

24   difference, but I don't think it's material here, but

25   nevertheless to be sure that I've captured any argument

1   about how the statute could be construed I decided to

2   put both in.  So, sexual activity is drawn from the

3   definition verbatim in the statute of sexual activity.

4   And I state sexual activity for purposes of this case is

5   contact between the penis and the vulva that involves

6   penetration however slight, contact between the mouth

7   and the penis and contact between the mouth and the

8   vulva.  That's, I didn't use the entire definition

9   because we didn't hear testimony about other types of

10  contact.  So that's verbatim, those portions of the

11  statute that appeared to relate to the case based on the

12  evidence in the case.  I did not hear the word vulva, so

13  I'm hoping that the jury can understand what the vulva

14  is, but we'll have to see.  I chose to use the exact

15  language in the statute.

16          Okay.  Then I propose to -- anybody have a

17  problem with that?  Then I propose to instruct on the

18  Vermont statute and say the following.  Engaging in a

19  sexual act with a child who is under the age of 16 is a

20  crime in Vermont.  A sexual act under Vermont law means

21  conduct between persons consisting of contact between

22  the penis and the vulva, the mouth and the penis, and

23  the mouth and the vulva.  Yeah, it means conduct between

24  persons consisting of -- okay.  Because it would not be

25  a crime under Vermont law for the defendant to engage in

1   a sexual act with Harvey unless at that time she was

2   under 16. You may not find the defendant guilty unless

3   the government proves beyond a reasonable doubt that

4   Harvey was -- Harvey was under 16 when the defendant

5   transported her from New Hampshire to Vermont.

6           Anybody have any issue with that?

7           MR. SAXE: Nope.

8           THE COURT: Okay. Intention. A defendant

9   acts with an intention that a person will engage in

10   sexual activity for which any person could be prosecuted

11   if he acts voluntarily with the specific intention that

12   the person transported will engage in sexual activity

13   for which any person could be prosecuted. The United

14   States does not need to prove that the defendant's sole

15   reason for transporting Mackenzie Harvey from New

16   Hampshire to Vermont was for the purpose that she would

17   engage in sexual activity -- I might rephrase that

18   slightly. A person may have several different purposes

19   or motives for such transportation. The government must

20   prove beyond a reasonable doubt, however, that at least

21   one of the defendant's substantial motivations was for

22   Harvey to engage in sexual activity.

23           That's what I've got on intention. I should

24   have something in the discussion about -- does the

25   government want me to put in something dealing with the

1    issue of consent?  So, I think I've had an earlier

2    version of this, some word about consent not being a

3    defense.  I think I need to add something like that.

4    I'll work on something over the weekend, but something

5    that will be to the effect that a consent by the child

6    is not a defense to a charge under Vermont law of having

7    engaging in a sexual act with a child under age 16,

8    something to that effect.  Do you have --

9              MR. AFRAME:  I was going to make a writing

10   suggestion, but --

11             THE COURT:  Go ahead.

12             MR. AFRAME:  I mean it could go engaging in a

13   sexual act with a child who is under the age of 16 is a

14   crime in Vermont regardless of whether --

15             THE COURT:  Regardless of whether the child

16   consents or not.  Yeah, I think that's right.  Okay, so

17   I'm going to add after the word Vermont, regardless of

18   whether the child consents to the sexual act, okay.  And

19   I've given intention, and that's basically what I think

20   we need to instruct on.

21             Do you have different thoughts?  Given your

22   client's testimony I think a lot of potential argument

23   that you would have had has gone out the window.  Now it

24   becomes a do you believe him or not case.  So I don't

25   think we need to do anything else.  Do you have other

1     specific instructions in mind as you sit here now

2     understanding that you might have some supplemental?

3              MR. SAXE:  I don't think so.

4              THE COURT:  No?  Okay, do you have anything

5     else?

6              MR. AFRAME:  No.

7              THE COURT:  The rest of it will be the

8     boilerplate.  Of course you should go over it.  I will

9     go over it.  I may strike certain things like sometimes

10    I have in there if an expert witness testifies when

11    there really wasn't an expert opinion witness, things

12    like that to the extent there is some testimony here,

13    some instruction that doesn't have any bearing on what

14    happened in the case, I may strike it.  I may clean up

15    grammatical errors and things because it's put together

16    quickly by my assistant.

17             But other than that I think you're on notice

18    of what I propose to do.  And I will ask you to email

19    the clerk by five.  Copy each other on anything you

20    email to the clerk.  The clerk will forward the email to

21    me.  I'll come in Sunday and do some more editing and we

22    should have things ready for you to go on Monday.

23             Anything else we need to talk about today?

24    Okay.  Good.  Thank you very much.

25             (Adjourned at 3:55 p.m.)

```
1                    C E R T I F I C A T E

2

3          I, Sandra L. Bailey, do hereby certify that

4    the foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, skill, ability and belief.

7

8

9    Submitted: 11/13/2019    _____
                              SANDRA L. BAILEY, LCR, CM, CRR
10                            LICENSED COURT REPORTER, NO. 15

11                            STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```