UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   17-cr-157-01-PB
            v.                    *   June 7, 2018
                                  *   9:00 a.m.
KURT CARPENTINO                   *
                                  *
* * * * * * * * * * * * * * * * * *
```


DAY 2 - MORNING SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE PAUL J. BARBADORO
AND A JURY



Appearances:

For the Government:     Seth R. Aframe, AUSA
                        Georgiana L. Konesky, AUSA
                        U.S. Attorney's Office
                        53 Pleasant Street
                        Concord, NH 03301


For the Defendant:      Jonathan R. Saxe, AFPD
                        Dorothy E. Graham, AFPD
                        Federal Public Defender Office
                        22 Bridge Street
                        Ralph Pill Building
                        Concord, NH  03301


Court Reporter:         Sandra L. Bailey, LCR, CM, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH  03301
                        (603)225-1454

I N D E X

Opening statement by Mr. Aframe, page 19

Opening statement by Mr. Saxe, page 25

Sealed transcript under separate cover, page 68

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| PATRICK ELMORE | | | | |
| By Ms. Konesky | 37 | | 67 | |
| By Mr. Saxe | | 51 | | |
| MICHAEL SORENSEN | | | | |
| By Mr. Aframe | 73 | | 96 | |
| By Mr. Saxe | | 82 | | 97 |
| ERIC ALBRIGHT | | | | |
| By Ms. Konesky | 98 | | | |

| Exhibits | ID | Evid. |
|----------|-----|-------|
| Defendant's Exhibit T | | 94 |
| Government's Exhibit No. 11g | | 102 |

1          P R O C E E D I N G S

2          THE CLERK:  In the matter of United States of

3  America versus Kurt Carpentino, 17-CR-157-01-PB, the

4  plaintiff has premarked exhibits 1 through 22.  The

5  following exhibits not marked for identification are

6  herewith accepted into evidence, there being no

7  objection by opposing counsel.  10 through 10b, 11a,

8  11c, 11e, 22, 12 and 15.  Those exhibits to which

9  objection has been made shall remain marked for

10 identification.

11         Defendant has premarked exhibits A through S.

12 The following exhibits not marked for identification are

13 herewith accepted into evidence, there being no

14 objection by opposing counsel.  A through B, D through L

15 -- I'm sorry.  Those exhibits to which objection has

16 been made shall remain marked for identification, C, M,

17 M-1, M-2, O, O-1.

18         THE CLERK:  Court is in session and has for

19 consideration a jury trial in United States of America

20 versus Kurt Carpentino, Criminal Case No.

21 17-cr-157-01-PB.

22         THE COURT:  All right.  I have two matters I

23 want to discuss with the parties before we bring the

24 jury in.

25         First, as you know, I issued an oral ruling on

1  the defendant's motions to suppress following the

2  evidentiary hearing I held on those motions.  Following

3  the hearing I continued to have concerns as to whether I

4  had fully understood the argument that the defendant was

5  pressing in support of his effort to suppress the fruits

6  of his second interview at the state police barracks.  I

7  held a telephone conference with the parties and

8  following that conference I believe I had clarity as to

9  what specific arguments the defendant was pressing with

10  respect to that interview.  I directed the parties to

11  file supplemental briefs on it.  They did.  I have

12  reviewed those briefs.  I spent yesterday drafting a

13  memorandum and order responding to the issues raised in

14  those briefs and I have determined that I am going to

15  deny the motion to suppress substantially for the

16  reasons I specified at the end of the hearing, but I

17  wanted to provide a more detailed written explanation of

18  why the suppression motions fail insofar as they are

19  directed at the second statement the defendant gave at

20  the state police barracks.

21        My rulings stand to the extent I made findings

22  of fact following the hearing on the motions to

23  suppress.  My rulings stand with respect to all other

24  issues raised in the motions to suppress that I resolved

25  orally.  I felt no need to further examine those issues

1     in my written order.  And I want the written order to

2     supplement my oral ruling insofar as it applies to the

3     defendant's second statement at the police barracks.

4     That order is being cite checked now and it will issue

5     either tomorrow or Monday, but the parties should know

6     that I have denied the motions to suppress after

7     receiving the supplemental briefing.

8              Does anybody want me to say anything else with

9     respect to the rulings on the motions to suppress?

10             MR. SAXE:  No, your Honor.

11             MR. AFRAME:  No.

12             THE COURT:  Second, last night I received a

13    telephone call, or the clerk's office received a phone

14    call from the defendant who asked to speak to me.  We

15    arranged a telephone call with counsel for both sides.

16    At that call the defense counsel noted that when they

17    reviewed the material produced pursuant to the Attorney

18    General's subpoena, they saw references in those

19    materials suggesting that the alleged victim in the case

20    may have made false statements on other matters either

21    to the Hinsdale police or in connection with her

22    attendance at the school that she attended.  The

23    defendant sought additional subpoenas and information

24    with respect to those alleged false statements.  I

25    instructed the government to contact the Hinsdale Police

1  Department and attempt to obtain any records that the

2  department has concerning any alleged false statements.

3  And I also approved the defendant's request for the --

4  for a subpoena to the school directing the production of

5  any records the school has about those false statements.

6  I'd like a status report.

7          MR. AFRAME:  The government obtained the

8  records from the Hinsdale Police Department and turned

9  them over to the defendant.

10         THE COURT:  All right, you received those

11  records?

12         MR. SAXE:  We did this morning, we reviewed

13  them, your Honor.

14         THE COURT:  And what's the status of your

15  subpoena, were you able to get it served?

16         MS. GRAHAM:  Yes, your Honor, we were able to

17  have it served last night.  We were in communication

18  with the school principal.  They were undergoing a

19  review based on that subpoena.  And I provided them with

20  Clerk Negron's email address and told them to direct any

21  communications specifically to him, because one of their

22  questions was if we don't find anything what do we do,

23  and since I know I'm going to be here I directed it to

24  the clerk.

25         THE COURT:  All right.  It seems to me that if

1   there is information that pertains to the issues raised

2   in the subpoena, the information is potentially useful,

3   if at all, under Rule 608(b) in cross-examination of the

4   alleged victim.  In other words, that rule allows for a

5   person cross-examining a witness to inquire of the

6   witness of matters that pertain to the witness's

7   credibility, including that they made false statements

8   in the past on other matters.  The rule generally

9   disallows extrinsic evidence of those alleged false

10  statements.  So to insure that the defendant has an

11  adequate opportunity to cross-examine the alleged victim

12  about any false statements, they're going to need to

13  have those records in hand at some point prior to the

14  cross-examination of the victim.

15          What's your plan with respect to calling her

16  as a witness?

17          MR. AFRAME:  At this point she is the fourth

18  or fifth witness.  I mean, our hope was to do it today,

19  but we understand the situation we're in as well.

20          THE COURT:  Well, one of the things we could

21  do is go through and if we run out of other witnesses,

22  you can do your direct.  Hopefully by the end of today

23  we'll have any records and we can just postpone the

24  cross until tomorrow.

25          MR. AFRAME:  We're also prepared with other

1   witnesses, so hopefully we can -- but you're right,

2   that's a possibility.

3         THE COURT:  All right, well, let's play it by

4   ear as to what we're going to do.

5         THE CLERK:  I just received an email from the

6   principal.

7         THE COURT:  What did the email say?

8         THE CLERK:  It says these are some notes

9   written by M. Harvey and the only documents Terry has

10   based on her search through the SPED eval files,

11   counseling files and emails, both paper and electronic,

12   and she's attached those notes.

13         THE COURT:  All right, I will review those

14   notes in camera, determine what if any portions of the

15   notes may be made available for inspection.  I will

16   treat those notes in the same way that I treated the

17   materials produced by the Attorney General.  To the

18   extent that they may produce information that could be

19   helpful to the defense, I'll order them to be made

20   available for inspection by the parties.  They can again

21   take notes on them but not make copies of the documents,

22   and assuming that takes place at the lunch hour, then I

23   don't see any reason why the defendant can't be able to

24   cross-examine the alleged victim and we can proceed as

25   scheduled.  Does the defense disagree?

1     MS. GRAHAM:  No, your Honor.

2     THE COURT:  Okay.

3     MR. AFRAME:  Just one clarifi -- point on

4 that.  So under the rule we are supposed to notify the

5 victim.  We have done that.  The victim does not want to

6 interpose any objection, and that was through her father

7 obviously.

8     THE COURT:  Okay.  All right.  Thank you for

9 reminding me of that.  That's important because under

10 the rule the victim does have a right to object.

11     All right, those are the only matters I need

12 to address with the parties before we begin with opening

13 statements.  Is there anything else that anyone needs to

14 raise with me?

15     Ms. Graham:  No.

16     MR. AFRAME:  No.

17     THE COURT:  Okay, bring the jury in.

18                    BEFORE THE JURY

19     THE COURT:  Jury please remain standing,

20 everybody else be seated, and you with can swear the

21 jury in.

22     THE CLERK:  Would you all raise your right

23 hand.

24     (Jury duly sworn.)

25     THE COURT:  All right, good morning, members

1  of the jury.  We're about to get started.  I want to

2  give you some general instructions that I'd like you to

3  follow throughout the case.  Let me begin by reiterating

4  a few things that I told you when you were selected.

5          You have to base your verdict in this case

6  solely on what happens here in the courtroom.  So, you

7  have received no information about this case at this

8  point.  I've explained to you that the defendant, as all

9  defendants in criminal cases have, has a right to be

10 presumed innocent and to remain innocent until and

11 unless the government proves the defendant's guilt

12 beyond a reasonable doubt.  So, we start with a clean

13 slate with no evidence.  And so you can't even begin to

14 make up your mind at this point.  And I want to ask you

15 to the extent you can possibly do it to keep an open

16 mind throughout the case.  You can't really decide

17 whether someone is guilty or not guilty until you've

18 heard all the evidence in the case.  So if you try to

19 make up your mind too soon before you've heard

20 everything you might be prone to making a mistake.  So

21 please keep an open mind as the evidence in the case is

22 presented to you and don't attempt to draw any

23 conclusions about the case until you've heard all the

24 evidence.

25          Also you should, you don't really know what

1  the law is that applies to this case yet, and I will

2  tell you everything you need to know about the law at

3  the end of the case.  So until you know what the legal

4  standards are that you'll have to apply, you really

5  can't make any decisions about somebody's guilt or

6  innocence.  So, you have to wait until I give you the

7  legal instructions.

8          The parties will have a chance to make closing

9  arguments at the end of the case and you need to be open

10  to hearing their arguments about what they -- how they

11  assess the evidence.  And it's important that you keep

12  an open mind until you've heard what other people on the

13  jury have to say.  So, please keep an open mind

14  throughout the case.

15          I've told you that you can't go out and do any

16  investigation about this matter and that you should not

17  expose yourself to any discussions of the case in the

18  media or in the newspapers or to acquire any information

19  about this case while you're sitting on the jury.  If by

20  chance you should end up being exposed to something

21  about the case outside of the courtroom, you should let

22  the clerk know and they'll bring it to my attention and

23  I'll determine what if anything needs to be done, but I

24  want you to make a real effort not to expose yourself to

25  any discussions about this case that may occur in the

1    media.  I don't want you to talk about the case with

2    anyone else, and even with other people on the jury.

3    Until you begin your jury deliberations I don't want you

4    to be discussing the substance of the case because jury

5    deliberation should occur after all of the evidence is

6    in and everybody on the jury should hear what other

7    jurors were saying.

8            You can talk about little things, if something

9    funny happens in court or things like that, but don't

10   talk about the substance of the case or attempt to

11   deliberate until you've heard all the evidence and I

12   instruct you that you can begin your deliberations.

13           Don't engage in any social media about the

14   case until the case is over.  When it's over you can do

15   whatever you want.  But until then I'm instructing you

16   not to engage in any social media concerning your work

17   as a juror in this case.

18           And don't go out and do any investigation on

19   the internet about issues that are talked about at the

20   trial or about what you think a jury should be doing.  I

21   explained to you a problem I had in a case a few years

22   ago and I don't want to see that problem repeated.

23           You have notebooks.  Let me tell you about how

24   to use those notebooks.  You may take notes if you

25   choose to do so, but you are not in any way obligated to

1    take notes.  Your primary job here is to listen to the
2    witnesses.  To watch them testify.  To look at the
3    exhibits.  And to take in what is happening in front of
4    you, the evidence that is being presented.  So I don't
5    want you to be so busy taking notes that you're not able
6    to focus on what's happening in the courtroom.  So if
7    you choose to take notes, don't let it distract you from
8    what your primary mission is here.
9            I should tell you that you are not to show
10   your notes to anyone else on the jury or read from your
11   notes to anyone else on the jury.  If you take notes,
12   they're to be used solely to help you refresh your own
13   memory as to something that happened.  You can't use it
14   to try to persuade another juror.  And even if you wrote
15   something down, you should be open to hearing what other
16   jurors remember because you might not have written it
17   down correctly.  And what I found over the years and why
18   I have so much faith in you and your ability to do this
19   job is that there are a large group of you who are
20   listening to the evidence, and collectively I find that
21   jurors don't miss very much.  But you have to be willing
22   to listen to what other people remember happened and not
23   simply take what you've written down verbatim in your
24   notes as the absolute truth and you're not willing to
25   hear any other argument about it.  Of course you have to

1  make up your own mind as to what the evidence actually

2  was at the end of the day.

3         Your notebooks will be collected at the end of

4  each day and placed in an envelope.  No one will ever

5  look at what's in your notebooks.  At the end of the

6  trial the notebooks will be collected and the notes

7  you've taken will be destroyed.  So they won't be shown

8  to anybody and you won't be able to keep them when you

9  leave.  So take notes if you choose, don't feel

10 obligated to take notes, don't let note taking distract

11 you from your job as a juror, don't show the notes to

12 anybody or read to them -- read from them to anybody

13 else on the jury.  Okay?

14        So, here's the way the trial is going to

15 unfold.  We're going to start with opening statements.

16 The prosecutors will make their opening statement and

17 then the defendant will make an opening statement if the

18 defendant chooses to do so.  What the lawyers say to you

19 in their opening statements, during their closing

20 arguments and indeed anything that comes out of their

21 mouths during the trial, none of that is evidence, all

22 right.  The evidence is the testimony that the witnesses

23 provide, the exhibits that are admitted into evidence,

24 and any inferences you draw from that evidence using

25 your daily experience and commonsense.  Any stipulations

1    that the parties agree to, and I will instruct you if
2    they do make a stipulation, that it is a stipulation,
3    can also be considered by you.  But what the lawyers say
4    is not evidence.  You can't consider it as evidence.
5    It's designed to help you understand the evidence, and
6    so you can consider it in that way, but it is not
7    evidence.  So if they say something and the evidence
8    doesn't support what they're saying, you can't accept
9    their position on it simply because they say it's so.
10   You have to decide what the evidence in the case is, not
11   the lawyers.  Okay?
12           But they'll have their opening statements and
13   then we'll start hearing witnesses.  And the prosecutor
14   has the burden of proof, so they will call witnesses
15   first, one at a time, and ask what's called direct
16   examination questions.  They'll ask their questions.
17   When they're done, I'll allow cross-examination from the
18   defendant.  When the defendant's done, I'll allow a
19   brief redirect questioning by the prosecutor.  That in
20   the ordinary case will be the end of it.  I don't
21   usually allow recross-examination unless there's
22   something unusual that happens.  And we'll go through
23   each of the prosecutor's witnesses until we're done with
24   all of the prosecutor's evidence.
25           At the end of that, the prosecutor's case, the

1  defendant will have an opportunity to call any

2  witnesses.  The defendant will have an opportunity to

3  testify.  But remember, the burden is always on the

4  prosecutor, not the defendant.  The defendant doesn't

5  have to call any witnesses.  Doesn't have to ask any

6  questions.  The defendant has no obligation to testify.

7  And you cannot infer anything from the fact that he

8  doesn't testify if he chooses not to testify.  The

9  defendant has no burden to do anything.  The burden is

10 on the government to do anything.

11         If the defendant elects to put on evidence, it

12 will proceed in the same way that the prosecutor has

13 proceeded.  The defendant will call witnesses one at a

14 time and ask direct questions, the prosecutor will be

15 allowed to have cross-examination, I'll allow the

16 defendant to have redirect, and that will be the end of

17 it.

18         Generally once we finish with all of the

19 defense witnesses, that will be the end of the evidence,

20 then we will have closing arguments and I'll instruct

21 you on the law, and then you'll be free to begin your

22 deliberations.

23         We'll proceed in court generally from 9:00

24 till about 4, sometimes we may go to as late as 4:30

25 depending upon what's happening in the case.  I won't go

1   beyond 4:30 without consulting with you about

2   commitments that you may have made.  We'll take a break

3   in the middle of the day for about an hour to an hour

4   and a half, and we'll take breaks in the middle of the

5   morning and the middle of the afternoon for about

6   15 minutes.

7           If you need a break at some point where I

8   haven't scheduled one, raise your hand and I'll ask you

9   do you need a break, and I will always respect your need

10  for a break.

11          If you have a back problem and you need to

12  stand or stretch or something, that's fine during the

13  course of the trial.

14          You can't speak out during the trial, so if

15  there's something that you think -- sometimes, for

16  example, everybody thinks you're seeing an exhibit on

17  your monitor and you're not, just raise your hand and

18  I'll figure out what's going on, okay.  If I ask you

19  something, you can answer, but don't otherwise speak

20  out.

21          Sometimes witnesses will be shown documents

22  that you will not see.  Until a document is admitted

23  into evidence, you wouldn't be shown it.  So, sometimes

24  we'll have documents on the screen that the witness can

25  see, the lawyers can see, and I can see, but you can't.

1   If they're admitted into evidence then they will be

2   depicted on your monitor when the lawyer is questioning

3   a witness about them.

4           Those are my general instructions.  Are we

5   ready to begin with opening statements?

6           MR. AFRAME:  Can I just have 20 seconds of the

7   Court's time?

8           THE COURT:  Yes.

9           MR. AFRAME:  One question.

10                      AT SIDEBAR

11          MR. AFRAME:  Just in light of the comments you

12  just made, in my opening I was going to mention what I

13  thought the elements are.  Do you not want me to do

14  that?

15          THE COURT:  No, I have no trouble.  Some

16  judges apparently do?

17          MR. AFRAME:  They do.

18          THE COURT:  It was a standard part of my

19  belief as to how I opened and closed every homicide case

20  I was involved with as long as it is clear, and I think

21  I've made it clear, that the law comes from me, not from

22  the lawyers, and you do so at your risk if you identify

23  something as different from what I ultimately instruct

24  on, but I have no problem with either of you referring

25  to what you expect the judge will tell you about the

law.

                    MR. AFRAME:  Okay, thank you.  I'm ready.

                          BEFORE THE JURY

          THE COURT:  All right, we're ready with
opening statements.  The government can proceed.

                    MR. AFRAME:  Good morning, members of the
jury.

                    This case is a case about manipulation.  The
manipulation of the then 33-year-old defendant Kurt
Carpentino of a 14-year-old girl, Mackenzie Harvey.  It
was manipulation for sex.  And that manipulation
resulted in the defendant taking Mackenzie Harvey from
her home in Hinsdale, New Hampshire, to an abandoned
motel room in Rockingham, Vermont, on April 27th where
they had sexual intercourse.

                    Now, in every criminal case, for you to
convict someone you have to decide beyond a reasonable
doubt certain facts, certain important facts that in the
law we call elements.  And at the end of the case as
Judge Barbadoro has already told you, he's going to
describe to you the elements of the case.  But I think
it's helpful for you to have at least some understanding
as to what I think those elements are going to be so
that you are listening to those things that are most
important.

1          So the crime here is that the defendant

2    knowingly transported in interstate commerce, which

3    means across state lines, a person who's under 18 years

4    of age with the intent to have sex in a way that

5    violates the law.  Those are the elements of this

6    offense as I understand them to be.

7          So what are you going to learn factually that

8    matches up to those elements over the next couple of

9    days?  You're going to learn that on April 27, 2017, in

10   the wee hours of the morning the defendant went to the

11   window of Mackenzie Harvey's home at 76 Glen Street,

12   threw a rock at the window, helped her down, walked up

13   to the old train tracks to where his car was and they

14   drove to this abandoned motel in Rockingham, Vermont,

15   having left New Hampshire, a property that is owned by

16   the defendant's family, and there that night Mackenzie

17   Harvey and the defendant had sexual intercourse.  Those

18   facts I submit to you at end of the case will prove the

19   elements of the offense.

20          Now, how are you going to learn this, because

21   as the judge told you, my telling you doesn't do a

22   thing.  How are you going to learn it?  Well, you're

23   going to learn it from witnesses.  And one of the

24   witnesses you're going to hear is Mackenzie Harvey.  And

25   she's going to tell you some of the background of this

situation.

Late in the summer of 2016 Kurt Carpentino was the landlord of the house where Mackenzie Harvey was living with her mother, and her mother had a friendship with Kurt Carpentino, and starting some time in August, late August, early September Kurt Carpentino started to stay in the semi-finished attic in that house at 76 Glen Street.

And you're going to hear a little bit from Mackenzie Harvey about her life. It was not an easy life. She suffered from a hearing disability. She suffered from ADD and ADHD, depression, anxiety. You will hear there was arguing in her home. You will just hear it was tough to be 14-year-old Mackenzie Harvey living at 76 Glen Street in New Hampshire. And you'll hear that once the defendant moved into that home, he started to show her attention. He bought some things for the family. He was nice to her.

But you'll hear that that relationship changed one night in the fall of 2017, some time around Halloween. You'll hear that Kurt Carpentino joined Mackenzie Harvey's family on a hayride that night. And somewhere on that hayride Mackenzie became scared and she grabbed on to Kurt Carpentino. And later that night Mackenzie Harvey ended up in that semi-finished attic

1    with Kurt Carpentino and for the first time they had
2    sexual intercourse.
3           And you'll hear that over the next several
4    months there were multiple sexual encounters between
5    Mackenzie Harvey and Kurt Carpentino.  You will see a
6    letter that Kurt Carpentino wrote to Mackenzie Harvey in
7    the midst of their relationship.  And you will see that
8    he told her in that letter to deny that they were having
9    sex, that he loved her, and suggested that they run away
10   together.
11          You'll see a text exchange between Kurt
12   Carpentino and Mackenzie Harvey the day before the
13   events that make up the crime that you're asked to
14   consider here, and you'll see again confirmation of the
15   nature of this relationship.
16          And finally you will see on a telephone that
17   was found in Kurt Carpentino's glove box, a phone that
18   is registered to him, a sexually explicit photograph of
19   Mackenzie Harvey that she will tell you she sent to him.
20          It was a sexual relationship from November to
21   the end of April, and then we have the events of April
22   27.  And Mackenzie will tell you that by that point she
23   knew he was coming for her.  She had packed some things.
24   They were in her backpack.  He came to the window.  He
25   threw the rock.  She climbed down.  You'll hear that

1   they walked up those old train tracks to his car and

2   they drove into Vermont and that's where he had sex with

3   her.

4         How did that happen?  They arrived at the

5   abandoned motel.  The defendant put out a tarp.  You'll

6   see pictures of this motel.  It is not a Ritz Carlton.

7   He put out a tarp on the floor and that's where they had

8   sexual intercourse.

9         The next morning people at 76 Glen Street

10   realized Mackenzie wasn't there and they sent out a

11   search party from Hinsdale over to Rockingham because

12   they had some idea that this was a possibility because

13   of the knowledge that Mr. Carpentino had an association

14   with this property.  And you will hear from a person

15   named Patrick Elmore.  He'll be the first witness in

16   this case.  And he was the leader of a youth church

17   group and knew Mackenzie through that context.  And he

18   will describe to you how he was part of that search

19   party and he saw her in the woods and eventually she

20   came out of those woods to the search party.  Kurt

21   Carpentino meanwhile was found just a couple miles away

22   by the police in his 2004 silver Dodge Neon.

23         You'll hear what Kurt Carpentino said to the

24   police at the side of the road, and then you'll hear

25   that after Mackenzie was found, he was arrested and he

1    went to the Vermont State Police Barracks, and later

2    that day he gave a full recorded confession of this

3    crime.  You will hear Kurt Carpentino's full recorded

4    confession.  Is it exactly the same as Mackenzie's down

5    to every single detail?  No.  And I would suggest to you

6    you shouldn't think that it would be.  But the essence

7    of it is the same.  Sex in November in the attic, went

8    to the motel in April, had sex again.

9         Now, about ten days later after that, Kurt

10   Carpentino was detained in a jail in Vermont and he

11   wrote some letters to a lawyer that he employed for

12   matters unrelated to this case.  And he asked the lawyer

13   to forward those to a friend of Mackenzie whose name is

14   Jasmine.  And the point of those letters was to get

15   Jasmine to give them to Mackenzie.  Jasmine didn't do

16   that.  Those letters ended up with the police.  You will

17   see those letters.

18        In those letters Kurt Carpentino told

19   Mackenzie Harvey to lie.  Told her what to say.  Told

20   her how to try to explain away everything that had

21   happened.  And he told her to do it for him because if

22   she loved him, she would save him from having to go to

23   jail.

24        Ladies and gentlemen, from the beginning to

25   the end it was manipulation.  You will hear about a sad

1  14-year-old girl who received promises of love and

2  affection from a 33-year-old man.  He did it for sex,

3  and then hid it to try to save himself when he got

4  caught.  It was manipulation, pure and simple.

5          That's what I expect the evidence will show

6  you.  After you hear that evidence my colleague Georgie

7  Konesky will come back to you and explain to you why

8  that evidence should result in you finding the defendant

9  guilty of the crime with which he is charged.  Thank you

10 very much.

11         THE COURT:  Thank you.  Does the defendant

12 wish to make a statement?

13         MR. SAXE:  Yes, your Honor.

14         THE COURT:  Go ahead.

15         MR. SAXE:  Thank you.  Good morning.  My name

16 is Jonathan Saxe.  I'm an attorney.  I work for the

17 Federal Defenders Office in New Hampshire.  Dorothy

18 Graham is my colleague.  She's the other attorney on the

19 case.  And we have two assistants, Brooke Cassidy and

20 Chase McNiss who are going to help us.  Most

21 importantly, Kurt Carpentino is our client.  Thank you.

22         Kurt is 34 years old right now.  At the time

23 that this, these allegations were made, he was 33 years

24 old.  He's from Hinsdale, New Hampshire.  He was born

25 and raised there.  He has a 14-year-old son who lives

with his mother.  His father died in 2006 and his mother
Karen Conway died I think in 2012.

Now, at the time she died she owned a number
of properties.  There was two properties in Vermont.
The first property was referenced to by the government.
It's this abandoned hotel.  And then there was another
property, and that was owned by his sister, okay, that
was left to his sister.  And his mother left him two
properties in Hinsdale and another property in Vermont.
And he had rented the property in Vermont to an
individual named Tim Olmstead and he rented the two
properties in Hinsdale, one to a woman named Tabatha
McQuestion or Donoghue, and another, the property in
question here, is 76 Glen Street, and that property was
rented to Carol Pino, and Carol Pino is Mackenzie's
mother, but there were a lot of other people living
there as well.

Frank Brown was her boyfriend at the time.  He
leaved with her.  They were in the same bedroom.
Mackenzie had a bedroom.  Then there was a younger son
of Carol's named David and then there was an older son
named Mike Pino who lived there with his wife Kaitlynne
and they had two children, and then at some point there
was an individual who was a friend of Mike's who was
having some trouble so he also lived there in the attic,

1    all right?

2          And, so, Kurt has a job.  He worked as a,

3    didn't get paid a lot of money, he worked at a linen

4    service in Keene, New Hampshire, and so he relied on the

5    income from these properties because he didn't make a

6    lot of money.  There was a mortgage on one of the

7    properties and that was the property that he rented to

8    Tabatha.  That was the second property in Hinsdale.

9    There was no mortgages on the property that he rented to

10   Carol Pino and there was no mortgage on the property

11   that he rented to Tim Olmstead in Vermont.

12         He fell behind in taxes.  He did not live at

13   the residence on 76 Glen Street in Hinsdale.  He had an

14   apartment in Manchester.  But because he was the

15   landlord he would go to the property, he'd fix it.  And

16   you'll see a picture at this time the house was being

17   painted.  It's kind of a rundown house.  He would go

18   over there on a regular basis to fix things, work on

19   things, and then he became friendly with Carol.  And so

20   he came over also socially as well, but he did not live

21   there.  He lived in an apartment in Manchester.

22         Now, this seemed to be working fine.  Then at

23   some point both Carol and Tabatha fell on hard times for

24   some reason and they stopped paying rent.  So, this put

25   him in a bind because he didn't have very much money.

1   They didn't pay rent in January and they didn't pay rent
2   in February and they didn't pay rent in March.  And yet
3   he maintained, he's a kind of soft-spoken guy, he
4   maintained good relations with them anyway, kept telling
5   them, you know, this can't go on, you're three months
6   behind in your rent.  So finally he served them with an
7   eviction notice, and this was in April, I believe it was
8   April 20, 2017.

9            These allegations came about shortly after
10  that happened, all right, and so the government has made
11  some assertions and allegations.  The defendant did not
12  have sex with Mackenzie Harvey in the attic at 76 Glen
13  Street.  He never had sex with her on any other
14  occasion.  And he did not transfer her to Vermont on the
15  27th and have sex with her at that motel.

16           This is a case that involves false allegations
17  and a rush to judgment.  You'll hear evidence that when
18  the defendant was arrested, the first thing that the
19  Springfield officer did was say where's the girl.  He
20  pulled over the defendant in Springfield and there was
21  no girl in the car.  There was no Mackenzie in the car.
22  And he said what girl.  He wasn't nervous.  If somebody
23  had actually done this stuff, they would be nervous.  He
24  wasn't nervous at all.  He said what girl, all right.
25  There was no girl in the car.  They searched the car

like there might be some other evidence that there was a
girl there.  There was no evidence that the girl had
been in the car.  They searched the trunk.  There was no
evidence that there was a girl in the trunk.

Why was he up there?  Because, two reasons.
He has a property that he rents to Tim Olmstead.  They
were actually in discussions about Tim Olmstead buying
the property, and because that apartment or it's a
rundown motel, you'll see, it's really run down, there's
no doors on it and people go up there and they do like
drugs in there or they -- so he goes up and he checks on
it and he goes up regularly on his day off to check on
that and to see Mr. Olmstead.  That's what he was doing
there.  And Carol Pino and the people in that house knew
that because he would regularly go up there on his day
off and check on things.  So they know he would be
there.

So he was detained on the side of the road.
There's no question then that the police learned that
Mackenzie was making allegations that something had
happened, so they arrested him.  That's enough evidence
to arrest somebody on.  But it's not enough evidence to
convict somebody on.

So, you'll hear Detective Albright testify.
He's a Vermont state trooper.  He was initially called

on the case because he was supposed to go to the

hospital because anytime there's an allegation of sexual

abuse or sexual assault, no matter how old the person

is, the person is generally taken to a hospital.  Why?

Number one they want to see that the person is okay.

And number two, they want to collect evidence.  And

number three, that evidence would include some sort of

statement, and that evidence would also include a test

kit to see if there was any physical evidence because

that's an important part of a case like this.

Detective Albright, however, once he learned

that the defendant had been arrested, went to the police

barracks because they brought the defendant there, and

the intent was to question him.  So he and another

officer, trooper, pardon me, Trooper McCoy questioned

the defendant.  That's all totally appropriate.  That's

exactly what they're supposed to do.

So, the defendant, however, was arrested at

approximately, he was stopped at approximately 9:00, and

from 9:00 he was detained by the police and not free to

go, and then some point after that he was arrested and

then he was put in the barracks.  He was put in a small

sterile cell with a stainless steel plate to sit on and

a steel toilet and nothing else, and he was left there

for several hours.  He didn't get any food and he didn't

get any water, and he knew that there was some

allegation that was really, really serious, and he was

told by one of the officers, you know, if this, we're

going to try to put you in jail for life, all right. So

he's scared. He doesn't know what to do.

So the police officers, Mr. Albright,

troopers, excuse me, Mr. Albright and Mr. McCoy come to

the cell and they bring him into an interview room and

then there's Miranda rights. You know, Miranda rights,

you have a right to remain silent. You have a right to

talk to a lawyer. You have a right to talk to a lawyer

and if you want to have a lawyer present when we

question you, you'll have that right. We cannot

question you without a lawyer present, all right?

So, he agreed to talk to them without a

lawyer. He didn't ask for a lawyer. And so what did he

tell him? He told them what he had done that day. And

they asked him in great detail what he had done that day

and he told them. All right? Now, they had already

gotten some information because they had been briefed on

their information that they'd received on the case.

They hadn't done any investigation, Mr. Albright and Mr.

McCoy, they're just going by this very brief briefing.

So, what they're trying to do is question the

defendant. And you'll hear them, when they didn't get

1    the information that they had, they became more

2    aggressive, and that's totally appropriate.  That's what

3    they're supposed to do.  They don't treat everyone with

4    kid gloves.  They didn't physically coerce him, but they

5    weren't happy with what he said because as they told

6    him, your story does not lineup with the other

7    information that we have.  Your information is not

8    lining up with the other information that we have.

9            So they became more aggressive.  And so, you

10   know, he had been in the cell for hours.  He hadn't

11   asked for a lawyer.  He was very nervous.  He was

12   starting to get scared because this is a real serious

13   thing, so he says, well, wait a minute, before I talk to

14   you anymore I want to talk to a lawyer, and then if he

15   does that the police have to stop questioning him, and

16   they honored that.  They did exactly what they were

17   supposed to do.  They stopped questioning him.

18           And then he went back to this cell with the

19   steel bed and the steel toilet and nothing else, bars,

20   and he sat there for what seemed like forever for him,

21   it was an hour, maybe a little less than an hour, all

22   right, and he's requested a lawyer.  He thought he was

23   going to get a phone call to his lawyer.  And he had a

24   lawyer.  And so he's waiting in the cell.  He never gets

25   to call his lawyer.

1    So he signals that he wants to talk to the

2  troopers again, all right, and then -- so the troopers

3  think he wants to reinstitute the questioning, okay.  So

4  they bring him into the cell a second time and they

5  think, well, okay, you want to talk to us again and he

6  says yeah, I was supposed to get a phone call to my

7  lawyer, and then they said do you want to talk to us

8  again or do you want a lawyer?  He said, well, both.  I

9  want to talk to my lawyer so that he can be here when I

10  talk to you, and they said, which is correct, look, we

11  don't have to talk to you.  If you call a lawyer, we're

12  not going to talk to you.  However, if you want to talk

13  to us without a lawyer, then we'll talk to you.  So he's

14  confused about that because that's a little inconsistent

15  with what <u>Miranda</u> says.

16    But the officers didn't do anything wrong.

17  They started questioning him again.  So he agreed -- he

18  finally after some hesitation said, okay, I'll talk to

19  you.  He is concerned because they tell him this girl is

20  missing, he wants to talk to them, but he's nervous and

21  he's scared and he wants his lawyer, but he can't do

22  both.  So he says, okay, I'll talk to you.

23    So, what does he do?  He starts telling them

24  the same thing he told them in the first place, you

25  know, what he did, that he rode around at night which he

1  quite often does after work, and they're believing that.

2          So they pressure him again, which is perfectly

3  legal.  The problem is that sometimes when this

4  situation arises they don't get accurate information

5  because people are emotional beings, and when they are

6  put in a situation like that that is stressful,

7  sometimes they say things.  There's a thing called false

8  confessions that happens for various reasons.  That's

9  what happened in this case.

10          So, how do we know that?  Well, they started

11  telling him about what the facts were according to them,

12  what their information was, and they told him some stuff

13  that wasn't true.  They told him that he had been seen

14  by a completely independent non-biased person in the

15  woods with Mackenzie by the hotel, all right.  Now, that

16  wasn't true.  What happened is a witness claims that he

17  saw Mackenzie and a person in the woods, but they

18  couldn't tell who it was.  So they told my client two,

19  three times this independent person saw you in the

20  woods.  They saw you in the woods.  We have all this

21  evidence against you.  They make it a huge effort to

22  tell him exactly what their information is, so he knows

23  what they want because they told him what they want.

24          So, at one point they told him, you know, just

25  to be clear, we got Hinsdale police pulling videos from

the house, because there was video cameras in the house

where he supposedly had sex with Mackenzie.  They said

we got her phone.  We're doing a warrant on your car.

They're going to search his car for evidence.  We're

doing a warrant on the abandoned hotel that the sister

owns to see if they can find evidence that he was there.

And they tell him that's where Mackenzie says you had

sex with her.  She says you took her from the house in

Hinsdale, not forcibly, but drove her to Vermont and

stayed at the hotel and you had sex with her.  I don't

know why anyone would tell us all that.  And then they

mentioned that he had told them that he had been driving

around and he was at a Jiffy Mart and at a Sunoco, so

they tell him the Jiffy Mart video and the Sunoco video,

I mean all that stuff, I hope it's there for your sake

and I hope you're alone for your sake.  But I got a

pretty good feeling you're not alone.  And that's, I

mean, that's about all I can tell you.  And I would

guess, they're doing a sex assault kit on Mackenzie, I

would guess they're going to find your DNA.  All right?

So he finally says just to stop it, he tells

them what they want to know.  How does he know what to

tell them?  They told him what to say.  That's how they

know.  And he says, okay, yeah, I brought her up here

and had sex with her.

1          But in reality there's no Jiffy Mart video.

2    There's no Sunoco video.  There's no videos from 76 Glen

3    Street or any other place.  You'll hear testimony --

4    well, actually, you know, I told you about the police

5    saying they were going to bring her to the hospital to

6    have a test kit to see if there was DNA, I want you to

7    remember that and then I want you to listen to the

8    government's case and see if there's any evidence of

9    that.

10          There wasn't any person that ID'd Kurt was the

11   person in the woods with Mackenzie.  There's no physical

12   evidence that Mackenzie was in the car.  They took the

13   car apart, tested it, cut pieces off the seat, searched

14   for everything.  There was no evidence that Mackenzie

15   was in the car.  None.

16          There was no evidence that Kurt was in the

17   motel.  And they searched for evidence.  They have a

18   special team, I think there was two or three people

19   searching for evidence.  There's no evidence of that.

20          You'll hear testimony about tire tracks.

21   There was tire tracks in the mud.  You'll hear an

22   officer testify about how muddy it was and he had to get

23   out of the car.  They had Kurt's car.  Any evidence

24   there was mud on the car?  Any evidence there was mud on

25   the tires?  There was tire tracks.  Did they check to

1   see if the tire tracks were Kurt's tire tracks?  No,

2   they didn't.

3         So, in the end I would submit to you that --

4   the judge told you wait to decide what happened until

5   you hear all the evidence.  That's obviously very, very,

6   very important.  But, you know, consider what the

7   evidence is and consider what their burden is and

8   consider what the evidence isn't, and we would submit to

9   you that there's not going to be enough evidence for

10   them to prove that my client committed this offense

11   beyond a reasonable doubt because he didn't do it.

12         THE COURT:  All right, thank you.  You can

13   call your first witness.

14         MS. KONESKY:  Thank you, your Honor.

15   Government calls Patrick Elmore.

16         THE CLERK:  Step around here and raise your

17   right hand.

18                     PATRICK ELMORE

19     having been duly sworn, testified as follows:

20         THE CLERK:  Would you please state your name

21   and spell your last name for the record.

22         THE WITNESS:  Patrick Elmore.  E-L-M-O-R-E.

23         THE CLERK:  Thank you.  You may be seated.

24                 DIRECT EXAMINATION

25   BY MS. KONESKY:

1    Q.    Good morning, Mr. Elmore.

2    A.    Good morning.

3    Q.    Mr. Elmore, where do you live?

4    A.    In Bellows Falls, Vermont.

5    Q.    Are you currently employed?

6    A.    Yes, I am.

7    Q.    Where are you employed?

8    A.    Red Thread.

9    Q.    And could you tell me a little bit about what

10   you do there?

11   A.    It's an office furniture company.  We sell

12   steel case and I'm one of the lead installers and I go

13   on jobs and run the jobs and install the furniture.

14   Q.    Are you married?

15   A.    I am.

16   Q.    Do you have children?

17   A.    I do.

18   Q.    How old are your children?

19   A.    I have a son that's 22 and we're currently in

20   the process adopting a little girl who is seven months.

21   Q.    Mr. Elmore, do you know Mackenzie Harvey?

22   A.    I do.

23   Q.    How do you know Mackenzie Harvey?

24   A.    Through a youth group.

25   Q.    And tell me about the youth group, what is

1  that?

2    A.    The youth group is a Christian-based program,

3  we hold it once a week, and it bring the kids in.  We

4  play games and have some fun and then in the end we do a

5  lesson to give a basic Christian knowledge.

6    Q.    Do you run the youth group?

7    A.    We did then, yes.

8    Q.    And did Mackenzie attend the youth group?

9    A.    Yes, she did.

10   Q.    Approximately how long did you know Mackenzie?

11   A.    It's been just a little over two years now.

12   Q.    And do you know her well?

13   A.    Fairly well, yes.

14   Q.    Could you describe your impressions of

15  Mackenzie?

16   A.    Mackenzie is a big-hearted girl.  She didn't

17  have the greatest home life and she has a hearing

18  disability, so she's been picked on a lot and beat on a

19  lot, so her self-esteem is pretty low when we got to

20  know her.  She immediately latched on to my wife Kim and

21  myself to the point where, you know, she'd call Kim

22  almost every day and Kim kind of had to tell her, okay,

23  you've got to wait, you can't call every ten minutes.

24  So she was starving for attention.

25   Q.    And in April 27th of 2017 do you know how old

1  Mackenzie was?

2      A.    She was 14.

3      Q.    Let's discuss that date, April 27, 2017.  Did

4  you become aware of something that happened involving

5  Mackenzie Harvey that day?

6      A.    I did.

7      Q.    And how did you become aware of that?

8      A.    I was sleeping.  My wife woke me up.

9  Throughout the night, I think it was around 4:30,

10  Mackenzie's mother Carol had posted that her daughter

11  was gone.

12          MR. SAXE:  Objection, it's hearsay your Honor.

13          MS. KONESKY:  Your Honor, it's not for the

14  truth.

15          THE COURT:  Well, I'll sustain the objection

16  and you can do what you want to do a different way I

17  think, so, why don't you try that.

18          MS. KONESKY:  Okay.

19      Q.    Can you tell me what you learned that caused

20  you to do what you later did that day?

21      A.    Um --

22          MR. SAXE:  Your Honor.

23          THE COURT:  Well, no, he has to have personal

24  knowledge.  I'm not sure why it's necessary that we

25  elicit this information.  Just get on to the next thing.

1  What he did, not what caused him to do.

2          MS. KONESKY:  Okay.

3      Q.    Did you ultimately leave your house that

4  morning?

5      A.    I did.

6      Q.    And where did you go?

7      A.    I went up to Alden Road in Rockingham,

8  Vermont.

9      Q.    And why did you go there?

10     A.    Because we had found out that Kurt had

11  property or his family had property there and we had

12  found out there were tracks near the old motel --

13          MR. SAXE:  Objection, hearsay, your Honor.

14          THE COURT:  The we found out Kurt has property

15  there is acceptable, disregard what followed after that,

16  members of the jury.  Go ahead.

17     Q.    Mr. Elmore, what was your purpose in traveling

18  to that location?

19     A.    To search the property to see if Kurt and

20  Mackenzie were there.

21     Q.    Okay.  And why were you searching for

22  Mackenzie?

23     A.    Because she was missing.

24     Q.    And about how far do you live from that

25  property in Vermont?

1        A.    It's about 15 minutes.

2        Q.    Okay.  And about what time did you arrive at

3    that property?

4        A.    If I remember right, it was around 7:00.

5        Q.    And what exactly is on that property in

6    Vermont?

7        A.    There's an old abandoned motel.

8        Q.    I'm going to show you what's been admitted as

9    Government's Exhibit 2.  Do you recognize that?

10       A.    I do.

11       Q.    What is that?

12       A.    That's the old motel.

13       Q.    And this is on the property in Rockingham,

14   Vermont?

15       A.    Correct.

16       Q.    And when arrived on that property what's the

17   first thing that you did?

18       A.    My first thing I did I observed the roadway

19   and it had rained the night before and there was a fresh

20   set of tracks, car tracks on the driveway.

21       Q.    Okay.  And what did you do observing the car

22   tracks?

23       A.    After I observed it I drove down the motel,

24   because I was previously informed that if you go

25   straight from the motel all the way to the back, there's

1  a spot in the back where a car could park that couldn't

2  see it from the road.  So I drove all the way down past

3  the motel, turned into that spot.

4        Q.    Did you see a car there?

5        A.    There was nothing there at the time.

6        Q.    Did you notice anything else while you were

7  there?

8        A.    At that time I didn't, so I started backing my

9  van up.  And as I backed up, kind of like what a

10  three-point turn would be, as I was in the curve I

11  looked towards the woods and then I noticed the two

12  people.

13        Q.    Okay.  Could you describe what you were able

14  to make out of the two people in the woods?

15        A.    The two people in the woods, one that had the

16  pink camo jacket, the other one was a tall person,

17  taller person, looked like a male, and I believe they

18  both had backpacks.

19        Q.    And that person with the pink camo jacket,

20  were able to determine whether that was male or a

21  female?

22        A.    It would have been a female.  She had long

23  hair.

24        Q.    What did you do when you observed them?

25        A.    So when I observed them they kind of ducked,

1  saw me, we kind of saw each other at the same time and

2  they ran straight forward.  So, I was still in my van,

3  so I figured I'd go back out to the main road to try to

4  cut them off.  So I went back out and took a left

5  towards the overpass, and right in front of the overpass

6  there's like a little pull-off, and I pulled my van in

7  there and I got out, walked across the road.  As I was

8  walking across the road, I saw Mackenzie.

9      Q.   Okay.  And were you able to make out that this

10  was Mackenzie?

11     A.   Yes.  At that point she was close enough I

12  could see her face and recognized Mackenzie.

13     Q.   Was anyone with her?

14     A.   No, at that point, no.

15          MS. KONESKY:  Could you please pull up

16  Exhibit 1.

17     Q.   Now Mr. Elmore, do you recognize what's

18  depicted in this picture?

19     A.   Yes, I do.

20     Q.   And could you just -- what does this depict a

21  picture of?

22     A.   This is a picture of the motel.

23     Q.   Okay.  Could you point out the motel on that?

24     A.   It's right here.

25     Q.   Yeah, if you write on the screen it should

show up.

    A.   Go like this?  Okay.

    Q.   And could you point out on that map where sort of the road is in relation to that when you arrived at the motel?

    A.   Which road are you looking for, like the Alden Road or Missing Link Road or the road in front of the motel?

    Q.   It might be helpful if you could show the jury both roads just to get a sense of where things are.

    A.   Okay.  So, this is Missing Link Road or Route 5, and you would take a left up on Alden Road, and it's hard to see but right here is the driveway that comes from Alden Road back to the motel, and back in this area is where I was told you could park the car.

    Q.   Okay.  And could you show us where approximately you observed the two people in the woods?

    A.   It would have been right about in this area.

    Q.   Okay.  And where did you observe Mackenzie by herself?

    A.   So when I pulled back out, I came out Alden Road and I came up here, there's a little pull-off right here, and I saw Mackenzie right about in there.

    Q.   Okay.  And about how much time passed between when you saw the two people and when you saw Mackenzie?

1     A.    Just a few minutes at most.

2     Q.    Okay.  And it's a bit hard to tell from the

3 side here, but could you estimate what distance is

4 between those two locations?

5     A.    When I saw them?

6     Q.    Between the two locations where you saw the

7 two people?

8     A.    Probably a couple hundred feet.

9     Q.    Okay.  If you could walk in, how long do think

10 you would walk?

11     A.    Not very long.

12     Q.    And when you saw the person you were able to

13 identify as Mackenzie, what was she wearing?

14     A.    She was wearing a pink camouflaged jacket.

15     Q.    Were you able to determine that was the same

16 as the jacket you observed earlier?

17     A.    Yes.

18     Q.    Now, when you saw Mackenzie by the woods, what

19 did you do?

20     A.    So, again, I was walking across the road and I

21 spotted her and I yelled out her name, and she turned

22 around and ran.  So, again, back in here there's a nice

23 swamp area, it was springtime, so all the flowers were

24 coming, so by the time I got through that to the dry

25 patch of land I had lost sight of Mackenzie.

1     Q.   And what did you do after that?

2     A.   After that I continued down into the woods,

3 down this way searching for her.

4     Q.   At some point did other people arrive?

5     A.   As I was searching I got to the point where I

6 was kind of near the hotel and I could see it, so I

7 looped back to the hotel, and I decided to search in the

8 hotel just to make sure, and I went through all the

9 individual rooms to see if I could see anybody.  When I

10 got done with that I continued back down the driveway to

11 Alden Road.  When I got close to the end of Alden Road,

12 Mackenzie's mother Carol and two of her relatives showed

13 up.

14     Q.   Okay.  And let's go back to when you walked

15 through the motel.  I'm going to show you what's been

16 admitted as Government's Exhibit No. 4.

17     Do you recognize this?

18     A.   Yes.

19     Q.   What is this a picture of?

20     A.   A picture of the inside of the hotel, one of

21 the rooms.

22     Q.   Okay.  That's how it looked like on the day

23 you were there?

24     A.   Yes.

25     Q.   Let me show you Exhibit 5.  Could you describe

1    this picture?

2         A.    It's another picture of the inside.

3         Q.    And Government's Exhibit 6?

4         A.    Again, another picture of the inside of the

5    motel.

6         Q.    Do these pictures fairly depict the condition

7    of the entire motel?

8         A.    Yes, it's pretty ragged and falling down and

9    been vandalized quite a bit.

10        Q.    And you just testified that after you went

11   through the motel you met some other people who had

12   arrived?

13        A.    Yes.

14        Q.    Did another -- did another person arrive

15   shortly after that?

16        A.    Not for a while.  So, when we met, when I met

17   Carol's mother and the two relatives, we broke apart.

18   We started searching back in the woods.  A little while

19   later I was with one of the relatives, I lost sight of

20   Carol and the other relative, so we decided to go loop

21   around and find them.  On our way back one of the state

22   police had arrived because prior to that when I first

23   saw them my wife had called the police to tell them that

24   I had saw them up there and that they needed to go up.

25        Q.    Okay.  And did you continue your search for

1    some time after that?

2       A.    When the state police officer showed up he

3    started asking, you know, the basic questions, names and

4    stuff like that, trying to get his bearings. I had

5    broken off to go search some more and he had caught up

6    to us and he asked us not to be in the woods anymore

7    because we were more of a hazard than a help at that

8    point and to come back out. He had, you know, suggested

9    that one of us post like a car down by the corner of

10    Missing Link which is Route 5, and Alden Road, to see if

11    we can see the car, and then one of us go like the other

12    side and see if we could see it that way, make sure

13    nobody drove past us.

14       Q.    And did you do that?

15       A.    We did.

16       Q.    Okay. And at some point did the search end?

17       A.    It did. One of Carol's family members went

18    down Missing Link and Alden and started there and I went

19    the other way. I went quite a bit of distance and it

20    just turns into really bad dirt roads, so I turned

21    around and I came back. As I was coming back to the

22    original motel site, Carol, Mackenzie's mother, told me

23    that their relative --

24       MR. SAXE: Objection, your Honor.

25       THE COURT: All right, stop just a minute.

1    Disregard his answer and ask another question.  His

2    answer went beyond what you had asked, so just ask a

3    question, just try to answer the questions being asked,

4    sir.

5         THE WITNESS:  Yes, sir.

6       Q.   Mr. Elmore, how did the search for Mackenzie

7    ultimately end?

8       A.   That one of the relatives had spotted Kurt's

9    car going by her and Kurt --

10        MR. SAXE:  Objection, hearsay, your Honor.

11        THE COURT:  Yeah, that's hearsay.  You can't

12   get that out.

13        MS. KONESKY:  I'm not trying to elicit that.

14        THE COURT:  Well, then, I'll give you

15   permission to ask a more leading question because I'm

16   not sure.

17      Q.   Okay.  Mr. Elmore, did Mackenzie ultimately

18   come out of the woods in that location?

19      A.   She did.

20      Q.   And approximately how long was that after you

21   had originally arrived on the scene?

22      A.   It was probably around an hour or hour and a

23   half.

24      Q.   Okay.  And did you observe Mackenzie after she

25   came out of the woods?

1      A.   I did.

2      Q.   And what was she wearing?

3      A.   The pink camouflage jacket and a backpack.

4      MS. KONESKY:  Could we pull up Exhibit 1 one

5 more time.

6      Q.   Could you point out on that map approximately

7 where Mackenzie came out of the woods?

8      A.   She came out somewhere around here, it might

9 have been a little further down the picture, but in that

10 general location.

11      MS. KONESKY:  No further questions.

12      THE COURT:  Thank you.  Cross-examination.

13      MR. SAXE:  Yes, thank you, your Honor.

14                  CROSS-EXAMINATION

15 BY MR. SAXE:

16      Q.   Okay, so, were you there when Mackenzie came

17 out of the woods?

18      A.   I don't remember -- I don't think I was there

19 exactly when she came out of the woods, but I was very

20 close and I can't remember if I saw her walking out of

21 the woods or when she was on the side of the road.

22      Q.   Isn't it true that when she came out of the

23 woods Carol Pino asked her if she was raped?  Do you

24 remember that?

25      A.   I don't.  I don't remember.  It's possible.

1      Q.   Okay, is there anything that might refresh

2   your recollection on that?

3      A.   (No response.)

4      Q.   Let me ask you this.  After this happened were

5   you questioned by anybody from law enforcement that day?

6      A.   That day I was.

7      Q.   Okay, it was Detective Albright; correct?

8      A.   I don't remember his name.

9      Q.   Okay, but you were questioned in the trooper

10  barracks?

11     A.   Yes.

12     Q.   And so everything was kind of fresh in your

13  mind at that point; right?

14     A.   Yes.

15     Q.   And so obviously you tried to tell them as

16  truthful as possible everything that happened, right?

17     A.   Yes.

18     Q.   So, if I showed you a copy of that report that

19  you wrote, would that maybe refresh your recollection?

20     A.   Yes.

21     Q.   Okay.

22          MR. SAXE:  This is for ID, your Honor.

23          THE COURT:  Counsel, as you know since you

24  were making hearsay objections, just make sure that the

25  witness has personal knowledge about anything that

1  you're asking about.

2       MR. SAXE:  That's why I'm trying to do that

3  this way, your Honor, okay, so.  Okay, so, can you

4  scroll that down a little, please.  So it's up a little.

5  Up a little more.  Up a little more.  Up a little more.

6  Up a little more.  Okay.

7       Q.  Okay.  So, I want you -- can you see that,

8  sir?

9       A.  Yes.

10      Q.  Okay.  So, there's the end of that first

11 paragraph.  Would you just read that to yourself and not

12 say anything about that.  That's the last couple

13 sentences.

14      A.  Okay.

15      Q.  Okay.  So does that refresh your recollection

16 as to whether you were present when she came out of the

17 woods?

18      A.  I was -- the only thing I don't -- I was there

19 when she was on the side of the road, but I can't

20 specifically tell you where I was when she actually came

21 out of the actual woods.  I know I was very close by.  I

22 know I saw her walking and I know she was with her mom

23 and relatives.

24      Q.  Did you actually see the interaction between

25 Carol Pino and Mackenzie?

1      A.   Yes, I did.

2      Q.   Okay.  So, what you described back then during

3 the interview, was that correct?

4      A.   I believe it was, yes.

5      Q.   Okay.  So, what did you observe Mackenzie say

6 -- did her mother ask her if she was raped?

7      A.   Yes.

8      Q.   What was her response?

9      A.   That she didn't know what that meant.

10     Q.   Okay.  Okay, you can take that down.

11          Okay, so, you talked about going to the

12 abandoned motel; right?

13     A.   Yes.

14     Q.   And you saw fresh tire tracks; right?

15     A.   Yes.

16     Q.   And was there only one set of tracks?

17     A.   I know I saw the tracks, but there must have

18 been two sets because there was no car there, so if one

19 went in, one would have to come out.

20     Q.   Okay, but what you observed was you saw one

21 set of cars -- one set of tire tracks?

22     A.   I saw tire tracks, yes.

23     Q.   Okay.

24     MR. SAXE:  Could you pull up Exhibit O-1.

25     Q.   This is the same thing as you just saw, okay,

1    that's a full exhibit.  Can you see that, sir?

2        A.    Yes.

3        Q.    Okay.  Could you just point to that hotel that

4    you were talking about on direct?

5        A.    It would be --

6        Q.    Okay.  So that's the hotel.  So, you drove

7    your car all the way past that little red dot that you

8    put on there?

9        A.    Yes.

10       Q.    And you went around all the way to the end of

11   the building?

12       A.    Yes, it would be the side end, yes.

13       Q.    Okay.  And that's because you wanted to see if

14   anyone was there?

15       A.    Correct.

16       Q.    You wanted to see if a car was there; right?

17       A.    Correct.

18       Q.    All right.  You didn't see any car, did you?

19       A.    No.

20       Q.    And so you looked -- and you were specifically

21   looking for one; right?

22       A.    Correct.

23       Q.    And you understood there might be a place in

24   back of that motel where there could be a car hidden;

25   right?

```
1        A.    Correct.

2        Q.    And you didn't see a car.

3        A.    Correct.

4        Q.    All right.  So, did you go -- and that's when

5   you backed out?

6        A.    That's when I started backing out, correct.

7        Q.    That's when you saw two people in the woods?

8        A.    Correct.

9        Q.    And there was a guy, you could tell it was a

10  guy; right?

11       A.    Correct.

12       Q.    At that point did you recognize Mackenzie or

13  was it just you could tell it was a girl?

14       A.    I could tell it was a girl and a guy.  I

15  didn't see the faces, they were a little too far way,

16  and it was kind of a quick glance.

17       Q.    So you obviously can't say that you saw Mr.

18  Carpentino there because you couldn't tell who it was;

19  right?

20       A.    Correct.

21       Q.    All right.  Did you tell law enforcement that?

22       A.    I believe I did.

23       Q.    Okay.  All right, so when you saw them you

24  said you parked your car and started looking; right?

25       A.    Correct.  I drove back out of the hotel and
```

1  parked on Alden Road.

2      Q.    And then eventually you said a couple minutes

3  later you saw the girl -- well, you saw a girl.  And

4  this girl, whether or not it was the same as the last

5  girl, was Mackenzie; right?

6      A.    Well, I saw -- as I parked my van I got out of

7  the van and just walked across the road and I saw her in

8  the woods.

9      Q.    And so you knew it was her because you

10 recognized her?

11     A.    Yes, at that point I could see her clearly.

12     Q.    Okay.  And she ran away from you?

13     A.    Yes.

14     Q.    And then you tried to locate her, but you

15 could not locate her?

16     A.    Correct.

17     Q.    All right.  And then you testified that at

18 some point a trooper arrived and he told everyone to get

19 out of the woods, you're messing stuff up; right?

20     A.    Correct.

21     Q.    All right.  So, then you went north on Route 5

22 and Carol Pino went south on Route 5 to look?

23     A.    No, it would have been west, I went west on

24 Alden Road.

25     Q.    Okay, so let's -- I'm confusing and I

1    apologize.  So, could you take a look at that exhibit

2    again and you'll see it says Alden Road; right?

3         A.   Correct.

4         Q.   So the direction that you drove in --

5         A.   The direction I drove was this way towards and

6    underneath 91 and up that way.

7         Q.   Okay, so you're on Alden Road?

8         A.   Correct.

9         Q.   All right.  So what happened then?

10        A.   As far as?

11        Q.   How far did you go?

12        A.   I went, the distance I couldn't tell you how

13   long, it's in the back roads, and I went to where

14   there's almost nothing and I was feeling unsafe with my

15   vehicle getting back, so I turned back around.

16        Q.   So this was a pretty rough road, it wasn't

17   paved; right?

18        A.   Correct, it's dirt.

19        Q.   Muddy?

20        A.   Yes.

21        Q.   All right.  Not the kind of place that looked

22   like there had been a lot of traffic on there?

23        A.   No.

24        Q.   Did you see any tire tracks on that road?

25        A.   I wasn't looking for tire tracks at that time.

1    Q.    You were more worried about the road, right?

2    A.    Yeah.

3    Q.    Okay, all right.  So, why did you decide to

4    turn around and go back the other way?

5    A.    I had gone as far as I could go and there was

6    no major crossroad that I could see that I could get to,

7    so I thought it was worthless going that way.

8    Q.    Okay, so what did you do next?

9    A.    So I turned back around to go back down

10   towards Missing Link Road which is Route 5 here.

11   Q.    Okay.  So did you get there or did you stop

12   somewhere on the way as you were going down Alden Road?

13   A.    I stopped almost near the motel.  Carol's

14   mother, they had stopped me.

15   Q.    Okay.  So I'm not going to ask you what

16   Carol's mother told you.  And so when did the police

17   officer arrive in relation to that event of you running

18   into Carol again?

19   A.    When did he arrive?

20   Q.    Yes.

21   A.    He arrived before that.

22   Q.    I'm sorry, okay.  So, when you ran into Carol

23   again, where was Carol if you could point to on that

24   map.  Was it at the intersection of Missing Link and

25   Alden?

1     A.   It was near the intersection of where the

2  hotel was with Alden.

3     Q.   Okay, so a little above, just a slight bit

4  away from Missing Link Road?

5     A.   Right.

6     THE COURT:  Can I see counsel at sidebar.

7                AT SIDEBAR

8     THE COURT:  I just wanted to let you know as

9  someone who's in a position like the jurors not knowing

10  the relevant facts, I find I'm completely confused about

11  the timeline because you examined the witness about

12  having encountered the trooper and being told to get out

13  of the woods and then you proceed --

14     MR. SAXE:  I did confuse that.

15     THE COURT:  And I don't know sequentially when

16  those things happened.  It may not matter to you, but I

17  just wanted to alert you if it does matter to you that

18  you may want to try to clear that up.

19     MR. SAXE:  It does.

20     THE COURT:  Okay.

21     MR. SAXE:  Thanks.

22     Q.   Okay, just to clarify here because I think I

23  confused things by asking not very good questions.

24        So, when did you first arrive up in this area,

25  what time?

1      A.    When everything first started, that's your

2  question?

3      Q.    Yes, I'm going to go back, way back to when

4  you first got up there.

5      A.    Somewhere around seven.

6      Q.    In the morning?

7      A.    Yes.

8      Q.    On April 27th?

9      A.    Yes.

10      Q.    All right.  Did you -- what time was it that

11  you went into the parking lot of the motel there where

12  you described the tire tracks?

13      A.    I honestly have no idea.  It mean, it wasn't

14  that long after that, but.

15      Q.    And when you did that had anyone else arrived

16  yet?

17      A.    When I first got to the motel?

18      Q.    Okay, the first -- okay, so you arrived at

19  about seven or whatever, and then at some point you went

20  to the motel and you saw the tire tracks?

21      A.    Correct.

22      Q.    Was anyone else there at that point?

23      A.    No.

24      Q.    All right.  And so then you talk about seeing

25  two people in the woods that you couldn't identify?

1    A.    Correct.

2    Q.    Was anyone else there then?

3    A.    No.

4    Q.    All right.  After you saw the two people in

5    the woods, then you backed, you stopped the car and then

6    you went and looked to see if you could find who they

7    were; right?

8    A.    Correct.

9    Q.    And how long after that was it that you saw a

10   young girl that you recognized as Mackenzie?

11   A.    It was less than a minute because as I said, I

12   parked on Alden Road and as soon as I got out I walked

13   across the road and I saw her.

14   Q.    All right.  Was anybody else there when that

15   happened?

16   A.    No.

17   Q.    All right.  And how long after that -- who

18   arrived next on the scene?

19   A.    Carol and two relatives.

20   Q.    How long after that did Carol and the two

21   relatives arrive on the scene?

22   A.    How long after what?

23   Q.    How long after you spotted the person that you

24   recognized to be Mackenzie?

25   A.    Fifteen, 20, 30 minutes.

1     Q.   Okay.  What did you do during that time?

2     A.   I searched.

3     Q.   And then where did you search?

4     A.   In the back of the hotel, little strip of
5 woods between the hotel and the interstate.

6     Q.   And so that search took about 15 minutes or
7 so?

8     A.   Well, I went from there around the side and I
9 searched the inside of the motel and all the rooms, and
10 I went through each room.

11     Q.   Okay.  And you didn't find anything?

12     A.   Correct.

13     Q.   All right.  So, then, after that period of
14 time how long after you finished the search did Carol
15 Pino arrive?

16     A.   After I finished the search I was walking back
17 towards Alden Road and that's when she arrived.

18     Q.   Okay.  And where was she when you first saw
19 her?

20     A.   She was just pulling into the driveway of the
21 hotel, motel.

22     Q.   Could you point out where that is on there.
23 Is that already marked with red there?

24     A.   Yeah, I can circle it, like right in there.

25     Q.   Okay, good.  All right.  So then what did you

```
 1    do after that, the very first thing that you did after
 2    that?
 3         A.   The first thing when I saw them, I told them
 4    that they were here and --
 5         Q.   You said they were here, but you actually
 6    hadn't seen Kurt so you don't know whether he was there
 7    or not; correct?
 8         A.   I didn't actually see him, but.
 9         Q.   You assumed he was there?
10         A.   Yes.
11         Q.   Okay.  So, you told them that.  What did you
12    all do at that point?
13         A.   Then we started searching.  We went back into
14    the woods behind the motel and searched along the strip
15    down like 91 and the hotel.
16         Q.   Okay.  You didn't see a car, did you?
17         A.   No.
18         Q.   All right.  And then how long did you do that
19    for?
20         A.   Ten, 15 minutes.
21         Q.   And then at the end of that 10 or 15 minutes
22    what happened?
23         A.   Then I looped back around to the hotel and
24    that's when we wound up meeting with the state police
25    officer.
```

```
 1      Q.   Okay.  And then how long was that after all
 2  you started searching together?
 3      A.   When I had met the police officer?
 4      Q.   When the police officer arrived?
 5      A.   It was like 10, 15 minutes.
 6      Q.   Okay.  Do you remember who that officer was?
 7      A.   No, I do not.
 8      Q.   And then you talked to about him instructing
 9  you stay out of the woods?
10      A.   Correct.
11      Q.   And then that's when you took your drive down
12  Alden Road?
13      A.   Correct.
14      Q.   Okay.  And then how long did that drive last?
15      A.   Just a few minutes.  It wasn't that long.
16      Q.   Five minutes, 10 minutes?
17      A.   Five, 10 minutes at best.
18      Q.   And then you turned around and you went back
19  down Alden Road towards Missing Link Road; right?
20      A.   Yes.
21      Q.   All right.  And then what happened next?
22      A.   Then Carol stopped me.
23      Q.   Okay.  And where was that on the map?
24      A.   It was, there's a circle, but right about in
25  there.
```

1      Q.   Okay.  And you had a conversation with her?

2      A.   A short one, yes.

3      Q.   And after that conversation what did you do?

4      A.   I was in my van.  I told her to follow me

5   because the police had stopped the car in Springfield

6   and she wanted to be there.

7      Q.   Okay, so -- okay, so prior to that time did

8   you ever -- so what kind of car was the car that Kurt

9   was supposed to be in?

10      A.   A silver or gray car.

11      Q.   Okay.  Did you ever see a silver or gray car

12   in that area?

13      A.   I did not see his car, that car.

14      Q.   Okay.  And you were looking for it; right?

15      A.   Yes.

16      Q.   All right.

17           MR. SAXE:  Could I have a second, your Honor?

18           THE COURT:  Yes.

19           (Pause.)

20      Q.   BY MR. SAXE:  So when you saw this individual

21   male in the woods in the rear view mirror --

22      A.   It wasn't the rear view mirror.

23      Q.   Oh, I mean, did you turn around and look or

24   what?

25      A.   As I was turning, as you turn, you turn around

1    like this, and as I was about to pull up I looked this

2    way and I saw them.

3        Q.   Okay.  And you said -- did the person have a

4    backpack on?

5        A.   I saw backpacks.

6        Q.   Did he have a backpack on or did the girl have

7    a backpack?

8        A.   I know she had the backpack.

9        Q.   Did the male have a backpack?

10       A.   I believe so but I can't be 100 percent

11   positive.

12       Q.   I understand.

13            MR. SAXE:  I don't have any further questions

14   your Honor.

15            THE COURT:  Any redirect?

16                       REDIRECT EXAMINATION

17   BY MS. KONESKY:

18       Q.   Mr. Elmore, just one question.  When you saw

19   Mackenzie after she had come out of the woods, how did

20   she appear?

21       A.   She was pretty disheveled.  She was cold and

22   shaken and very scared and she was crying.

23            MS. KONESKY:  Okay, thank you.  No further

24   questions.

25            THE COURT:  Thank you, sir, you can step down.

 1          It's a good time for our mid-morning break.

 2   We'll break for approximately 15 minutes.

 3          (Jury exited the courtroom.)

 4          THE COURT:  I want to discuss these notes with

 5   the parties, but I want to ask anyone who is not

 6   employed by the Court or one of the parties to please

 7   leave while I, I'm going to seal the courtroom, and

 8   after the break you can come back in.  All right?  So

 9   anybody, interns can stay, people employed by the

10   parties can stay.  Everybody else should leave.

11          (Public leaves the courtroom.)

12          (Sealed transcript under separate cover.)

13          THE COURT:  I do want to raise one other issue

14   with this juror.  Do you remember, when did this happen

15   to her?

16          MR. AFRAME:  I think she had recently.

17          THE COURT:  Yeah, but did she say how

18   recently?  Between the time of jury selection and now?

19          MR. AFRAME:  I didn't get that sense, but I'm

20   not sure.

21          THE COURT:  Well, one of the things that

22   concerns me is one of the questions I asked all the

23   jurors during voir dire is have you had any connection

24   with a criminal case, either as a victim, a witness or a

25   defendant.  I do not recall her speaking up at that

1 time, which is concerning to me if she in fact had a

2 criminal charge against her at the time and didn't say

3 anything about it.  So I think I have to bring her back

4 in and ask about when this occurred.  But if it occurred

5 before jury selection and she didn't disclose it, that's

6 concerning to me.

7 　　　　　MR. AFRAME:  And I do think she said that, as

8 I understood it, the charge was against the husband.

9 That would --

10 　　　　　THE COURT:  Well, let me look at the question

11 that I ask.  I use a standard form here.  Have you at

12 any time been involved in a criminal matter in any court

13 that concerned yourself or any member of your immediate

14 family either as a defendant, a witness or a victim.

15 　　　　　MR. AFRAME:  Okay.

16 　　　　　THE COURT:  If I find that a juror hasn't come

17 forward when I've instructed them to under those

18 circumstances, that is concerning to me.

19 　　　　　MR. AFRAME:  Okay.

20 　　　　　THE COURT:  And so I'm inclined to bring her

21 back in.  Does anybody have any different view about the

22 matter?

23 　　　　　MR. SAXE:  No, your Honor.

24 　　　　　THE COURT:  Okay.  Would you ask the juror to

25 come back in one more time.

                MR. AFRAME:  Judge, do you want the public out
of the courtroom.

                THE COURT:  No, this part is a public
proceeding.  The references to the materials submitted
are under seal.  I felt I could do it publically.

                MR. AFRAME:  Okay.

                (Juror enters the courtroom.)

                THE COURT:  Sorry to bother you again, ma'am.

                JUROR:  That's okay.

                THE COURT:  And again, you've done nothing
wrong, you have nothing to be concerned about here,
okay?

                When was it that your husband was charged with
assault?

                JUROR:  About three weeks ago when we
delivered our written -- the process is we have to
deliver an eviction notice.  Once that eviction, I guess
it was four weeks ago, when that, when the time on the
eviction notice passes, then you contact the sheriff's
office and then they do the next step.  So we did that
last -- on June 1st we did the second step.  So it was a
month ago we served notice.

                THE COURT:  Okay.  And one of the things that
I wanted to ask you about, and again, I'm not in any way
suggesting you acted inappropriately, but I do want to

know what your response is to this question.

So, during the jury selection process I asked all of the jurors have you at any time been involved in a criminal matter in any court that concerned yourself or any member of your immediate family either as a defendant, a witness or a victim.  And I'm wondering why you didn't come forward at that time.

JUROR:  I, I guess I didn't think of it as a -- she went to the police station.  It didn't proceed from there because they called us right away, asked us some questions.  It was not filed in court.  She just went to the police station.

THE COURT:  So you're saying there never was a criminal charge brought?

JUROR:  Not an official charge.

THE COURT:  She made a complaint.

JUROR:  That's correct.

THE COURT:  But you weren't charged with assault?

JUROR:  That's correct.

THE COURT:  Okay.  So your -- then your answer was literally correct to me that neither you or your husband have been involved in a criminal matter in any court that concerned yourself or member of your immediate family because the matter never got to court.

1    JUROR:  That's correct.  They called, they

2   spoke to us, it didn't proceed further than that.

3          THE COURT:  Okay.

4          JUROR:  I just felt, to be honest, I didn't

5   disclose that kind of a current situation only because

6   we're involved right now in the serving of eviction

7   papers.

8          THE COURT:  But are you concerned that a

9   criminal charge may be brought against you?

10          JUROR:  I don't think it's going to go to that

11  after the conversation with the police officer and my

12  husband, and I believe they reached back out to her, the

13  police officer she had spoken to, but it did not get

14  actually filed.  It was just, she was angry and she went

15  to the police.  It didn't proceed as an actual charge.

16          THE COURT:  Okay.  Thank you.  Could you go

17  back into the jury deliberation room.

18          (Juror exits the courtroom.)

19          THE COURT:  That satisfies my concern.  Is

20  there anything else we need to do?

21          MR. SAXE:  No, your Honor.

22          THE COURT:  Okay.  Thank you.  You can bring

23  the jury back in.

24                    BEFORE THE JURY

25          THE COURT:  All right, call your next witness.

1          MR. AFRAME:  Vermont State Trooper Michael

2   Sorensen.

3                    MICHAEL SORENSEN

4        having been duly sworn, testified as follows:

5          THE CLERK:  Thank you.  Please state your name

6   and spell your last name for the record.

7          THE WITNESS:  Sure.  My name is Michael

8   Sorensen.  That's S-O-R-E-N-S-E-N.

9                   DIRECT EXAMINATION

10  BY MR. AFRAME:

11       Q.   Good morning, Trooper Sorensen.  Could you

12  begin just by explaining to the jury how you're

13  employed?

14       A.   I'm a corporal with Vermont State Police and

15  I've been a trooper since January of 1990, so a little

16  over 28 years.

17       Q.   And can you just describe very generally what

18  you do in your position as a Vermont State Police

19  corporal?

20       A.   Presently I'm assigned to the traffic crash

21  reconstruction unit.  So I investigate serious bodily

22  injury and fatal crashes.  But on the date of this

23  incident I was the senior trooper in charge of the shift

24  at Westminster Barracks.

25       Q.   Okay.  And let me direct your attention right

1   to the morning of April 27, 2017.  Did you get a call to

2   report somewhere that morning?

3      A.   Yes.

4      Q.   Where did you report?

5      A.   I got called to the area of Alden Road and

6   Missing Link Road or U.S. Route 5 in the town of

7   Rockingham.

8      Q.   I'd ask to bring up Government's Exhibit 1.

9   It will come up on the screen in a second.

10      Is it on the screen?

11      A.   Yes.

12      Q.   Okay.  Is that the area to which you reported?

13      A.   Yes, it is.

14      Q.   And what was your reason for coming to that

15   location?

16      A.   The dispatcher advised me that we were looking

17   for a missing 14-year-old girl.

18      Q.   Okay.  And when you arrived at that location,

19   tell me about what you found there?

20      A.   I got met by Patrick Elmore, Carol Pino and I

21   believe two other females whose names I don't recall.

22      Q.   And where were they?

23      A.   I believe that they were in the area of Alden

24   Road just west of the interstate.

25      Q.   And we have the feature here where you can

1  just show by putting a dot or an X on the picture.

2         THE COURT:  If you touch the screen, it will

3  --

4       Q.   Yes.

5       A.   (Witness doing so.)

6       Q.   Okay.  When you encountered them after talking

7  to them, where did you ask them to go?

8       A.   I asked a couple of them to maintain a

9  position on Alden Road, I believe west of the

10 interstate, and another pair to hang out in the area of

11 Alden Road and Missing Link Road or Route 5.

12      Q.   Okay.  Did you ask them to stay out of the

13 woods?

14      A.   Yes.

15      Q.   Why?

16      A.   It's been my experience that putting untrained

17 personnel out into the woods tends to create more

18 problems for us and doesn't help us further our mission

19 in finding a missing person.

20      Q.   Did you do any searching in the woods?

21      A.   I took a walk to check out what was believed

22 to be an abandoned trailer, but I didn't find any

23 missing person there.

24      Q.   Okay.  What did you do next?

25      A.   I patrolled around the roads in the area

 1    because I was fairly certain based on past experience

 2    that whoever we were looking for would pop out on the

 3    roads again.

 4        Q.    Okay.  Did you see anyone?

 5        A.    No.

 6        Q.    Okay.  At some point did you see the people

 7    that you had asked to stand out from the search party?

 8        A.    Yes.

 9        Q.    And without telling me what it was did you

10    receive any information from them?

11        A.    Yes.

12        Q.    And based on that information what did you do

13    next?

14        A.    I began traveling at a high rate of speed

15    north on Route 5 towards Springfield.

16        Q.    And just again by drawing or showing, showing

17    us on that map, what does that mean, which direction

18    were you going?

19        A.    (Witness indicating.)

20        Q.    Okay.  And what were you looking for that you

21    were going at a high rate of speed?

22        A.    A silver Dodge Neon.

23        Q.    And you said you were going towards

24    Springfield.  So, how does Springfield relate to

25    Rockingham, Vermont?

1    A.    Springfield is the next town north of the town

2  of Rockingham.  It's on the eastern side of the state.

3    Q.    In addition to you yourself trying to find

4  this Dodge Neon, did you take any steps to get other

5  assistance from law enforcement?

6    A.    Yes, I did.

7    Q.    What did you do?

8    A.    I requested that our dispatcher put out a

9  be-on-the-lookout or a BOL for this vehicle to the

10  officers in our area as well as the Springfield Police

11  Department.

12    Q.    And while you were driving on Route 5 did you

13  receive any information about the location based on that

14  step you took, about the location of the Dodge Neon?

15    A.    Not while I was driving on Route 5, but later

16  on, yes, I did receive some information.

17    Q.    And just so the jury has a sense of time.  So

18  from the time you left this area heading on Route 5 to

19  the point that the Dodge Neon was located, about how

20  much time went by?

21    A.    I would say maybe 10 to 15 minutes.

22    Q.    Okay.  And did you find out where the Dodge

23  Neon was?

24    A.    Yes.

25    Q.    And where was it?

1    A.    It was on Route 11 in the town of Springfield

2    near the, I think it's the Edgar May Recreation Center.

3    Q.    Okay.  And about how far from this area that

4    we're looking at here to the Edgar May Recreation

5    Center, how far is that?

6    A.    It's about five miles as the crow flies.

7    Q.    And did you report to that location?

8    A.    I did.

9    Q.    And when you reported to that location what

10   did you see there?

11   A.    I saw the Springfield Police Department had

12   stopped the vehicle that we were looking for, the silver

13   Dodge Neon.

14   Q.    And what did you do?

15   A.    I gathered some information from the

16   Springfield officers, I spoke with Trooper Lunderville

17   who was on shift with me, and I spoke with Mr.

18   Carpentino.

19   Q.    Okay.  Now, was Mr. Carpentino alone other

20   than police?

21   A.    Yes, there was nobody else in his vehicle.

22   Q.    Okay.  And was he outside of his vehicle?

23   A.    Yes, he was.

24   Q.    And did you engage in a discussion with him?

25   A.    Yes, I did.

1    Q.   And did you ask him about the nature of your

2    investigation?

3    A.   Yes.

4    Q.   And did you let him know that it was related

5    to a missing person named Mackenzie Harvey?

6    A.   Yes.

7    Q.   And did you ask him to provide an explanation

8    of where he had been and what he had been doing?

9    A.   Yes, I did.

10   Q.   Can you tell the jury what he told you at the

11   side of the road by the car?

12   A.   He said that he had been driving around most

13   of the night and he had gone to this area of Rockingham

14   where his, I believe I think he said his sister or maybe

15   his family owned some property.

16   Q.   And what else did he say he saw when he went

17   by that property?

18   A.   He said that he saw his ex-girlfriend, who I

19   think he identified as Carol Pino, acting crazy.  So he

20   sped off.

21   Q.   And did he say what he meant by acting crazy?

22   A.   I think she was waving her arms.

23   Q.   Okay.  And did he say anything else

24   significant about what he had been doing the night

25   before, the day before?

1     A.   He just said that he had been driving around
2  all night.  He went to check on this property that his
3  family owned.  It was kind of in ruins.  And he was
4  driving to his sister's house in --

5     Q.   Sorry, what did he say about Ms. Mackenzie
6  Harvey?

7     A.   That his last contact with her had been in
8  like four, between four and five the previous day in
9  Hinsdale, New Hampshire.

10     Q.   Okay.  And did you wait with Mr. Carpentino at
11  the side of the road?

12     A.   Yes, the general area.

13     Q.   And what were you waiting for?

14     A.   I was waiting for Corporal Brian Turner to get
15  in the area to start searching for Mackenzie.

16     Q.   And some time later that morning was Mackenzie
17  found?

18     A.   Yes.

19     Q.   And after she was found did you obtain some
20  additional information?

21     A.   Yes, I did.

22     Q.   And based on that information what did you do?

23     A.   I took Mr. Carpentino into custody.

24     Q.   And where did you take him?

25     A.   I brought him to the Westminster Barracks.

1    Q.    Were you responsible for processing him into

2  the Westminster Barracks?

3    A.    Yes, I was.

4    Q.    And after you processed him was he

5  interviewed?

6    A.    Yes.

7    Q.    Did you have responsibility for the interview?

8    A.    No, sir.

9    Q.    At some point did the interview, the first

10 round of interviews stop?

11   A.    Yes.

12   Q.    And once the interview stopped where did Mr.

13 Carpentino go?

14   A.    I believe it was back to holding cell one at

15 the barracks.

16   Q.    Okay.  And roughly what time of day was this

17 by this point, roughly?

18   A.    I think it was around 2 p.m.

19   Q.    Okay.  And did -- was one of your

20 responsibilities to monitor that cell?

21   A.    Yes.

22   Q.    And did Mr. Carpentino at some point do

23 anything that caught your attention?

24   A.    Yes.  I believe he waved to the camera.

25   Q.    And did you, what did you do when he waved to

1  the camera?

2      A.   I believe that I went in and asked him what he

3  wanted.

4      Q.   And what did he tell you?

5      A.   He wanted to know if the detectives were still

6  there.

7      Q.   And what did you do after that?

8      A.   I went and told detective Sergeant Albright

9  that Mr. Carpentino wanted to speak with him.

10     Q.   And did you arrange for that to happen?

11     A.   Yes.

12          MR. AFRAME:  No further questions.

13          THE COURT:  Cross-examination.

14          MR. SAXE:  Thank you, your Honor.

15                      CROSS-EXAMINATION

16  BY MR. SAXE:

17     Q.   Okay.  So, where -- when you first arrived

18  there you saw Carol Pino, somebody you learned was Carol

19  Pino?

20     A.   Yes.

21     Q.   Okay.  Could you point out on there again

22  where that was?

23     A.   The area that I recall speaking with her was

24  this area here.

25     Q.   Okay.  And that's on the other side of the

1  interstate?

2       A.    Yes.

3       Q.    Okay.  All right.  In reverse order here.  So

4  you testified at some point you heard that Mr.

5  Carpentino had been stopped in Springfield; correct?

6       A.    Correct.

7       Q.    And then you went there?

8       A.    Correct.

9       Q.    And do you remember what time you arrived?

10      A.    I believe it was either 9:09 a.m. or 9:11 a.m.

11      Q.    Okay.  All right.  So then you said you

12  received some other information and then you took him

13  into custody; right?

14      A.    Yes.

15      Q.    Do you remember what time it was that you took

16  him into custody?

17      A.    I believe in my report I said that it was 9:52

18  a.m., but when I reviewed my video I think the time of

19  my video recorder said 9:48.

20      Q.    Okay, so --

21      A.    There was a couple minutes discrepancy.

22      Q.    All right.  And so between 9:09 and 9:48 he

23  was there -- he wasn't technically in custody but he

24  wasn't free to leave; right?

25      A.    Correct.

1    Q.   All right.  So, and then what time did you

2  arrive at the police station?

3    A.   I don't remember, however long it took me to

4  drive from Springfield to the Westminster Barracks.

5    Q.   Estimate, do you have an estimate?

6    A.   Fifteen or 20 minutes.

7    Q.   All right.  Now, do you remember what time you

8  arrived there when you booked him in, do you keep track

9  of the time?

10    A.   I would have radioed the dispatcher that I was

11  arriving at the barracks with a someone in custody.

12    Q.   You indicated that you processed him; right?

13    A.   I placed him in the, I think it was holding

14  cell one.

15    Q.   Okay.  And do you remember what time you

16  placed him in holding cell one?

17    A.   Without looking at my report, I don't recall.

18    Q.   Okay.  Do you remember what time he was

19  initially removed from that cell in order to be

20  questioned for the first time by Detective Albright?

21    A.   I don't recall.

22    Q.   All right.  In between the time he was placed

23  in the cell and the time he was removed to talk to Mr.

24  Albright, did he get any food, did you bring him any

25  food?

1    A.    No.

2    Q.    Any water?

3    A.    There's a sink in the cell.

4    Q.    Okay.  Is there a cup in the cell?

5    A.    I don't remember.

6    Q.    All right.  So, as part of your investigation,

7  like right where you marked that X --

8    A.    Yes.

9    Q.    -- right, did you search, did you go and look

10  to see if there was a travel trailer there?

11    A.    Yes, I did.

12    Q.    And is the travel trailer on the map?

13    A.    I do not see it, but it would be kind of in

14  this area, I guess.

15    Q.    Pretty close to the highway; right?

16    A.    Yes.

17    Q.    Okay.  And so did you try to drive your

18  cruiser up that road?

19    A.    Yes, I did.

20    Q.    Were you able to do that?

21    A.    Just for a few feet.

22    Q.    And why was that?

23    A.    At the time I had a Dodge Charger and it

24  really didn't have much ground clearance.  It was kind

25  of a rough road.

1    Q.    Was it muddy?

2    A.    Yes.

3    Q.    All right.  How about the condition in your

4    first X where you said you saw Carol Pino for the first

5    time, what's the condition of that road?

6    A.    I would call it a regular Vermont dirt road.

7    Q.    Okay.  You didn't put in your report that you

8    saw any footprints in the mud; right?

9    A.    Correct.

10   Q.    You didn't put in your report that you saw any

11   tire tracks in the mud; correct?

12   A.    Correct.

13   Q.    And when you got to the trailer did you go

14   inside the trailer?

15   A.    Yes.

16   Q.    Did you see any muddy footprints inside the

17   trailer?

18   A.    No.

19   Q.    Did you see a lighter and a cell phone cord

20   inside there?

21   A.    I believe so.  I believe that's what I

22   documented.

23   Q.    Okay.  So, you didn't take those into

24   evidence?

25   A.    I did not.

```
1         Q.   All right.  So, typically in a case like this
2    is there then a unit of troopers that's appointed to
3    actually gather evidence, is that what's typically done?
4         A.   Yes.
5         Q.   And that unit would be advised of the nature
6    of the case so they would know what evidence to gather;
7    correct?
8         A.   Correct.
9         Q.   All right.  But you were not part of that unit
10   in this case?
11        A.   No, sir.
12        Q.   Other than the cell phone, the lighter and the
13   cell phone cord, did you see anything else that caught
14   your attention in that trailer?
15        A.   No.
16        Q.   And there was no one in the trailer; right?
17        A.   Correct.
18        Q.   And when you arrived at the scene of the stop
19   in Springfield where Mr. Carpentino had been stopped,
20   you saw the car; right?
21        A.   Yes.
22        Q.   Okay.  And you didn't put in your report that
23   you saw any mud on the car; right?
24        A.   I don't recall.
25        Q.   Did you see any mud on the car?
```

1    A.    I don't recall seeing any mud on the car.

2    Q.    That would include the tires; right?

3    A.    I don't recall whether there was mud on the

4 car or not.

5    Q.    Okay.  And so when you arrived at the scene of

6 the stop, you had the opportunity to look inside the

7 car?

8    A.    Yes.

9    Q.    And did you find any evidence -- okay, strike

10 that.  So, you knew what this case was about; right?

11    A.    Yes.

12    Q.    And so how long have you been a trooper?

13    A.    At that time a little over 27 years.

14    Q.    So you know that it's important to try to look

15 for evidence; right?

16    A.    Yes.

17    Q.    And you didn't see any evidence in the car

18 that would have suggested that a girl had been in the

19 car; right?

20    A.    Trooper Lunderville came to my attention at

21 one point and said that he saw some fingerprints on the,

22 I think it was the passenger side window.

23    Q.    Did anybody -- so you're an investigator,

24 right, so typically you would lift those prints, right,

25 if they were of interest?

1    A.   I had the vehicle seized and brought back to

2 the barracks for the crime scene search team to do that.

3    Q.   So the troopers were aware that there was

4 supposedly fingerprints on the passenger side of the

5 vehicle; right?

6    A.   I believe so.

7    Q.   But you didn't see a purse or anything like

8 that?

9    A.   I just looked very quickly.  My main focus was

10 with Mr. Carpentino.

11    Q.   No personal items?

12    A.   I don't remember seeing anything.

13    Q.   Did you try to gather any hair samples or

14 other evidence at that point?

15    A.   No.

16    Q.   All right.  So, back to the fingerprints.  So,

17 whenever a suspect is arrested and they're booked, you

18 routinely take fingerprints; right?

19    A.   Typically, yes.

20    Q.   And the trunk of the vehicle was also

21 searched; right?

22    A.   Not in my presence.

23    Q.   Okay.  So -- all right, okay.  And then did

24 you return back to this general area which is referenced

25 in Government's Exhibit 1 at any point?

1     A.   Yes.  Later in the evening I did.

2     Q.   Okay.  So, where did you go when you returned

3 to that area?

4     A.   I believe that I took a position just for

5 scene security in this area here.

6     Q.   Oh, so you went right to the actual building;

7 right?

8     A.   Yes.

9     Q.   Okay.  And at the time you took that position

10 were you aware whether or not Mackenzie had been found

11 at that point?

12     A.   When I took this position it was probably

13 around 5 p.m.

14     Q.   Oh.

15     A.   It was well after we had already taken him

16 into custody, she had been found and interviewed.

17     Q.   Okay.  So the road where you had that first X

18 that you put on there, what's the name of that road?

19     A.   Alden Road.

20     Q.   Okay.  And the other road that is to the

21 right, not the highway but the road to the right, what's

22 the name of that road again?

23     A.   This one?

24     Q.   That's correct.

25     A.   That's Missing Link Road or U.S. Route 5.

1    Q.   Now, are you familiar with that area?

2    A.   Somewhat.

3    Q.   All right.  So, do you know where the address

4  of 626 Missing Link Road is?

5    A.   I do not.

6    Q.   Okay.  Now, you indicated that you didn't

7  remember the exact times about when things happened as

8  far as when you met Mr. Carpentino and brought him back

9  to the station, right?  Right now you don't really

10  remember that, fair to say?

11    A.   No, I remember the time that I arrived and the

12  time that I took him into custody.

13    Q.   Okay.  So, when you bring him into the

14  station, though, you do some sort of a log that says

15  exactly what the times are?

16    A.   No.  I would have radioed to our dispatcher

17  saying that I was 10-7 the barracks with a 95 which is a

18  10 code for somebody who we have in custody.

19    Q.   Okay.  But isn't there a form that is done

20  where you say what the times were when the suspect is

21  checked into the jail?  Isn't there a form?

22    A.   There's a form that we fill out and we hang on

23  the door to the cell saying that, indicating when we

24  have checked on somebody who was in our custody.

25    Q.   Okay.  So, if you were to look at that form

1  would it refresh your recollection as to what time these

2  things happened?

3       A.   Probably.

4       Q.   Okay.  This is for ID.  So I'm just going to

5  show you a document which is not in evidence just to

6  refresh your recollection to see if this makes you

7  remember the exact times that everything happened, okay?

8       A.   Okay.

9            MR. SAXE:  Sorry, your Honor, we don't have

10 that on PDF.

11           THE COURT:  All right, has it been marked yet?

12           MR. SAXE:  It's not an exhibit.  I'm just

13 using it to refresh his recollection.

14           THE COURT:  All right, well, we'll mark it for

15 identification as the next defendant exhibit at the next

16 break.

17           MR. SAXE:  Okay, so that would be T.

18           THE COURT:  T for identification.  You can

19 show it to him and ask him if that refreshes his

20 recollection as to whatever it is you want him to be

21 refreshed.

22      Q.   Okay.  Would you take a look at that and tell

23 me what that is?

24      A.   It is a Vermont State Police detained persons

25 security log.

1    Q.   Okay, and is that the log that you were

2   referring to?

3    A.   I don't recall referring to this log.  The log

4   that I was talking about is that the dispatcher would

5   enter what I told them into our radio log.

6    Q.   What is that log?

7    A.   This is the log that we hang on the door to

8   the cell to just show when we checked on a prisoner.

9    Q.   Okay.  So that would have the exact times that

10  things happen in the cell with the prisoner; right?

11   A.   Yes.

12   Q.   Okay.  Can I see that a second?

13   A.   Sure.

14   Q.   Okay.  So, and then whoever goes to the cell

15  would put their initials there?

16   A.   Correct.

17   Q.   All right.  So, looking at this can you tell

18  what time he arrived in the cell?

19       THE COURT:  Well, that more than refreshes.

20  Do you have any objection to this coming in?

21       MR. AFRAME:  No.

22       THE COURT:  Let's mark it as a full exhibit,

23  okay, so that way you can refer to it that way, all

24  right?  It will be admitted as a full exhibit without

25  objection.

1    MR. SAXE:  Okay.

2    (Defendant's Exhibit T admitted.)

3    Q.    So you would agree that that shows he arrived

4 at 11:11?

5    A.    No.

6    Q.    What's that say?

7    A.    It says he was checked at 11:11.

8    Q.    Oh, all right.  So what that means is he would

9 have arrived there before 11:11?

10    A.    Correct.

11    Q.    And do you remember exactly what time that was

12 or approximately again?

13    A.    Again, I would have to refer to the radio log

14 which I don't have on me.

15    Q.    And then he was sent out for the interview at

16 12:56, or taken out for the interview at 12:56; right?

17    A.    Yes.

18    Q.    And he returned from the interview at 13:49.

19 That would be 1:49?

20    A.    Correct.

21    Q.    All right.  And then at 14:31, which would be

22 2:31; right?

23    A.    2:31 p.m., yes.

24    Q.    That reflects a request to speak to the

25 detectives, correct?

1      A.   Correct.

2      Q.   And then 14:54, which is 2:54, he was brought

3  out of the room to be re-interviewed?

4      A.   Yes.

5      Q.   And then he was returned to the cell at 15:56?

6      A.   Correct.

7      Q.   Which is 3:56.

8      A.   Correct.

9      Q.   Okay.  And you indicated that you had spoken

10  -- can I have a second, your Honor.

11          First of all, you indicate that you spoke to

12  the defendant at the side of the road; right?

13      A.   Yes.

14      Q.   And then you indicated that you wrote a

15  report; right?

16      A.   Yes.

17      Q.   And isn't it true that you told him that if

18  you found out that the truth was different from the

19  answer that he gave, you would work long and hard to

20  insure that he went to jail for as long as possible;

21  correct?

22      A.   Correct.

23          MR. SAXE:  Can I have a second, your Honor.

24          THE COURT:  Yes.

25          (Pause.)

1          MR. SAXE:  I don't have any further questions,

2     thank you.

3          THE COURT:  Redirect?

4          MR. AFRAME:  Two, two questions.

5                     REDIRECT EXAMINATION

6     BY MR. AFRAME:

7          Q.   First of all, on that last comment.  So, you

8     said to him if he lied to you you would work to keep him

9     in jail for as long as possible, is that what you just

10    told Mr. Saxe?

11         A.   Yes.

12         Q.   What else did you tell him about that?

13         A.   I also told him that on the flip side of the

14    coin if he was cooperative and assisted us in finding

15    Mackenzie, that I would work to show how he cooperated

16    to assist us.

17         Q.   Now, at that time at the side of the road were

18    you doing a forensic examination at that point of the

19    car?

20         A.   No.

21         Q.   What was the situation at that point just so

22    we're clear on this?

23         A.   At that point we were still looking to

24    identify where Mackenzie was.  We did not know where she

25    was other than she had last been seen in the woods near

1   this property on Alden Road.

2       Q.   And so other than what Mr. Carpentino told you

3   and that his car was within a short distance from that

4   location, did you really know anything else at that

5   point?

6       A.   No.

7       Q.   Okay.  And so what step did you take to make

8   sure any evidence that was there was preserved?

9       A.   I had the car seized when we took him into

10  custody and transported back to the barracks maintaining

11  evidence or evidentiary custody of the vehicle.

12      Q.   Thank you.

13          MR. AFRAME:  No further questions.

14          THE COURT:  Thank you, trooper, you're all

15  set.

16          MR. SAXE:  Just one question?

17          THE COURT:  All right, quick.

18                  RECROSS-EXAMINATION

19  BY MR. SAXE:

20      Q.   Okay.  So you didn't do the forensic

21  examination, but in your experience as a trooper at some

22  point somebody would have done a forensics examination;

23  correct?

24      A.   Yes.

25          MR. SAXE:  That's it.

1    THE COURT:  Thank you, sir, you're all done.

2  Call your next witness.

3    MS. KONESKY:  Detective Sergeant Eric

4  Albright.

5    THE CLERK:  Raise your right hand.

6                      ERIC ALBRIGHT

7     having been duly sworn, testified as follows:

8    THE CLERK:  Thank you.  Please state your name

9  and spell your last name for the record.

10    THE WITNESS:  My name is Eric Albright.  My

11  last name is spelled A-L-B-R-I-G-H-T.

12                    DIRECT EXAMINATION

13  BY MS. KONESKY:

14    Q.   Mr. Albright, would you please begin by

15  telling the jury where you're employed?

16    A.   I'm employed by the Vermont State Police as a

17  full time law enforcement officer.

18    Q.   And how many years have you been so employed?

19    A.   It will be 24 years this August.

20    Q.   And what are your primary duties as a Vermont

21  State Police detective?

22    A.   I'm assigned to the criminal division as a

23  detective, so we investigate major crimes, major

24  felonies.

25    Q.   I'm going to direct you to April 27th of 2017.

1    Did you participate in an investigation of Kurt

2    Carpentino?

3         A.    I did.

4         Q.    And how did you first become involved in that

5    investigation?

6         A.    It was approximately 9, 9:30 that morning, one

7    of the other detectives in my unit had alerted me to the

8    fact that there was a subject believed to be involved in

9    a possible abduction and sexual assault of a minor

10   female from New Hampshire.

11        Q.    And what was your first assignment with

12   respect to the investigation that day?

13        A.    Initially I was assigned to go with another

14   detective in my unit to the hospital and interview

15   family members as well as the victim if possible.

16        Q.    And did you end up doing that?

17        A.    No.  The victim was transported to a different

18   hospital actually in New Hampshire.

19        Q.    And were you then given a different

20   assignment?

21        A.    I returned to the barracks where I had been

22   originally, and yes, I was given a different assignment.

23        Q.    What was the assignment you were given back at

24   the barracks?

25        A.    That assignment was to interview Kurt

1    Carpentino.

2        Q.    Okay.  And do you recall at approximately what

3    time you interviewed Mr. Carpentino?

4        A.    It was late that morning initially.

5        Q.    Had you ever met Mr. Carpentino before?

6        A.    No.

7        Q.    Do you recognize Mr. Carpentino in the room

8    today?

9        A.    I do.

10       Q.    Could you please point him out and describe an

11   article of clothing?

12       A.    He has no hair, seated at the defense table in

13   the middle between defense counsel.

14            MS. KONESKY:  May the record reflect that the

15   witness has identified the defendant.

16            THE COURT:  Yes.

17       Q.    Detective Albright, could you tell the jury a

18   little bit about your procedure for conducting

19   interviews of people in custody?

20       A.    When somebody's in custody we're required to

21   provide them their <u>Miranda</u> warnings or their rights to

22   not speak to us or to have counsel.

23       Q.    And also do you document the interview

24   typically?

25       A.    Yes, we do.

1      Q.    And how do you do that?

2      A.    Besides taking our own notes we would also

3  audio and video record whenever possible.  If the

4  interview is taking place at the barracks it would be

5  video and audio recorded.

6      Q.    Okay.  And in this case was the interview of

7  Mr. Carpentino video and audio recorded?

8      A.    It was.

9      Q.    And did you use two separate devices to do

10  that?

11      A.    I did.  I always run a backup digital audio

12  recorder.

13      Q.    And in this case did both devices capture the

14  interview?

15      A.    Both of them captured it, the audio of the

16  interview.

17      Q.    I'm going to show you what's marked for

18  identification only as Government's Exhibit 11g.

19            Do you recognize this?

20      A.    Yes, ma'am.

21      Q.    And what is depicted?

22      A.    That's Mr. Carpentino in the interview room

23  where we interviewed him.

24      Q.    And what is this taken from?

25      A.    This is a still frame or photograph taken from

1   the video recording.

2      Q.   Is it a fair and accurate representation of a

3   part of that interview?

4      A.   Yes, it is.

5      MS. KONESKY:  I would like to strike the ID

6   and admit Government's Exhibit 11g.

7        THE COURT:  Any objection?

8        MR. SAXE:  No, your Honor.

9        THE COURT:  Without objection, may be admitted

10  as an exhibit.

11        (Government's Exhibit 11g admitted.)

12        MS. KONESKY:  Display that to the jury,

13  please.

14     Q.   On April 27, 2017, how many times did you

15  speak to Mr. Carpentino?

16     A.   It was on two occasions.

17     Q.   Okay.  And let's talk about the first time.

18  You testified that part of your procedure is to review

19  the Miranda rights with someone.  Did you do that with

20  Mr. Carpentino?

21     A.   I did.

22     Q.   And did he waive those rights?

23     A.   He did.

24     Q.   And did you then proceed to fingerprint him?

25     A.   I did.

1      Q.   Let's talk about the substance of that

2 interview.  How did you begin the interview with Mr.

3 Carpentino?

4      A.   Usually it's just some background information

5 about employment or just getting to know that person a

6 little bit in general.

7      Q.   And what did Mr. Carpentino tell you about

8 employment?

9      A.   He told me he worked for People's Linen in

10 Keene, New Hampshire.

11     Q.   And did he tell you about where he resided?

12     A.   He told me that he resided in Manchester, yes.

13     Q.   And you testified that you were investigating

14 a possible abduction in this case.  Did you question him

15 about that?

16     A.   Eventually, yes.

17     Q.   Did you question him about his relationship

18 with the victim?

19     A.   Yes.

20     Q.   And what did he say about that?

21     A.   He said that he was a landlord renting a

22 property in Hinsdale, New Hampshire, to the victim and

23 the victim's mother.

24     Q.   Did you question him about his whereabouts

25 during the time of the abduction?

1    A.    Yes.

2    Q.    And what did he tell you about that?

3    A.    He had told us that he had been there at the

4  Hinsdale address where the victim lived the day before

5  the interview, late afternoon, for a short period of

6  time, approximately an hour, and done some painting and

7  then left for an appointment in Manchester.

8    Q.    What did he tell you he did after that over

9  the evening?

10    A.    He basically said that he had left Manchester

11  and drove around returning to Keene, Hinsdale, and

12  eventually early that morning into the town of

13  Rockingham, Vermont.

14    Q.    Why did he tell you that he went to

15  Rockingham?

16    A.    He said that he had gone to Rockingham to

17  check a piece of property that his sister owned for

18  potential squatters.

19    Q.    And after he told you this what were your

20  impressions about his statement?

21    A.    That he was leaving out a lot of parts to that

22  sequence of events and wasn't being completely truthful.

23    Q.    And can you explain a little more why you

24  didn't think he was being truthful?

25    A.    Yes.  Basically that, you know, there was

1    large gaps in the timeline.

2        Q.    Did you confront Mr. Carpentino about that?

3        A.    I did.

4        Q.    And what did he do?

5        A.    He said that he wanted to speak to an

6    attorney.

7        Q.    And what did you do when he told you that?

8        A.    We stopped interviewing him.

9        Q.    And where did Mr. Carpentino go after the

10   interview ended?

11       A.    He was returned to the holding area or the

12   processing room where there's two holding cells and he

13   was returned to one of the cells.

14       Q.    And you testified that you spoke with him

15   twice; correct?

16       A.    Yes.

17       Q.    And how did the second interview come to

18   occur?

19       A.    Approximately 30 minutes later Corporal Mike

20   Sorensen alerted me to the fact that Mr. Carpentino had

21   gotten his attention and said that he wanted to speak to

22   the detectives again.

23       Q.    What did you do?

24       A.    There was probably 20 minutes had passed,

25   myself and Sergeant McCoy talked a little bit and then

1  we went and spoke to Mr. Carpentino in the cell briefly.

2      Q.   And what was the substance of the conversation

3  in the cell?

4      A.   I just flat out asked him if, that I had heard

5  that he wanted to speak to us again and was that true.

6  He confirmed it was.  And we escorted him back down to

7  the interview room.

8      Q.   Did you undertake the same procedure with

9  respect to the second interview?

10     A.   Yes.

11     Q.   Was it recorded?

12     A.   It was recorded, yes.

13     Q.   And did you review Mr. Carpentino's <u>Miranda</u>

14 rights with him?

15     A.   I did.

16     Q.   Did he waive those rights?

17     A.   That's correct.

18     Q.   And we're going to listen to the recordings

19 that have been admitted into evidence.  Do you know if

20 transcripts have been prepared of those parts of the

21 recordings?

22     A.   Yes.

23     Q.   And have you reviewed the transcripts?

24     A.   Yes, I have.

25     Q.   And do they accurately reflect what's heard on

1  the recording?

2      A.   Yes, they did do.

3           MS. KONESKY:  I'd like to pass out the

4  transcripts to the jury.  They are marked for ID, they

5  won't be introduced as exhibits.

6           THE COURT:  Yes, just give me an estimate on

7  timing here.  So, you're planning to play both

8  interviews in full?

9           MS. KONESKY:  No.  It's about 20 to

10 30 minutes.

11          THE COURT:  Okay.  You're only going to play

12 the second interview?

13          MS. KONESKY:  Part of the second interview.

14          THE COURT:  Part of the second interview.

15 Yeah, I'm trying to get my timing down for the lunch

16 break is what I'm working on.  I can go to like, you

17 think you can finish it by 12:20?

18          MS. KONESKY:  I believe it's a little bit

19 longer than 20 minutes, but we could --

20          THE COURT:  I'm wondering whether it makes

21 sense to break now and do the interview right afterwards

22 or it makes sense to do the interview now and take a

23 later lunch.  I can defer to your --

24          MS. KONESKY:  We can break now.

25          MR. AFRAME:  We'll have an early lunch.

1      THE COURT:  Everybody okay with that?

2      MR. SAXE:  No problem.

3      THE COURT:  All right, so why don't we break

4  for lunch now and we'll come back at 1:15 and we'll hear

5  the tape, okay?

6      (Lunch recess taken at 12:00 p.m.)

7

8

9

10

11

12              C E R T I F I C A T E

13

14      I, Sandra L. Bailey, do hereby certify that

15  the foregoing transcript is a true and accurate

16  transcription of the within proceedings, to the best of

17  my knowledge, skill, ability and belief.

18

19

20  Submitted: 11/13/2019

21              **SANDRA L. BAILEY, LCR, CM, CRR**

22              LICENSED COURT REPORTER, NO. 15

23              STATE OF NEW HAMPSHIRE

24

25